| | | |
|---|---|---|
| PATRICIA B. BAUM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, DINESH C. PALIWAL, ADRIANE M. BROWN, JOHN W. DIERCKSEN, ANN M. KOROLOGOS, ROBERT NAIL, ABRAHAM N. REICHENTAL, KENNETH M. REISS, HELLENE S. RUNTAGH, FRANK SKLARSKY, GARY G. STEEL, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. and SILK DELAWARE, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff Patricia B. Baum ("plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges (i) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(a), (ii) violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), (iii) breaches of fiduciary duty, and (iv) aiding and abetting. Plaintiff's allegations are based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Harman International Industries, Incorporated ("Harman" or the "Company"), as well as other publicly available information.

## PRELIMINARY STATEMENT

1.      This action arises out of the proposed acquisition (the "Acquisition") of Harman by Samsung Electronics Co., Ltd. ("Samsung"), Samsung Electronics America, Inc. ("Samsung USA") and Silk Delaware, Inc. ("Merger Sub," and with Samsung and Samsung USA, the "Samsung Defendants").  Under the parties' Agreement and Plan of Merger (the "Merger Agreement"), Samsung, through Samsung USA and Merger Sub, will acquire all of the outstanding shares of Harman common stock for $112 per share in cash, or a total of approximately $8 billion.  The Acquisition, which is conditioned on Harman stockholder approval, is expected to be completed in mid-2017.

2.      On January 20, 2017, Harman filed a definitive proxy statement on a Schedule 14A (the "Proxy") with the SEC, announcing that the stockholder vote on the Acquisition would occur on February 17, 2017.  Despite a clear legal mandate to disclose any and all material information regarding the Acquisition in a truthful, non-misleading manner, defendants violated federal and state law by misrepresenting and omitting material information needed by Harman stockholders to cast an informed vote on the Acquisition.

3.      In the summer of 2016, before discussions with Samsung had begun, Harman's Board of Directors (the "Board" or the "Individual Defendants") and management contemplated various "separation transactions" that would split the Company's four business segments – Connected Car, Lifestyle Audio, Professional Solutions and Connected Services – into two or more separate publicly traded entities.  Once Samsung expressed interest in buying the Company in late August 2016, Harman's Board and management all but abandoned any separation transaction to secure personal benefits not shared by the rest of Harman's stockholders.

4.      To enable Harman stockholders to assess whether the Acquisition is in their best interests (especially as compared to what appears to be the likeliest of alternatives), defendants should have provided basic information about the potential separation transaction.  The Proxy, however, contains virtually no information about the separation, including: (a) the types of separation transactions considered; (b) the steps taken to explore the viability of any such separation

transactions, including whether Harman or its advisors held any discussions with potential counterparties, investors, underwriters, or other relevant persons; (c) the resulting value indications from each of the scenarios presented as part of the Board's consideration of a separation transaction; (d) the timing of any such separation; and (e) the benefits that the Individual Defendants and their advisors would have received from a separation compared to what they will receive as a result of the Acquisition.

5.  The Proxy also fails to disclose material information concerning: (a) Harman's financial projections; (b) the financial analyses regarding the fairness of the Acquisition price which were performed by J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard"), the Board's financial advisors (the "Financial Advisors"); and (c) the process leading up to the execution of the Merger Agreement.

6.  Without this information, the Company's stockholders are unable to make an informed decision whether to vote for or against the Acquisition. Defendants' failure to disclose this information renders the Proxy materially deficient in violation of §14(a) of the Exchange Act and also implicates a breach of the Board's fiduciary duties.

7.  The Individual Defendants also breached their fiduciary duties by agreeing to an inadequate price for Harman following a flawed process besieged by self-interest. Specifically, a supine Board permitted defendant Dinesh C. Paliwal ("Paliwal"), Harman's longtime Chairman, Chief Executive Officer ("CEO") and President, to dominate the process and negotiate for himself a lucrative role with Samsung after the Acquisition closes. Separately, J.P. Morgan, which has substantial historical and ongoing ties to Samsung, served as lead financial advisor and for self-interested reasons helped steer the process toward the Acquisition and away from other more valuable alternatives, including a separation or spin-off transaction as the Board had discussed before Samsung expressed its interest. Indeed, once Samsung expressed interest in buying the Company, Harman made no effort to solicit interest from other potential buyers and, through its advisors, had just two brief communications with an entity referred to as "Company A," which in December of 2015 had offered to buy Harman for $115 per share.

8. The Individual Defendants exacerbated their breaches by agreeing to overly restrictive deal protection measures. In particular, the Merger Agreement includes a "no solicitation" provision, a "matching rights" provision giving Samsung four business days to match any competing offer, and a termination fee of approximately $240 million that Harman will have to pay Samsung to enter into a competing transaction agreement. These provisions were specifically designed to forestall other companies from mounting a topping bid.

9. Accordingly, plaintiff seeks injunctive, declaratory and other relief.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act for violations of §§14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

11. This Court has personal jurisdiction over each of defendants because each is a corporation that conducts business in and maintains operations in the forum state, has purposefully directed its activities toward the forum state, or is an individual who has sufficient minimum contacts with the forum state so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Harman's headquarters are located in this District, at 400 Atlantic Street, Stamford, Connecticut 06901, and the special meeting on the Acquisition will occur in this District, at the Sheraton Hotel, 700 E. Main Street, Stamford, Connecticut 06901. Moreover, defendants include officers and/or directors who reside in Connecticut.

## PARTIES

13. Plaintiff Patricia B. Baum is, and has been at all relevant times, the owner of Harman common stock.

14. Defendant Harman is a Delaware corporation that maintains its headquarters at 400 Atlantic Street, Suite 1500, Stamford, Connecticut 06901. Its stock trades on the New York Stock Exchange under the ticker symbol "HAR."

15. Defendant Paliwal has served on the Board since 2007 and as the Company's Chairman, CEO and President since July 1, 2008. Paliwal first joined Harman in July 2007 as Vice Chairman and CEO. Before joining Harman, Paliwal was a longtime executive at ABB, Ltd. ("ABB"), a global company operating mainly in robotics and the power and automation technology areas. While at ABB, Paliwal worked alongside defendant Steel (identified herein). In connection with the Company's entry into the Merger Agreement, Paliwal entered into an employment agreement with Merger Sub under which, among other things, Paliwal will continue to be employed post-Acquisition and will receive: (a) an annual base salary of $1,266,198; (b) a threshold, target, and maximum annual bonus opportunity of 100% of base salary, 200% of base salary, and 300% of base salary, respectively; (c) a cash retention award of $21,961,769, which will vest with respect to 2/9ths of the total retention award on the date that is six months following the closing date, with respect to 2/9ths of the total retention award on the first anniversary of the closing date, with respect to 2/9ths of the total retention award on the second anniversary of the closing date, and with respect to 1/3rd of the total retention award on the third anniversary of the closing date; and (d) a long-term unit incentive program award of no less than $21,000,000 (at target), comprised (at target) of 60% performance-based units that vest on the third anniversary of the closing date based on the level of achievement of performance targets during the applicable performance period and 40% time-based units that vest in equal installments on each of the first three anniversaries of the closing, subject, in each case, to continued employment. Paliwal also entered into a severance agreement with Merger Sub providing for the same lucrative change-of-control payouts that he currently enjoys at Harman.

16. Defendant Adriane M. Brown ("Brown") has served on the Board since 2013.

17. Defendant John W. Diercksen ("Diercksen") has served on the Board since 2013.

18. Defendant Ann M. Korologos ("Korologos") has served on the Board since 1995 and as the Board's Lead Director since May 2008.

19.     Defendant Robert Nail ("Nail") has served on the Board since 2015.

20.     Defendant Abraham N. Reichental ("Reichental") has served on the Board since 2015.

21.     Defendant Kenneth M. Reiss ("Reiss") has served on the Board since 2008.

22.     Defendant Hellene S. Runtagh ("Runtagh") has served on the Board since 2008.

23.     Defendant Frank S. Sklarsky ("Sklarsky") has served on the Board since 2012.

24.     Defendant Gary G. Steel ("Steel") has served on the Board since 2007.  Before joining the Board, Steel was a longtime executive at ABB, where he worked alongside and developed a close relationship with Paliwal.

25.     Defendant Samsung is a South Korean multinational electronics company.  It is the world's second largest information technology company by revenue.  Samsung's products include TVs, smartphones, wearable devices, tablets, digital appliances, network systems, and semiconductor and LED solutions.

26.     Defendant Samsung USA is a New York corporation and a wholly owned subsidiary of Samsung.

27.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Samsung USA that was formed for the sole purpose of effectuating the Acquisition.

28.     Defendants Paliwal, Brown, Diercksen, Korologos, Nail, Reichental, Reiss, Runtagh, Sklarsky and Steel are collectively referred to as the "Board" or the "Individual Defendants." Defendants Samsung, Samsung USA and Merger Sub are collectively referred to as the "Samsung Defendants."  Harman, the Individual Defendants and the Samsung Defendants are collectively referred to as "defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

29.     Harman designs and engineers connected products and solutions for automakers, consumers and enterprises worldwide, including connected car systems, audio and visual products, enterprise automation solutions, and connected services.  The Company's brands include AKG®,

Harman Kardon®, Infinity®, JBL®, Bang & Olufsen®, Bowers & Wilkins®, Lexicon®, Mark Levinson® and Revel®.

30.     Harman operates in four segments: Connected Car, Lifestyle Audio, Professional Solutions and Connected Services.  For fiscal 2016 (which ended June 30, 2016), these segments accounted for approximately 45%, 31%, 15% and 10%, respectively, of the Company's net sales.

31.     The Connected Car segment designs, manufactures and markets connected car systems for vehicle applications to be installed primarily as original equipment by automotive manufacturers.

32.     The Lifestyle Audio segment designs, manufactures and markets car audio systems for vehicle applications to be installed primarily as original equipment by automotive manufacturers, as well as a wide range of consumer audio products including mid-to high-end loudspeakers and electronics, headphones, embedded audio products for consumer electronics and branded portable wireless speakers.

33.     The Professional Solutions segment designs, manufactures and markets an extensive range of audio, lighting, video and control, and automation solutions for entertainment and enterprise applications, including live concerts and festivals, stadiums, airports, hotels and resorts, conference centers, educational institutions, command centers and houses of worship.

34.     The Connected Services segment includes the operating results of Symphony Teleca Corporation ("STC"), Red Bend Ltd., and the Company's automotive services businesses.  Harman's Connected Services segment creates innovative software solutions that integrate design, mobility, cloud and analytics, and brings the benefits of the connected world to the automotive, retail, mobile, healthcare, media and consumer electronics markets.

35.     Harman's recent financial results show that the Company's business is sound.

36.     On August 4, 2016, for example, Harman announced its financial results for its fourth quarter and fiscal year ended June 30, 2016.  Among other things, net sales for the fourth quarter were $1.9 billion, an increase of 12% compared to the prior year.  Connected Car net sales increased 11% due to higher take rates and stronger production.  Lifestyle Audio net sales increased 25% due

to higher consumer audio sales and higher car audio take rates. Connected Services net sales increased 7% compared to the prior year due to higher demand for engineering services. Excluding restructuring, acquisition-related items and non-recurring charges, fourth quarter operating income increased 23% to $185 million compared to $150 million in the prior year, and EBITDA increased 20% to $225 million compared to $187 million in the prior year. Earnings per diluted share increased 14% to $1.57 compared to $1.37 in the prior year.

37.     Net sales for the full-year were $6.9 billion, an increase of 12% as Connected Car, Lifestyle Audio and Connected Services reported strong increases in net sales. Excluding the impact of foreign currency translation and acquisitions, net sales increased 9% compared to the prior year. On a GAAP basis, fiscal year 2016 operating income increased 24% to $580 million from $470 million in the prior year, EBITDA increased 26% to $804 million compared to $639 million in the prior year, and earnings per diluted share increased 3% to $4.99 compared to $4.84 in the prior year. Excluding acquisition-related items, restructuring and non-recurring charges, fiscal year 2016 operating income increased 22% to $677 million compared to $554 million in the prior year, EBITDA increased 20% to $836 million compared to $699 million in the prior year, and earnings per diluted share increased 9% to $6.24 from $5.71 in the prior year.

38.     Defendant Paliwal commented on the year-end results, stating:

> "***In fiscal 2016, HARMAN delivered record revenue, EBITDA and earnings per share****. . . .* HARMAN's intelligent, embedded connected car solutions, including unparalleled audio and sound management systems, led to a record-breaking automotive backlog of more than $24 billion. Together with a rapidly growing consumer audio business and improving Professional Solutions business, Harman has a strong foundation for long-term growth.

> . . . In fiscal 2017, we will continue to leverage our comprehensive technology portfolio, including expanded cloud and analytics capabilities, to meet the growing demand for embedded software and services in the automotive, consumer and enterprise markets. We also presented a longer-term outlook that capitalizes on the opportunities in connected car, mobility and IoT. ***With an industry-leading automotive backlog and continued focus on disciplined execution, Harman is well positioned to deliver superior financial and operational performance for our customers and shareholders****.*"

39.     In conjunction with the fiscal 2016 earnings release, Harman also disseminated a presentation touting the strength of the business, including double-digit growth in key metrics:



40.     Regarding its potential for future growth, Harman has a history of leveraging its continuous technological innovation across all of the markets the Company serves.  The Company has a well-deserved reputation for delivering premium audio and connected car solutions across a full spectrum of applications.  Harman's technological innovation, the quality of its products, and its reputation for on-time delivery have resulted in Harman being awarded a substantial amount of Connected Car and Lifestyle Audio automotive business.

41.     As of June 30, 2016, Harman has an unrivaled cumulative estimated $24.1 billion of awarded Connected Car and Lifestyle Audio automotive business, which represents the estimated future lifetime net sales for automotive customers.

42.     In connection with its August 4, 2016 earnings release, Harman also provided guidance for fiscal 2017 by segment, as follows:

| Fiscal Year 2017 | Total HARMAN | Connected Car | Lifestyle Audio | Professional Solutions | Connected Services | Corporate / Eliminations |
|---|---|---|---|---|---|---|
| Sales | $    7,300M - $7,500M | ~$3,320M | ~$2,410M | ~$1,045M | ~$680M | (~$55M) |
| Operational EBITDA | $900 – $940M | ~$480M | ~$365M | ~$140M | ~$100M | (~$165M) |
|  | ~12.4% | ~14.5% | ~15.1% | ~13.4% | ~14.7% | (~2.2%) |
| Operational EPS | $6.75 – $7.00 |  |  |  |  |  |

43.     Harman also provided enterprise-level guidance for 2017, 2018 and 2019:

| Total HARMAN | Fiscal 2017 Guidance | Fiscal 2018 Outlook | Fiscal 2019 Outlook |
|---|---|---|---|
| Sales | $7.3 - $7.5B | ~$7.7B | ~$8.6B |
| Operational EBITDA | ~12.4% | ~12.7% | ~13.5% |

44.	Its "Investment Thesis," as represented in the year-end presentation, also touts the Company's potential, as follows:



45.	The market is also bullish on Harman's prospects.

46.	Harman is well positioned as the leader in what analysts uniformly characterize as a high-growth industry.  The automotive infotainment and automotive audio industry is facing growth to the rise of embedded infotainment, activity security and emerging market growth in the auto industry.  Deutsche Bank sees 90% of all vehicles produced being connected by 2025, roughly double today's level.

47.	Analysts see Harman as more than just a Tier 1 supplier due to the inclusion of its Connected Services, which elevates the technological and software capabilities of the Company beyond its competition.  Harman is particularly well positioned in the luxury car market, with high-end audio penetration benefiting a richer vehicle mix in developing nations.  Harman has also had success in generating mainstream high-volume business through new business with American and Japanese automakers.

48.	In an analyst report from November 4, 2016, J.P. Morgan explains Harman "took a clean sheet of paper to system design, moving to a new 'scalable' rather than custom approach,

which significantly cut development cost and speeds time to market." Analysts see Harman as well positioned for meeting the industry's growth after having completed its restructuring.

49.     In short, Harman has a sound business and is poised for great success.

**Preliminary Discussions with Company A**

50.     In late 2015, Harman held preliminary discussions with Company A, a potential strategic counterparty, concerning a combination of Harman and Company A.

51.     Among other things, Harman and Company A entered into a confidentiality agreement that permitted the parties to share non-public information regarding their respective businesses. Notably, the Proxy does not state whether the confidentiality agreement contained a standstill provision and, if so, whether it fell away with the execution of the Merger Agreement. In fact, §5.02(f) of the Merger Agreement suggests the opposite. Moreover, on December 17, 2015, Company A submitted a proposal to acquire Harman for mixed cash and stock consideration valued at that time as $115 per share of Company common stock. By comparison, Harman stock had closed on December 15, 2015 at $91.96 per share, and the Acquisition offers only $112 per share. Further, J.P. Morgan was involved in discussions with Harman's management or the Board.

52.     In January 2016, because of market volatility, Harman and Company A discontinued merger discussions.

**The Company Continues to Post Impressive Financial Results**

53.     On January 28, 2016, Harman announced its financial results for the second quarter ended December 31, 2015. Among other things, net sales for the second quarter were $1.8 billion, an increase of 12% compared to the prior year, or 19% excluding the impact of foreign currency translation (ex-FX). Connected Car net sales increased 2% (9% ex-FX) due to higher take rates, stronger automotive production and platform expansions. Lifestyle Audio net sales increased 20% (26% ex-FX) due to new product introductions and expanded global distribution channels in consumer audio, the acquisition of Bang & Olufsen Automotive, and higher car audio take rates. Net sales in Professional Solutions decreased 7% (4% ex-FX) mainly due to weakness in emerging markets. Connected Services net sales were $170 million compared to $74 million in the prior year,

primarily due to the expansion of the Company's services portfolio as a result of the acquisition of STC.

54.     Defendant Paliwal commented on the quarterly results, stating:

"I am pleased to announce our 11th consecutive quarter of top and bottom line growth. Our strong first half results were in-line with our expectations. While we are closely monitoring macroeconomic developments, at this time, we are on track to deliver on our full year plan. . . . We are also partnering with key technology leaders such as Google, Microsoft and Under Armour to capitalize on the opportunities presented by IoT for automotive, enterprise and consumer electronics. In addition, our acquisition of TowerSec will strengthen our cybersecurity leadership position for automotive."

55.     On April 28, 2016, Harman announced its financial results for the third quarter ended March 31, 2016. Among other things, net sales for the third quarter were $1.6 billion, an increase of 11% compared to the prior year or 12% excluding the impact of foreign currency translation (ex-FX). Connected Car net sales increased 5% (6% ex-FX) primarily due to higher take rates. Lifestyle Audio net sales increased 11% (12% ex-FX) due to the acquisition of Bang & Olufsen Automotive, higher car audio take rates and higher consumer audio sales. Net sales in Professional Solutions decreased 4% (3% ex-FX) mainly due to lower demand in Brazil and certain European markets, as well as channel rationalization to support a solutions-based go-to-market structure. Connected Services net sales were $166 million compared to $67 million in the prior year, primarily due to the expansion of the Company's services portfolio as a result of the acquisition of STC.

56.     Defendant Paliwal commented on the third quarter results, stating:

"*For the 12th consecutive quarter, HARMAN has delivered top and bottom line growth*, and in the quarter, we grew EBITDA 26 percent year-over-year. Our Connected Car and Lifestyle Audio divisions, which represent approximately 75 percent of our revenue, *continue to deliver strong results*. In our Professional Solutions division, we are taking decisive actions to improve performance and better position HARMAN for growth. . . .

Harman is capitalizing on the *robust demand* for seamless, secure connectivity across the full vehicle market. On top of the *record $6.2 billion in automotive awards* we announced in fiscal 2015, I am very pleased with the additional $3.5 billion of new automotive awards secured year-to-date, including a *breakthrough* display audio infotainment award."

**The Company Explores a Separation Transaction**

57.     During the summer and fall of 2016, Harman decided to explore a potential separation of the Company's businesses into two or more independent publicly traded companies.

58.     Such a separation transaction was possible because the Company's business was divided into four segments – Connected Car, Lifestyle Audio, Professional Solutions and Connected Services – each with its own unique operating characteristics.

59.     In late July 2016, the Board also authorized the engagement of Lazard as an additional financial advisor.  Despite the addition of a second advisor (likely to minimize the appearance of J.P. Morgan's conflicts, discussed below), the Financial Advisors worked in tandem.

60.     As part of the Board's ongoing review of potential strategic alternatives, the Board discussed with Harman's senior management and also the Financial Advisors the Company's ongoing work and analyses regarding these potential separation alternatives at several Board meetings during this period, including on July 29, 2016 (at which only J.P. Morgan was present) and August 19, 2016 (at which both Financial Advisors were present).

61.     Meanwhile, as alleged above, Harman announced its fourth quarter and year-end financial results on August 4, 2016, which results soundly demonstrated the strength of the Company's business.  Indeed, as stated on an earnings conference call, Paliwal stated unequivocally: "*The fourth quarter caps [another banner year] for Harman.  Revenue, EBITDA, and earnings per share all reached record highs*."

**Samsung Expresses Interest in Buying Harman
and Paliwal Orchestrates the Acquisition**

62.     On August 22, 2016, Young Sohn ("Sohn"), President and Chief Strategy Officer of Samsung, met an unidentified member of the Company's management team at an industry conference, and the executives had a brief discussion regarding the possibility of collaborations between Samsung and the Company, particularly in the automotive area (*i.e.*, where Harman had exhibited tremendous growth potential).

63.     Two days later, after a series of back-and-forth e-mails, Sohn contacted Paliwal to discuss Samsung's interest in, among other things, acquiring Harman. Sohn and Paliwal agreed to meet in San Jose, California on September 8, 2016, to continue these preliminary discussions. Paliwal, in fact, did meet with and Sohn and other Samsung executives on September 8, 2016, to discuss Harman's business in the context of a potential deal. Although Paliwal stood to gain immensely from such a transaction, he did not initially advise the entire Board of these communications, choosing instead to tell only co-defendant Korologos.

64.     Over the next two months, Harman's executives, aided by J.P. Morgan and enabled by a supine Board, met extensively with Samsung to discuss the Acquisition. In connection with these discussions, Harman and Samsung executed a confidentiality agreement, and a conflicted J.P. Morgan offered extensive feedback concerning the merits of a deal with Samsung. Notably, the Board had no direct involvement in any negotiations with Samsung, nor did it establish a committee to insulate the process from potential conflicts of interest. Indeed, the Board authorized Paliwal to engage directly with Samsung, thereby giving the most self-interested individual the opportunity to orchestrate the outcome that would favor him the most (*i.e.*, an acquisition of Harman).

65.     Moreover, eschewing other alternatives (such as the separation transaction) and other potential buyers (such as Company A and untold other potential acquirers), the Board authorized Paliwal to enter into a "no shop" exclusivity agreement with Samsung after it offered at least $112 per share to buy the Company. Under the unorthodox "no shop" exclusivity agreement, executed on October 14, 2016, Harman could not actively solicit interest but could negotiate only with a party that submitted a "superior" offer. However, this was highly unlikely because Samsung was the only party with access to non-public information regarding Harman's business.

66.     By sanctioning continued discussions with Samsung, including agreeing to exclusivity, the Board all but abandoned a separation transaction.

67.     Meanwhile, at an October 6, 2016 Board meeting, J.P. Morgan revealed that Company A's financial advisors had recently contacted J.P. Morgan to discuss a potential merger. J.P. Morgan met and spoke with Company A's advisors on October 13 and 14, 2016, respectively,

but there were no further communications between Harman and Company A or their respective representatives.

68.     The isolated nature of these discussions – unlike with Samsung, neither Paliwal nor Company A's executives were involved – demonstrates that Harman's management or Board disfavored a deal with Company A, preferring instead to deal with Samsung.  Moreover, at no point in time did Harman ever consider contacting any other potential buyers to gauge their interests in acquiring the Company.

69.     As negotiations between Harman and Samsung intensified, Samsung offered Paliwal a concrete inducement to wrap up negotiations and agree to a deal.  Specifically, on October 20-22, 2016, members of each of the Company's and Samsung's management met in New York.  Among other things, Samsung senior executives told Harman management that Samsung and its Board would not proceed with the Acquisition unless certain members of the Company's senior management team entered into acceptable employment agreements with Samsung committing them to remain with the Company for a period of time following the closing of the Acquisition.  Samsung executives also told Harman executives of the former's desire to finalize all key terms of the definitive transaction documentation by November 7, 2016, after which Samsung proposed that the parties could finalize retention and post-closing employment matters.

70.     On October 27, 2016, despite Paliwal's clear potential conflict of interest, the Board authorized the Company's management and its advisors to continue to cooperate with Samsung's due diligence review and to progress the negotiations of the draft merger agreement and other transaction documentation.

71.     One week later, on November 3, 2016, the Board authorized management to meet with representatives of Samsung in Palo Alto to discuss retention matters, including employment arrangements for certain members of senior management.

72.     Meanwhile, also on November 3, 2016, Harman announced its financial results for the first quarter ended September 30, 2016.  Among other things, net sales for the first quarter were $1.8 billion, an increase of 8% compared to the prior year.  Connected Car net sales increased 6%

due to higher take rates and stronger production. Lifestyle Audio net sales increased 19% due to higher sales in both consumer and car audio. Connected Services net sales increased 4% primarily due to higher demand for automotive services, while Professional Solutions net sales decreased 3%. Excluding restructuring, acquisition-related items and non-recurring charges, first quarter operating income increased 19% to $187 million compared to $158 million in the prior year, and EBITDA increased 15% to $227 million compared to $197 million in the prior year. Earnings per diluted share increased 27% to $1.87 compared to $1.48 in the prior year.

73.    Defendant Paliwal commented on the first quarter results, stating:

"HARMAN delivered a solid first quarter, with strong revenue growth and outstanding EBITDA and EPS performance. We secured $2 billion in new automotive awards in the quarter, demonstrating increasing demand from automakers and their drivers for a rich in-car experience, including embedded infotainment, cloud connectivity and sound management solutions. . . .

. . . On top of our strong automotive performance, HARMAN's strong brands and award-winning design are driving market share gains with our consumer audio products. We remain focused on innovation, execution and driving cost leadership in all of our businesses, and are on track to meet our fiscal 2017 guidance."

74.    Over the next several days, Harman and Samsung finalized the Merger Agreement.

75.    On November 8-9, 2016, Harman's senior management met with Samsung executives in Palo Alto to discuss retention matters, including post-closing employment arrangements between Samsung and certain members of the Company's senior management. Discussions regarding these matters continued over the course of that week.

76.    On November 13, 2016, the Board met and approved the Company's entry into the Merger Agreement.

**Summary of the Acquisition**

77.    On November 14, 2016, Harman and Samsung announced they had entered into the Merger Agreement, under which Samsung, through Samsung USA and Merger Sub, plans to acquire all of the outstanding shares of Harman's common stock for $112 per share in cash. In total, the Acquisition is worth approximately $8 billion to Harman stockholders.

78.     The Merger Agreement was approved unanimously by the Board, which caused Harman to enter into the Merger Agreement.

79.     J.P. Morgan and Lazard are serving as Harman's Financial Advisors. Evercore Group L.L.C. ("Evercore") is serving as Samsung's financial advisor.

80.     The Acquisition is conditioned on, among other things, approval by a majority of the outstanding shares of Harman's common stock.

81.     On January 20, 2017, Harman filed the Proxy with the SEC, asking stockholders to vote "FOR" the Acquisition and announcing that the special meeting of Harman stockholders would occur on February 17, 2017 at 9:00 a.m. EST in Stamford, Connecticut.

**The Acquisition Resulted from Numerous Conflicts of Interest**

82.     The Acquisition resulted from actual and potential conflicts of interest plaguing Harman's management as well as the Company's financial advisor. The Proxy, in fact, expressly contemplates the Board's and management's potential conflicts, stating: "[T]he Company's directors and executive officers have interests in the merger that are different from, or in addition to, those of other stockholders of the Company generally."

83.     The Company's management, including most notably Paliwal, is conflicted by virtue of post-close arrangements with Samsung. Notably, Samsung discussed the potential for lucrative post-close employment several weeks before the Merger Agreement was finalized, thus pitting Paliwal and the rest of his management team against Harman stockholders at a point in time when they should have been 100% focused on maximizing stockholder value. Before the Merger Agreement was signed, Paliwal finished negotiating his post-close arrangement.

84.     Paliwal's agreement with Samsung includes: (a) an annual base salary of $1,266,198; (b) a threshold, target, and maximum annual bonus opportunity of 100% of base salary, 200% of base salary, and 300% of base salary, respectively; (c) a cash retention award of $21,961,769, which will vest with respect to 2/9ths of the total retention award on the date that is six months following the closing date, with respect to 2/9ths of the total retention award on the first anniversary of the closing date, with respect to 2/9ths of the total retention award on the second anniversary of the

closing date, and with respect to 1/3rd of the total retention award on the third anniversary of the closing date; and (d) a long-term unit incentive program award of no less than $21,000,000 (at target), comprised (at target) of 60% performance-based units that vest on the third anniversary of the closing date based on the level of achievement of performance targets during the applicable performance period and 40% time-based units that vest in equal installments on each of the first three anniversaries of the closing.

85.     Paliwal's arrangement with Samsung also provides that he will continue to be provided with a company car and reimbursed up to $2 million for private plane or first-class airline travel, as determined in his judgment, in connection with business trips, based on past practice.

86.     Many other Harman executives – Sandra E. Rowland, the Company's Executive Vice President and Chief Financial Officer; Phillip Eyler, the Company's Executive Vice President and President, Connected Car Division; David Slump, Executive Vice President, Operations; John Stacey, the Company's Executive Vice President and Chief Human Resources Officer; Mohit Parasher, the Company's Executive Vice President and President, Professional Solutions Division; Ralph Santana, the Company's Executive Vice President and Chief Marketing Officer; and Michael Mauser, the Company's Executive Vice President and President, Lifestyle Audio Division – also reached agreements with Samsung that provided for lucrative post-close compensation.

87.     Paliwal and several other Harman executives also stand to receive lucrative "golden parachute compensation," as detailed in the chart below, thus further offering them substantial motive for favoring the Acquisition by Samsung over any other strategic alternative.

| Name | Cash ($) | Equity ($) | Pension/ NQDC ($) | Perquisites/ Benefits ($) | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|---|
| Dinesh C. Paliwal | 15,911,000 | 27,643,613 | 6,749,782 | 283,000 | 28,766 | 50,616,161 |
| Sandra E. Rowland | 3,264,041 | 7,020,272 | — | 73,000 | — | 10,357,313 |
| Phillip Eyler | 2,588,000 | 4,731,908 | — | 73,000 | — | 7,392,908 |
| Michael Mauser | 2,251,000 | 6,164,049 | — | 50,000 | — | 8,465,049 |
| David Slump | 2,001,000 | 3,848,504 | — | 73,000 | — | 5,922,504 |

88.     The rest of the Board will also personally benefit from the Acquisition, receiving more than $35 million from the sale of their Harman stock.

| Director | Shares Owned | Proceeds |
|---|---|---|
| Adriane M. Brown | 6,764 | $757,568 |
| John W. Diercksen | 6,764 | $757,568 |
| Ann M. Korologos | 26,069 | $2,919,728 |
| Robert Nail | 1,707 | $191,184 |
| Dinesh C. Paliwal | 192,522 | $21,562,464 |
| Abraham N. Reichental | 2,103 | $235,536 |
| Kenneth M. Reiss | 23,945 | $2,681,840 |
| Hellene S. Runtagh | 30,641 | $3,431,792 |
| Frank S. Sklarsky | 9,594 | $1,074,528 |
| Gary G. Steel | 28,234 | $3,162,208 |
| **TOTAL** | **328,343** | **$36,774,416** |

89.     J.P. Morgan also suffered from various conflicts of interest.

90.     Over the past several years, J.P. Morgan has advised and provided services to Samsung and its many affiliates.  As disclosed in the Proxy, over the past two years J.P. Morgan has provided services to Samsung or its affiliates, including serving as joint bookrunner on the initial public offering of Samsung SDS in October 2014, as joint global coordinator and joint bookrunner on the initial public offering of Cheil Industries (a Samsung affiliate) in December 2014, as financial advisor to Samsung on Samsung's disposals of equity interests in Samsung Techwin and Samsung Chemicals in June 2015, and as joint bookrunner on the initial public offering of Samsung Biologics in October 2016.  The Proxy further states that J.P. Morgan has earned roughly $17 million from Samsung in the past two years alone.  And although it has also received compensation from performing services for Harman, J.P. Morgan has received 55% more from Samsung than it has received from the Company.

91.     What the Proxy fails to disclose, however, is that J.P. Morgan is also currently serving as investment manager for the U.S. office mezzanine debt fund of Samsung affiliate Samsung SRA Asset Management.  Moreover, a May 5, 2016 article in *The Korea Times* refers to J.P. Morgan's "track record" of working on "major deals with Samsung."  Accordingly, further disclosures would likely reveal a deeper conflict impairing J.P. Morgan's ability to act in Harman's best interests.

92. The Board ostensibly tried to insulate the process from J.P. Morgan's conflicts of interest by retaining a second financial advisor in Lazard, but the Board acted in vain. After the second advisor was retained, J.P. Morgan continued to dominate the process, at least in relation to Lazard. Moreover, the Financial Advisors performed joint financial analyses – not their own independent analyses, as is customary when two advisors have been retained – which enabled J.P. Morgan to overreach and dictate the specifics of the financial analyses underpinning the Financial Advisors' purported "fairness opinions." The tilt in J.P. Morgan's favor is confirmed by the fact that J.P. Morgan stands to earn a whopping $31 million in connection with the Acquisition, while Lazard is due only $25 million.

**The Board Sanctioned a Self-Interested, Deficient Process**

93. Despite Paliwal's and other executives' extraordinary conflicts of interest, as well as J.P. Morgan's longstanding connections with Samsung, the Board permitted conflicted management and a conflicted advisor to run the process that led to the signing of the Merger Agreement.

94. According to the Proxy, no member of the Board *ever* met, spoke, or directly engaged with Samsung, Company A, or their respective legal or financial representatives. Indeed, the Board's involvement in the process was limited to receiving occasional updates and Board meetings and permitting Paliwal to continue dealing with Samsung unilaterally. Despite the law requiring directors to be actively involved, the Board could not have been more passive.

95. The Proxy also makes clear that the Board, Harman's management or J.P. Morgan decided at a very early stage that Samsung would be the victorious bidder. Indeed, the Proxy expressly states that Lazard was retained in July 2016 – more than two months before Samsung had even submitted an offer – at least in part because of its familiarity with both Harman and Samsung. This demonstrates that the Board had already unreasonably decided to deal exclusively with Samsung and not to solicit interest from any other potential buyer.

96. Accordingly, Harman conducted what was essentially a single-bidder process under which Paliwal and J.P. Morgan negotiated exclusively with Samsung and refused to canvas the market for interest from other potential acquirors. And although Harman held a few conversations

with Company A, the limited outreach at the turn of 2016 and later that year were insufficient to maximize stockholder value. Further, in the event that the confidentiality agreement with Company A contained a standstill provision, §5.02(f) of the Merger Agreement precludes Company A from contacting Harman to lodge a topping bid.

97.     Harman has touted in its public statements that it has numerous strategic partners, and many other companies likely would have expressed interest in at least exploring a strategic transaction with the Company. The Board eschewed such value-maximizing alternatives, however, and decided to undertake a single-bidder process with Samsung.

98.     The Board also did not adequately explore other strategic alternatives, including the possibility of splitting the Company into two or more independent publicly traded companies.

99.     As explained above, Harman has organized its business into four main segments: Connected Car, Lifestyle Audio, Professional Solutions, and Connected Services. These are related, but discrete, businesses and could have yielded many different permutations through a separation transaction.

100.    Before Samsung proposed the Acquisition in August 2016, the Board purportedly considered various separation alternatives. Although these alternatives (or even persisting with the status quo) would have provided greater benefit for Harman stockholders, they did not stand to benefit Paliwal, other members of Harman's management or the Financial Advisors as much as the Acquisition. Paliwal, like all members of management, would not have been able to preside over a smaller entity and receive the same level of compensation, nor would he have been able to reap the substantial golden parachute compensation that he stands to receive in connection with the Acquisition. Moreover, neither J.P. Morgan nor Lazard would have earned nearly as much in fees from a separation transaction as they stand to earn from the Acquisition.

101.    Once Samsung expressed interest in acquiring the Company, Harman's management and J.P. Morgan persuaded the Board to abandon consideration of any separation transaction and instead convinced the Board to focus solely on pursuing the Acquisition with Samsung. The Proxy reflects this change in attitude because there appears to have been minimal discussion about the

potential separation transactions once Harman and Samsung entered into a confidentiality agreement on September 16, 2016.

**The Acquisition Price Is Unfair to Harman Stockholders**

102.     The Acquisition price is inadequate and does not represent the Company's actual intrinsic value or account for Harman's positive future outlook.

103.     *First*, the Acquisition price is less than what Company A had offered one year earlier. In particular, on December 17, 2015, Company A offered to acquire Harman for $115 per share in cash and stock.  Since then, the Company has posted stellar financial results and expects its growth to continue well into the future, rendering Samsung's $112 per share inadequate.

104.     *Second*, certain financial analyses performed by the Financial Advisors demonstrated that Harman was worth far more than the $112 per share Acquisition price.  Specifically, the Financial Advisors performed a discounted cash flow ("DCF") analysis for Harman using a set of financial projections that the Company's self-interested management created (thus inherently casting doubt on the credibility of such projections).  The DCF analysis is widely viewed as the most probative of a company's value.  Here, the midpoint of the Financial Advisors' DCF analysis was approximately $116.63 per share, and the high end was $129.25 per share, both of which values significantly exceed the Acquisition price.

105.     *Third*, the Acquisition undervalues Harman as an enterprise in light of its solid business and forward-looking prospects.  As alleged above, Harman has posted impressive financial results in recent years, and it forecasts substantial long-term growth.  As the Company explained in its year-end earnings call: "You will recall, in 2013, we set out an ambitious plan to grow Harman revenues to $6 billion by 2016.  Today, we reported almost $7 billion in revenue and more than doubled our 2013 EBITDA."  The Company has also underscored confidence in its out-years: "[W]e are very confident about our out years. . . . [T]hat's what is reflected in 2019 and 2021, double-digit growth. . . . [W]e feel very good about 2019, 2021, also, 2018, is actually still a good year."  By agreeing to $112 per share, the Board sold short the Company's massive potential.

106.     **Fourth**, the Acquisition does undervalue Harman in light of its recent mergers and acquisitions ("M&A") activity.  More specifically, Harman consummated approximately $1 billion in M&A in 2015 and 2016.  Those deals were strategic catalysts for future growth, as returns on those investments are more long- than short-term propositions.  The $112 per share Acquisition price does not reflect the Company's long-term potential taking into account its recent acquisitions.

**The Deal Protection Devices and Attendant Circumstances Are Preclusive**

107.     As part of the Merger Agreement, the Board agreed to certain onerous and unreasonable "deal protection" devices that operate conjunctively to make the Acquisition a *fait accompli* and preclude competing offers from emerging for the Company.

108.     For example, §5.02 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Samsung.

109.     This section further demands that the Company terminate any and all prior or on-going discussions with other potential acquirers, and require that any other potential acquirer with whom the Company engaged in prior discussions return or destroy any non-public Company information provided to the potential acquirer.

110.     Further, should an unsolicited bidder submit a competing proposal, the Company must notify Samsung of the bidder's identity and the terms of the bidder's offer.

111.     Thereafter, should the Board determine to enter into a superior competing proposal, the Merger Agreement requires the Board to give Samsung at least four business days to make a counter-offer so that the competing offer no longer constitutes a superior proposal.  Further, if the competing bidder modifies its topping bid in any manner, the Merger Agreement gives Samsung an additional two days to amend its offer further.

112.     The Merger Agreement also provides that Harman must pay Samsung a $240 million termination fee if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the stockholders

with a superior offer.  The Merger Agreement further provides that the termination fee must be paid by the Company contemporaneously with or before the termination is effectuated.

113.    Especially in light of the Board's refusal to contact other potential buyers **before** signing the Merger Agreement, these deal protection provisions unreasonably restrain the Board's ability to maximize stockholder value by restricting the Board from soliciting better deals or engaging in communications with potentially interested parties.  Indeed, under the circumstances surrounding the Acquisition, the limited instances in which the Board can respond to an entreaty are too narrowly circumscribed to provide an effective "fiduciary out" for the Individual Defendants.

**The Proxy Fails to Disclose Material Information**

114.    On January 20, 2017, Harman filed the Proxy with the SEC in anticipation of the February 17, 2017 stockholder vote on the Acquisition.  In violation of federal and state law, the Proxy misrepresents or omits material information, thus preventing Harman stockholders from casting an informed vote on the Acquisition.

115.    **First**, although the Proxy reveals that the Board considered various "separation transactions" before it entered into the Merger Agreement with the Samsung Defendants, the Proxy fails to disclose material information concerning the separation transactions contemplated, including:

(a)      the types of separation transactions considered (which information is necessary to inform stockholders of the types of strategic alternatives considered);

(b)      the steps taken to explore the viability of any such separation transactions, including whether Harman or its advisors held any discussions with potential counterparties, investors, underwriters or other relevant persons (which is necessary to apprise stockholders of the likelihood of the various separation transactions considered versus the Acquisition by Samsung);

(c)      the resulting value indications from each of the scenarios presented as part of the Board's consideration of a separation transaction (which is necessary to inform Harman stockholders as to the relative value of the Company's various alternatives);

(d)      the timing of any such separation (which is important in assessing likelihood of accomplishing any such transactions under consideration); and

(e)　　the benefits that the Individual Defendants and their advisors would have received from a separation compared to what they will receive as a result of the Acquisition (which is crucial to understanding defendants' and the Financial Advisors' motivations for pursuing or recommending the various alternatives available to Harman).

116.　　Because the Company likely would have strongly considered a separation transaction in the absence of the Acquisition, a separation represents the likeliest of alternatives. Accordingly, Harman stockholders deserve to be informed about the options they have to choose from, *i.e.*, accepting the Acquisition or continuing on as a standalone entity pending the Company's decision to pursue a separation transaction that would maximize stockholder value.

117.　　***Second***, the Proxy fails to disclose material information concerning the financial projections created by Harman's management, including:

(a)　　the financial projections provided by Harman's management and relied upon by the Financial Advisors for purposes of their analysis, for fiscal years 2017-2026, under each of the management case and the sensitized management projections, for the following items: (i) EBIT (or D&A) (sensitized management projections only); (ii) taxes (or tax rate); (iii) changes in net working capital; (iv) stock-based compensation expense; (v) any other adjustments to unlevered free cash flow; and (vi) dividends; and

(b)　　the segment-level financial projections provided by Harman's management and relied upon by the Financial Advisors for purposes of their analysis, for fiscal years 2017-2026, under each of the management case and the sensitized management projections, for each of the Connected Car/Car Audio, Connected Services, Consumer Audio and Professional Solutions services for the following items: (i) revenue; (ii) EBITDA; (iii) EBIT (or D&A) (sensitized management projections only); (iv) taxes (or tax rate); (v) capital expenditures; (vi) changes in net working capital; (vii) stock-based compensation expense; (viii) any other adjustments to unlevered free cash flow; (ix) unlevered free cash flow; and (x) dividends.

118.　　This information is essential to adequately inform Harman stockholders about the Company's forward-looking prospects. Specifically, Harman has touted its long-term growth

prospects, citing, among other things, its industry-leading and record-setting backlog. Moreover, industry analysts have hailed Harman's industry as one destined for extraordinary growth. Further, with respect to stock-based compensation, the Proxy expressly states that various projected metrics reflect the impact of "share-based compensation expenses," but these are non-cash expenses. Accordingly, insofar as non-cash expenses are used to augment or diminish resulting unlevered free cash flows – a key input in a discounted cash flow analysis – this information is material and must be disclosed. Equally relevant is changes in net working capital, which the Proxy states was accounted for in calculating unlevered free cash flows but was not disclosed.

119. With respect to segment-level information, the Company has consistently reported its financial results by segment and has also discussed growth prospects of the various segments independently. Professional Solutions, for example, is treated by Harman itself as a very different business than Connected Car or Lifestyle Audio. Moreover, the Proxy expressly states that the Board considered various types of separation transactions that would split or combine segments with the goal of isolating and maximizing value. Accordingly, in order for stockholders to assess the attractiveness of the Acquisition, they should be informed about the projections pertaining to each individual segment of the Company's business.

120. ***Third***, the Proxy fails to disclose material information concerning joint financial analyses performed by the Financial Advisors, including:

(a) whether there was ever any discussions among the Board members about the Financial Advisors performing financial analyses regarding the Acquisition separately versus jointly;

(b) the relative roles that the Financial Advisors played in constructing the joint financial analyses, including the method agreed upon for resolving any disagreements about how to perform any of the analyses;

(c) for the Discounted Cash Flow Analysis: (i) the implied terminal EBITDA multiples observed from this analysis; and (ii) whether the Financial Advisors treat stock-based compensation as a cash or non-cash expense; and

(d)     for the Illustrative Present Value of Future Share Price Analysis: (i) the net debt amount used by the Financial Advisors as of fiscal year 2021 for Harman; and (ii) the forecast per share cash dividends for Harman for years 2016-2021, under both the management and sensitivity case.

121.    Here, that two institutions comprised of financial professionals declined to do their own work – as is customary when a company hires two investment banks – and instead put forth a joint effort is highly unusual, and it raises questions about the role that each advisor played in creating the financial analyses that ultimately led to the issuance of two separate fairness opinions. Indeed, in numerous other transactions, the Financial Advisors have conducted their own financial analyses, deferring to their own professional judgment.  Here, however, Lazard yielded to J.P. Morgan's influence, or vice versa (although the former is far more likely).  Accordingly, as there is currently no disclosure on this point, it is important for Harman stockholders to understand the advisors' respective roles and the Board's role in choosing to retain a second advisor yet declining to require a second set of financial analyses.

122.    Furthermore, it is well established that stockholders are entitled to a "fair summary" of a banker's financial analyses.  Here, however, the Company offers insufficient summary of the Financial Advisors' joint financial analyses, which yields more questions than answers.  In particular, there are key unanswered issues such as the treatment of stock-based compensation, the multiples observed, the allegedly comparable companies or transactions, and the extent to which the Financial Advisors attempted to standardize their analyses (*i.e.*, whether they performed any benchmarking).

123.    **Fourth**, the Proxy fails to disclose material information concerning the process leading up to the execution of the Merger Agreement, including:

(a)     whether the confidentiality agreement entered into with Company A contains a standstill provision and, if so, whether it fell away with the execution of the Merger Agreement;

(b)     the value of a potential transaction with Company A, as discussed on or about October 13, 2016;

(c)     the extent of conversations between Harman management or J.P. Morgan, on the one hand, and Company A, on the other, regarding the urgency of discussions in light of the fact that Harman and Samsung entered into an exclusivity agreement on October 13, 2016; and

(d)     the value of Company A's December 2015 proposal as of when Harman entered into the Merger Agreement with the Samsung Defendants.

124.     The above information is material and was necessary for Harman stockholders to make an informed decision with respect to the Acquisition. Disclosure of the above information would have enabled Harman's stockholders to gauge the accuracy and relevance of the Financial Advisors' analyses, as well as provided them with material information required to determine the true value of their investment. Absent such information, the Acquisition was consummated without the Company's stockholders being fully informed, providing them with grossly inadequate consideration as a result.

## CLASS ACTION ALLEGATIONS

125.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all persons who owned shares of Harman common stock as of January 10, 2017, excluding defendants and their affiliates (the "Class"). This action is properly maintainable as a class action for the reasons set forth below.

126.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there are 69,883,605 shares of Harman common stock issued and outstanding, likely held by thousands of persons.

127.     There are questions of law and fact that are common to the Class, including:

(a)     whether Harman and the Individual Defendants violated §14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

(b)     whether the Individual Defendants and the Samsung Defendants are liable as "controlling persons" under §20(a) of the Exchange Act;

(c)     whether the Individual Defendants breached their fiduciary duties in connection with the Acquisition;

(d)	whether any of the Individual Defendants aided and abetted the Board's breaches of their fiduciary duties;

(e)	whether the Samsung Defendants aided and abetted the Individual Defendants' breaches of their fiduciary duties; and

(f)	whether plaintiff and the other members of the Class were, or stand to be, injured as a result of defendants' misconduct.

128.	Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff is not subject to any atypical claims or defenses.

129.	Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

130.	The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would (i) establish incompatible standards of conduct for defendants, or (ii) as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, substantially impairing or impeding their ability to protect their interests.  Moreover, defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

**Violations of §14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
Against Harman and the Individual Defendants**

131.	Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

132.	SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral,

containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

133.     During the relevant period, Harman and the Individual Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

134.     By virtue of their positions within the Company, Harman and the Board were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Harman and the Board. The Proxy misrepresented and/or omitted material facts, as detailed above. Harman and the Board were at least negligent in filing the Proxy with these materially false and misleading statements. Haman and the Board have also failed to correct the Proxy, and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

135.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

136.     By reason of the foregoing, Harman and the Board have violated §14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Samsung Defendants

137.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

138.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder. Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

139.     By reason of the allegations herein, the Board and the Samsung Defendants violated §14(a) of the Exchange Act by issuing and publishing the Proxy, which contained untrue statements of material fact concerning the Acquisition, and omitted material facts concerning the Acquisition necessary in order to make the statements in the Proxy not misleading.

140.     The Individual Defendants were controlling persons of Harman within the meaning of §20(a) of the Exchange Act.

141.     The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Harman.

142.     The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, had the power or ability to control the issuance, publication and contents of the Proxy. The Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Acquisition.

143.     The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

144.     By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act, and plaintiff is entitled to relief.

## COUNT III

### For Breach of Fiduciary Duties
### Against the Individual Defendants

145.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

146.    The Individual Defendants have violated their fiduciary duties owed to the public stockholders of Harman and have acted to put their personal interests ahead of the interests of the Company's public stockholders, or acquiesced in those actions by fellow defendants.

147.    The Individual Defendants failed to take adequate measures to ensure that the interests of Harman's stockholders were properly protected.  The Individual Defendants sanctioned a process and price that was not entirely fair.  Furthermore, the Individual Defendants failed to disclose material information in the Proxy.

148.    In selling the Company, the Individual Defendants failed to take reasonable efforts to maximize the value of the Company for the benefit of Harman's public stockholders, instead accepting grossly inadequate consideration, thus breaching their fiduciary duties owed to the Company's public stockholders.

149.    The Board also failed to disclose material information concerning the Acquisition, thus rendering the Company's stockholders unable to make an informed decision whether to tender their shares and whether to seek appraisal.

150.    By the acts, transactions and course of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, have harmed plaintiff and the other members of the Class.

## COUNT IV

### For Aiding and Abetting
### Against the Samsung Defendants

151.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

152.     The Samsung Defendants knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Acquisition, which, without such aid, would not have occurred.  In connection with discussions regarding the Acquisition, the Samsung Defendants obtained sensitive, non-public information concerning Harman, and thus had an unfair advantage that enabled them to pursue the Acquisition, which offered unfair and inadequate consideration.  The Samsung Defendants also offered lucrative enticements that led the Individual Defendants and the Company's management to breach their fiduciary duties.

153.     As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining fair consideration for their Harman shares.

154.     Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Acquisition;

C.     In the event defendants consummate the Acquisition, rescinding it and setting it aside or awarding rescissory damages to plaintiff and the Class;

D.     Directing defendants to account to plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

DATED: February 15, 2017

DISERIO MARTIN O'CONNOR
  & CASTIGLIONI LLP
JONATHAN P. WHITCOMB

_/s/ Jonathan P. Whitcomb_
      JONATHAN P. WHITCOMB (ct15014)

One Atlantic Street
Stamford, CT 06901
Telephone: 203/569-1105
203/348-2321 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone: 212/802-1486
212/602-1592 (fax)

Attorneys for Plaintiff