UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICIA B. BAUM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 3:17-cv-00246-RNC |
| Plaintiff, | ) ) ) | FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, DINESH C. PALIWAL, ADRIANE M. BROWN, JOHN W. DIERCKSEN, ANN M. KOROLOGOS, ROBERT NAIL, ABRAHAM N. REICHENTAL, KENNETH M. REISS, HELLENE S. RUNTAGH, FRANK S. SKLARSKY, and GARY G. STEEL, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

1286607_1

Plaintiff Patricia B. Baum ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges (i) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(a), and (ii) violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).  Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Harman International Industries, Incorporated ("Harman" or the "Company"), as well as other publicly available information.

## PRELIMINARY STATEMENT

1.      This action arises out of the acquisition (the "Acquisition") of Harman by Samsung Electronics Co., Ltd. ("Samsung") and the defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  Plaintiff was a Harman stockholder; Defendants are Harman and the Harman Board of Directors (the "Board") at the time of the Acquisition.

2.      Harman is a leader in the design and engineering of connected products and solutions for automakers, consumers and enterprises worldwide, including connected car systems, audio and visual products, enterprise automation solutions and connected services.  Prior to the Acquisition, Harman was publicly traded.  Now it is a wholly-owned subsidiary of Samsung, yet still led by the same management team.  At its top remains CEO Dinesh C. Paliwal ("Paliwal"), who exerted control pre-Acquisition as the Company's CEO and Board Chairman.

3.      Harman and Samsung announced the Acquisition on November 14, 2016.  Under the parties' Agreement and Plan of Merger (the "Merger Agreement"), Samsung, through its affiliates,

acquired all of the outstanding shares of Harman common stock for $112.00 per share in cash, or a total of approximately $8 billion.  In fact, Harman was worth far more than the $8 billion.

4.      In contrast to shareholders at large, Samsung personally rewarded Harman insiders with additional payments for consummating the Acquisition and continuing with Samsung post-close.  Most notably, Paliwal negotiated a historically massive side-deal from Samsung.  Before any Harman director voted in favor of the Acquisition and before receiving a final financial analysis in support of the Acquisition price, Paliwal extracted personal side-payments from Samsung including a $21,961,769 "cash retention award" and an additional guarantee of "no less than $21,000,000" in long-term unit incentive compensation over the next three years.  Through the Acquisition, Paliwal was also able to accelerate $28,913,614 in restricted Harman stock and bonuses.  Paliwal's side-deals unquestionably placed him in a position of conflict relative to Harman stockholders at large.

5.      On January 20, 2017, Harman issued a materially false and misleading Definitive Proxy Statement on Schedule 14A (the "Proxy") in order to secure shareholder support for the undervalued Acquisition.  The Proxy, which recommended that Harman's shareholders vote in favor of the Acquisition, omitted and misrepresented material information in contravention of §§14(a) and 20(a) of the Exchange Act.

6.      Paliwal's payments depended on consummation of the Acquisition, which in turn required a majority vote by Harman stockholders.  Stockholders were voicing opposition to the deal and approval was far from certain.  Yet, despite Paliwal's patent conflicts of interest, the full Board granted Paliwal broad personal discretion in shaping a misleading narrative regarding the Company's intrinsic value and standalone prospects.  This discretion led to severe problems in the disclosure statements regarding the Acquisition.

7.      When stockholders are forced to decide whether to accept a sum certain value in a cash-out merger, there is no more material information than management's estimates of the

standalone corporation's future cash flows.  In such a situation, investors are concerned, perhaps above all else, with the expected corporate cash flows if the sale is not approved.  A common refrain throughout case law states that "projections . . . are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or . . . market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  For these reasons, under the federal securities laws, corporate directors are obligated to provide an honest and untainted summary and description of projected future cash flows.  Here, however, the Board provided several misleading descriptions of the Company's expected cash flows when attempting to create the appearance of fairness on an undervalued Acquisition.

8.      Harman built its business in large part through acquisitions and planned to continue to do so well into the future.  Consistent with its time-tested growth strategy, from February 2015 through 2016, Harman deployed over $1.2 billion of capital on acquisitions of smaller companies. Harman confirmed in its last annual report filed before the Acquisition, issued on August 11, 2016, that "[a]cquisitions are an important element of our corporate growth strategy and use of capital."  In fact, even after announcing the Acquisition, when asked in an interview whether Harman would "be making any more acquisitions," Paliwal answered:  "[Y]es, we will definitely make some unique technology acquisitions, especially in the areas of active safety and sensor detection and technologies."  Absent its own acquisition by Samsung, Harman's acquisition-based growth strategy would have thus continued unabated.

9.      In order to secure fairness opinions from two contingently compensated financial advisors, however, Paliwal provided the financial advisors with projections that falsely assumed Harman would immediately cease and abandon its acquisition strategy.  While these "organic" projections were already in existence in the Proxy, the Board purposefully concealed from

stockholders that those projections unreasonably assumed that the Company would discontinue a material part of its corporate strategy.  That omission rendered statements about the "organic" projections misleading.

10.     Even worse, Paliwal directed Harman management to apply a massive 25% cut to these "organic" projections.  The Proxy misled stockholders regarding the rationale for Paliwal's cut, which he likely made at the same time he was negotiating his side-deal with Samsung.  When describing Paliwal's downward revision, the Board advanced the misleading narrative that even the organic projections contained greater downside risk than upside potential. This narrative directly contradicted Paliwal's repeated statements to analysts that the organic projections were based on "by far very conservative" assumptions and that he was "very confident" in hitting the numbers in the later years.  Paliwal flip-flopped by presenting confidence about Harman's projected cash flows when running the Company, then turning around and painting a dark and foreboding picture about the same set of numbers when attempting to sell the Company and lock in tens of millions of dollars in personal gains.

11.     The Board compounded these misstatements by including misinformation in the Proxy stating:  (a) that Harman did not previously "make public long-term projections as to future performance" (false); (b) that the projections contained in the Proxy "were prepared for internal use" (false); and (c) that the projections contained in the Proxy "were not prepared with a view toward public disclosure" (false).

12.     The Board ultimately paid $56 million to two banks – J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard") – for the fairness opinions that utilized Paliwal's projections.  The Board's financial advisors disclaimed approval of the projections and simply used the numbers "without independent verification of such information."  For their work, the Board paid the financial advisors a total $56 million in fees, all of which was contingent upon the

- 4 -

advisors declaring the deal fair.  The Proxy failed to disclose, however, that J.P. Morgan was concurrently engaged by a Samsung affiliate at the same time it was purportedly negotiating against Samsung in connection with the Acquisition.

13.    As a result of the materially misleading Proxy, uninformed Harman stockholders voted in favor of the Acquisition on February 17, 2017.  Just 46,921,832 shares out of 69,883,605 total outstanding shares of Harman common stock, or 67%, were voted in favor of the Acquisition, which is an unusually low number on an all-cash third-party acquisition (which are invariably announced at a premium).

14.    The Proxy also included a recommendation from the Board "that the stockholders of the Company vote 'FOR' the advisory (non-binding) proposal to approve specified compensation that may become payable to the named executive officers of the Company in connection with the merger."  On this proposal, stockholders voted overwhelmingly against Paliwal and other Harman executives' lavish Acquisition-related compensation.  Over 35 million shares voted against the executive compensation packages, while just 14 million shares voted in favor.  Because the vote was just "advisory" and "non-binding," however, both Samsung and Harman flouted stockholder preference and agreed to pay Paliwal in any event.

15.    Samsung's improper side-deals were not unprecedented for Samsung; in fact, its leadership is notorious for unscrupulous business practices.  Indeed, on February 16, 2017 – before the close of the Acquisition –  Samsung's vice chairman and acting head Lee Jae-yong, son of incapacitated chairman Lee Kun-hee, was arrested on charges of bribery, perjury, concealment of criminal proceeds, and illicit transfer of assets abroad.  On February 28, 2017, Lee and four other top Samsung executives were formally indicted on charges including embezzlement and bribery.  Lee is accused of paying $36 million in bribes to entities run by Choi Soon-sil, a friend of the impeached South Korean President Park Geun-hye, in return for the government's backing the

merger of two Samsung affiliates in 2015, as reported by the South Korean news agency *Yonhap*. Also according to *Yonhap*, investigators suspect that Choi and Park took bribes from Samsung in return for business favors.

16.     The preparation and dissemination of the false and misleading Proxy induced stockholder action which resulted in substantial harm to Plaintiff and Harman's other shareholders. After the stockholder vote, the Acquisition closed on March 10, 2017.

17.     This action seeks damages on behalf of Harman's stockholders, incurred as a result of the defendants' materially misleading Proxy disseminated in contravention of §§14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act for violations of §§14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.   This Court has supplemental jurisdiction under 28 U.S.C. §1367.

19.     This Court has personal jurisdiction over each of the defendants because each is a corporation that conducts business in and maintains operations in the forum state, has purposefully directed its activities toward the forum state, or is an individual who has sufficient minimum contacts with the forum state so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Harman's headquarters are located in this District, at 400 Atlantic Street, Stamford, Connecticut 06901, and the special meeting on the Acquisition occurred in this District, at the Sheraton Hotel, 700 E. Main Street, Stamford, Connecticut 06901.   Moreover, defendants include officers and/or directors who reside in Connecticut.

## PARTIES

21.     Plaintiff Patricia B. Baum was, and had been at all relevant times, the owner of Harman common stock.

22.     Defendant Harman was a Delaware corporation that maintained its headquarters at 400 Atlantic Street, Suite 1500, Stamford, Connecticut 06901.  Its stock traded on the New York Stock Exchange under the ticker symbol "HAR."

23.     Defendant Paliwal served on the Board since 2007 and as the Company's Chairman, CEO and President since July 1, 2008.  Paliwal first joined Harman in July 2007 as Vice Chairman and CEO.  Before joining Harman, Paliwal was a longtime executive at ABB, Ltd. ("ABB"), a global company operating mainly in robotics and the power and automation technology areas.  While at ABB, Paliwal worked alongside defendant Steel (identified herein).

24.     Defendant Adriane M. Brown ("Brown") served on the Board since 2013.

25.     Defendant John W. Diercksen ("Diercksen") served on the Board since 2013.

26.     Defendant Ann M. Korologos ("Korologos") served on the Board since 1995 and as the Board's Lead Director since May 2008.

27.     Defendant Robert Nail ("Nail") served on the Board since 2015.

28.     Defendant Abraham N. Reichental ("Reichental") had served on the Board since 2015.

29.     Defendant Kenneth M. Reiss ("Reiss") served on the Board since 2008.

30.     Defendant Hellene S. Runtagh ("Runtagh") served on the Board since 2008.

31.     Defendant Frank S. Sklarsky ("Sklarsky") served on the Board since 2012.

32.     Defendant Gary G. Steel ("Steel") served on the Board since 2007.  Before joining the Board, Steel was a longtime executive at ABB, where he worked alongside and developed a close relationship with Paliwal.

- 7 -

33.     Defendants Paliwal, Brown, Diercksen, Korologos, Nail, Reichental, Reiss, Runtagh, Sklarsky and Steel are collectively referred to as the "Board" or the "Individual Defendants."  All Individual Defendants other than Paliwal are collectively referred to as the "Outside Directors."

## RELEVANT NON-PARTIES

34.     Samsung is a South Korean multinational electronics company.  It is the world's second-largest information technology company by revenue.  Samsung's products include TVs, smartphones, wearable devices, tablets, digital appliances, network systems, and semiconductor and LED solutions.

35.     Samsung Electronics America, Inc. ("Samsung USA") is a New York corporation and a wholly owned subsidiary of Samsung.

36.     Silk Delaware, Inc. is a Delaware corporation and a wholly owned subsidiary of Samsung USA that was formed for the sole purpose of effectuating the Acquisition.

37.     J.P. Morgan and Lazard acted as Harman's financial advisors regarding the Acquisition (the "Financial Advisors").

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

38.     Harman designs and engineers connected products and solutions for automakers, consumers and enterprises worldwide, including connected car systems, audio and visual products, enterprise automation solutions, and connected services.  The Company's brands include AKG®, Harman Kardon®, Infinity®, JBL®, Bang & Olufsen®, Bowers & Wilkins®, Lexicon®, Mark Levinson® and Revel®.

39.     Prior to the Acquisition, Harman operated in four segments: Connected Car, Lifestyle Audio, Professional Solutions and Connected Services.  For fiscal 2016 (which ended June 30,

2016), these segments accounted for approximately 45%, 31%, 15% and 10%, respectively, of the Company's net sales.

40.     The following slide provides a visual breakdown of Harman's four divisions, as presented by Harman in August 2016:



41.     At the same time, Harman summarized its "investment thesis" to analysts as follows:

42.     Harman contended that it was best viewed as a high tech software company, rather

than a traditional speaker manufacturer.  At the Robert W. Baird Global Consumer, Technology &

Services Conference on June 9, 2016, Paliwal stated:

> [A]lthough the official name of the Company is Harman Industries Incorporated,
> symbol HAR, we are not a traditional [industrial company], we are a very high-tech
> company.  If you look at kind of a high-tech company like Apple where you have
> mobile devices and iCloud and iTunes and so on and so forth, Harman is [also] all
> about technology.  We are a very technology-heavy company in terms of . . . working
> in already interesting and exciting areas of the new trends around connected car,
> connected homes, connected enterprise, and so on and so forth.
>
>                             *       *       *
>
> So although the other three divisions sell the products as a hardware product,
> really the divisions are software divisions.  Connected car for example, if you look at
> the real IP of what we do in connected car as Harman is really we built this very
> complex system.  Yes, it's packaged in a hardware, just like Apple IP is packaged in
> a piece of hardware device that you all carry.  No different. Just like Apple has in a
> cloud platform with iTunes and iCloud and so on and so forth, Harman is the only
> tier 1 that has a service delivery platform, . . .  analytics cloud platform and a
> software OT management cloud platform to complete that whole end-to-end
> connected car strategy.  So we are really a software company when it comes to kind
> of a lot of things that we do.  Yes, we do deliver our value on hardware. Just like you
> can't run Google or Apple, you need hardware to run that. The same thing for us as

- 10 -

well.  And to produce sound, you need acoustics and you need something to move the air.

**The Company Relied Heavily on Bolt-On Acquisitions**

43.     Harman built its growth strategy largely through acquisitions.  Indeed, Harman describes itself on page 1 of its last annual report prior to the Acquisition, issued on August 11, 2016, as follows:

> We believe we are a leader in the design and engineering of connected products and solutions for automakers, consumers and enterprises worldwide, including connected car systems, audio and visual products, enterprise automation solutions and connected services. ***We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets***. Our AKG®, AMX®, Crown®, Harman/Kardon®, Infinity®, JBL®, JBL Professional, Lexicon®, Mark Levinson®, Martin®, Revel®, Soundcraft® and Studer® brand names are well known worldwide for premium quality and performance. Our software solutions power mobile devices and systems that are designed to be connected, integrated, personalized and adaptive across all platforms, from work and home, to car and mobile.

44.     Harman completed the following acquisitions from February 2015 to March 2016, all of which materially contributed to the Company's growth strategy:

- **TowerSec Ltd.**  On March 10, 2016, a Harman subsidiary acquired all of the outstanding shares of TowerSec, a global automotive cyber security company, for a purchase price of $45.0 million, subject to certain adjustments.

- **Southern Vision Systems, Inc.**  On June 10, 2015, a Harman subsidiary acquired all of the issued and outstanding shares of Southern Vision Systems, a developer, manufacturer and marketer of audio/video over internet protocol products and services, for a total purchase price of $20.0 million, subject to certain adjustments.

- **Bang & Olufsen Automotive Assets.**  On June 1, 2015, Harman acquired certain automotive assets and liabilities of Bang &Olufsen A/S ("B&O"), a developer of home audio systems and car audio solutions, including a perpetual exclusive license to use the Bang & Olfusen and B&O Play® trademarks, for a total purchase price of €150.8 or approximately $165.7 million, subject to a final purchase price adjustment.

- Symphony **Teleca Corporation.**  On April 8, 2015, Harman acquired all of the outstanding shares of Symphony Teleca Corporation, a global software services company, that provides software, engineering and integration services, for an estimated total base purchase price of $720.8 million, of which $491.5 million was

- 11 -

paid at closing, consisting of $299.7 million in cash and $191.8 million in shares of Harman common stock.

- **Red Bend Ltd.**  On February 26, 2015, a Harman subsidiary acquired all of the outstanding shares of Redbend, a provider of software management technology for connected devices, over-the-air software and firmware upgrading services, in a cash and stock transaction valued at approximately $195.3 million, of which $71.0 million was paid in cash and $124.3 million was paid in shares of Harman common stock, subject to certain adjustments.

- **S1nn GmbH & Co. KG.**  On February 1, 2015, a Harman subsidiary acquired all of the issued and outstanding shares of S1nn GmbH & Co. KG, a developer of infotainment systems, connectivity and car audio solutions, for a total purchase price of €49.0 million or approximately $55.4 million, which includes €4.1 million, or approximately $4.6 million, placed in escrow for certain indemnification holdbacks.

45.     These acquisitions total over $1.2 billion in consideration.

46.     Harman intended to continue its acquisition strategy for the foreseeable future. Harman confirmed in its annual report issued August 11, 2016 that "*[a]cquisitions are an important element of our corporate growth strategy and use of capital*, and these transactions could be material to our financial condition, results of operations and cash flows.  *We expect to continue to evaluate and enter into discussions regarding a wide array of potential strategic transactions*." The same annual report represented that Harman's "Growth Strategy" consisted of four primary drivers, one of which included "*Continued growth through acquisitions*."  Paliwal similarly stated days earlier:  "A product like this is a perfect example of how our bolt-on acquisition are paying off. We strategically expanded our capabilities in over-the-air update technology, cybersecurity, cloud applications, and data analytics, and when we combine these with our own deep expertise in connectivity technologies, we can create unique solutions for our customers that are smart, safe, secure, and real-time updatable."

47.     Even after the Acquisition was announced, Paliwal confirmed that the Company's acquisition strategy would continue unabated.  When asked by *Bloomberg* on January 4, 2017

whether Harman would be "making any more acquisitions" and whether it was still "on the M&A trail," Paliwal answered:

> [Y]es, because if you really want to be fast to the market, then you need to be alert and agile. Sometimes you do your own developed organically, which we do. At the same time, either you need to partner, collaborate . . . are actually acquired. So we speak to markets. So yes, we will definitely make some unique technology acquisitions, especially in the area after safety and sensor detection and technologies.

**Harman Posts Strong Results in August 2016**

48.     On August 4, 2016, Paliwal and Harman CFO Sandra E. Rowland conducted a Q4 2016 earnings call, where they walked through a PowerPoint presentation entitled: "Fourth Quarter & Full-Year Fiscal 2016 Highlights." The presentation described the significant successes of fiscal 2016, including: "Net sales up 12% to $6.9B"; "GAAP EBITDA up 26% to $804M; Operational EBITDA up 20% to $836M"; and "GAAP EPS up 3% to $4.99; Operational EPS up 9% to $6.24." Paliwal also touted its "Industry-leading $24.1B automotive backlog," which was set to provide billions in revenues and growth for years to come. That presentation included the following slides:



49.    Defendant Paliwal commented on the year-end results in the related press release

issued by Harman the same day, stating:

> "*In fiscal 2016, HARMAN delivered record revenue, EBITDA and earnings per share*. . . . HARMAN's intelligent, embedded connected car solutions, including unparalleled audio and sound management systems, led to a record-breaking automotive backlog of more than $24 billion.  Together with a rapidly growing consumer audio business and improving Professional Solutions business, HARMAN has a strong foundation for long-term growth.

> . . . In fiscal 2017, we will continue to leverage our comprehensive technology portfolio, including expanded cloud and analytics capabilities, to meet the growing demand for embedded software and services in the automotive, consumer and enterprise markets.  We also presented a longer-term outlook that capitalizes on the opportunities in connected car, mobility and IoT.  *With an industry-leading automotive backlog and continued focus on disciplined execution, HARMAN is well positioned to deliver superior financial and operational performance for our customers and shareholders*."

**Paliwal Publicly Discloses Harman's Long-Term "Public Organic Projections"**

50.    As noted, on August 4, 2016, Paliwal and Harman CFO Sandra E. Rowland

conducted a Q4 2016 earnings call, where they walked through a PowerPoint presentation entitled:

"Fourth Quarter & Full-Year Fiscal 2016 Highlights."  That presentation contained a series of

- 14 -

"Financial Outlook" slides, projecting the Company's growth for fiscal year 2017 and beyond. Paliwal and Rowland's presentation stated in its opening slide that Harman management prepared projections "in light of [Harman's] industry experience, as well as its perception of historical trends, current market conditions, current economic data, expected future developments and other factors that the Company believes are appropriate under the circumstances."  Paliwal presented Harman's mid- and long-term outlook as follows:

Slide 20:



Slide 21:



51.     Harman's August 4, 2016 press release added: "'We also presented a longer-term outlook that capitalizes on the opportunities in connected car, mobility and IoT [Internet of Things]. With an industry-leading automotive backlog and continued focus on disciplined execution, HARMAN is well positioned to deliver superior financial and operational performance for our customers and shareholders.'"  That same press release provided projections for 2017, 2018 and 2019:

| Total HARMAN | Fiscal 2017 Guidance | Fiscal 2018 Outlook | Fiscal 2019 Outlook |
| --- | --- | --- | --- |
| **Sales** | $7.3 - $7.5B | ~$7.7B | ~$8.6B |
| **Operational EBITDA** | ~12.4% | ~12.7% | ~13.5% |

52.     Combining the two slides above with the press release shows that Harman externally provided its organic five-year growth forecasts for FY2017, 2018, 2019, and 2021 as follows:

**Public Organic Projections**

|  | **FY2017E** | **FY2018E** | **FY2019E** | **FY2020E** | **FY2021E** |
|---|---|---|---|---|---|
| **Revenue** | $7.4B | $7.7B | $8.6B | [$9.9B][1] | $11B |
| **Operational EBITDA margins[2]** | 12.4% | 12.7% | 13.5% | | |
| **Operational EBITDA[3]** | $917m | $978m | $1.161B | | |

53.     Importantly, the above projections reflected only "organic" growth.  In other words, those projections do not incorporate additional bolt-on acquisitions, which constituted a key pillar of the Company's overall growth strategy.[4]  This fact is evidenced by the description above the projections in Slide 21 (above), which states that they represent "ORGANIC REVENUE CAGR."  In addition, Slide 20 (above), lists the revenue "growth drivers" for these projections and "acquisitions" are not included.

54.     Harman also confirmed that it considers "organic growth" separate and distinct from "strategic, bolt-on acquisitions that accelerate growth" in the "Capital Allocation Considerations" box in the lower-right corner of Slide 22 (below), from the same presentation:

---

[1]     FY202E is not disclosed, but is added here and rounded to approximate growth between what Harman disclosed for FY2019E and FY2021E.

[2]     Harman provides outlook regarding EBITDA margins, which represents operational EBITDA as a percentage of revenue.

[3]     Operational EBITDA is calculated by applying the operational EBITDA margin percentage to revenue.

[4]     The word "organic," when referencing a company's growth, generally means internal growth without acquisitions.  In more detail:  "Organic growth is the growth rate a company can achieve by increasing output and enhancing sales internally.  This does not include profits or growth acquired from takeovers, acquisitions or mergers.  Takeovers, acquisitions and mergers do not bring about profits generated within the company, and are therefore not considered organic growth."  *See* http://www.investopedia.com/terms/o/organicgrowth.asp#ixzz4lRABwOzV.





55.     Slide 22 (above) also confirms that as of August 4, 2016, "strategic bolt-on acquisitions that accelerate growth" remained a key aspect of Harman's corporate strategy for the forseeable future.

56.     When presenting these slides at the August 4, 2016 Harman Q4 2016 earnings call, Paliwal made a number of statements about Harman's expected growth:

> I'm pleased to report that our automotive backlog now stands at $24.1 billion.
> . . .  Our record automotive backlog of more than $24 billion provides Harman a strong foundation for long-term growth.

> \*       \*       \*

> This morning, we have also provided financial guidance for 2017 and presented a longer-term outlook. . . .

> As we look forward, we see significant growth opportunities across all of the divisions.  In the automotive space, the industry's experiencing an unprecedented social and technological transformation fueled by increasing intelligence connectivity and supported by autonomous vehicles, electrification, and other mobility. The car is getting an upgrade as never seen before. Harman is well-positioned to capitalize on each of these trends.

> \*       \*       \*

- 18 -

Building on our strong backlog of awarded business and track record of execution, we expect continued growth in our automotive revenue.  At the same time, due to the staggered timing of various automotive program launches and roll-offs, we expect to see lower growth in 2018 followed by strong growth in 2019 and beyond.

*     *     *

*Longer term, we are confident that we will see accelerated revenue expansion from our automotive backlog, higher margin automotive services, and increasing market demands for Connected Car and autonomous driving technologies*.  On top of that, there are additional reasons to be excited.  With autonomous driving, the in-car audio experience, or sound management, becomes even more essential. With our record $6.6 billion car audio backlog and continued growth in take rates, we expect car audio continue to lead the Company in profitability and grow faster than the Company average.

. . . Together, with the continued growth in our consumer audio business and increasing opportunities in Connected Services, we are squarely on the path towards achieving our goal of $11 billion in revenue by 2021.

57.     On the same call, Paliwal and CFO Rowland also fielded a number of questions from

analysts regarding the long-term Public Organic Projections:

Ryan Brinkman – JPMorgan – Analyst:

It looks like you're expecting, as Sandy mentioned, an acceleration in 2019 versus 2018.  I'm just curious what is primarily driving that, whether it might relate to a potential single large contract on the Connected Car side or really just a collection of smaller factors? . . .

Dinesh Paliwal – Harman International Industries, Inc. – Chairman, President & CEO:

Ryan, thank you for your question. Yes, first of all, we are very happy with 2016 record revenue and EBITDA and EPS and with a great backlog we have, especially, *I repeat, $11 billion auto bookings in the last two years, that gives us momentum, so we are very confident about [the] out years*.

As we indicated, 2018 directional outlook is a slower growth and in fact flattish Connected Car revenue and that is primarily due to rolling off of some of the programs while we're still ramping up the large programs both in Europe and North America but they will not be fully at scale. *So that is what is reflected in 2019 and 2021, double-digit growth, and we have a number of North American and even Asian programs coming up which also have very good margins. So we feel very good about 2019, 2021*. Also, 2018 is actually still a good year. We're still growing and still expanding our margins.

*     *     *

- 19 -

Dinesh Paliwal:

So, all in all 2018 would be a very busy, very good year building up for excellent accelerated growth in 2019 and onwards.

*     *     *

David Leiker –  Robert W. Baird & Company, Inc. – Analyst:

Okay, great.  And in the 2019, 2021 timeframe what are you assuming there for expansion [in] take rates?

Sandy Rowland – Harman International Industries, Inc. – CFO:

Our plan as we look out the next three years is that we will continue to see a linear path. So this year for take rates we saw that the industry finished right around 27% and our guide for next year calls for take rates rising to about 30%. And we've continued the same linear trajectory in our guidance through out through 2019.[5]

*     *     *

Brian Johnson – Barclays Capital – Analyst:

Yes, good morning.  Want to return to the topic of growth in Connected Car for 2019 over 2018 and 2018 over 2017.  When we think about keeping 2018 flat in the face of what sounds like some customer roll offs and then growing in 2019, how much of that business is already in the new business backlog and how much is yet to be signed?

Dinesh Paliwal:

Brian, first of all thanks for your question. Typically, we have 100% of revenue in the backlog for the immediate 12 months year, so FY17 we have 100% revenue in our backlog, and three years out, which is 2019, we have about 75% of the revenue in the backlog, and typically five years out we will have 50% in the backlog which makes a lot of sense.  That's what gives us good visibility and of course we will be booking more orders towards 2021 and subsequently.

*     *     *

Paresh Jain – Morgan Stanley – Analyst:

. . . And what gives you more comfort around that 7% to 8% growth in the next three years when many in the industry believe we've seen peak [SAR]?

---

[5]    According to Harman, "[t]he term 'take rate' represents the number of units sold by the Company divided by an estimate of the total number of vehicles of a specific vehicle line produced during the same timeframe."

- 20 -

Sandy Rowland:

What gives us confidence in our growth is the platforms we have rolling on coming out of our backlog and converting into revenue and some of the mega trends around connectivity and take rates and telematics.

Dinesh Paliwal:

Can I just add maybe quickly, Paresh, that might be very useful.  So we guided 7% revenue growth for Connected Car for FY17. Actually, you have to consider 4% to 5% we started [a hole] as APR. So for us to have 7% growth, we need to have right around 10% to 11% total growth.

So that means we will have roughly about 2% to 3% production, which is a reasonable assumption, and 5% to 6% of our growth will come from take rates, which is pretty much in line with – if industry will go from 27% to 31%, 3% to 4% so that will mean – 44%, so that will mean 5% to 6% for us to achieve our 7%. And then remaining 3% to 4% in program expansion. So add them all together it becomes right around 8% – 7% to 10% – or actually 8% to 11%. Take out the APR and that gives you 6% to 8% range which is about 7% mid-point. That's what we guided.

*          *          *

Brad Erickson – Pacific Crest Securities – Analyst:

First I guess just on the inflection you're looking for in revenue growth beyond 2019 out to 2021.  I imagine confidence there comes from just so many wins in hand, pretty good for Connected Car's portion. How would you impact that between for the growth beyond 2019? How would you impact that just between the embedded infotainment versus display audio wins you talked about here this morning?

Dinesh Paliwal:

Brad, first of all thanks for the question. I don't think we break out display audio revenue or telematics revenue unless we start to report in our reporting system. *What I would say though, inflection point from 2019 onwards, beyond 2018 we are very fast-paced growth because we're relying on current programs which are being developed*.  They have a very large ramp up. Once they scale it, they're going to be great.

They're all scalable platforms. We have very good margin in this business. Once they scale it, this will good for revenue. That's why what we saw exactly after transition year 2013, *we saw 2014, 2015, 2016 double-digit growth in Connected Car and same thing we think is going to happen after transition year of 2018*.

58.    On August 10, 2016, Paliwal gave a presentation on Harman's behalf at the annual JPMorgan Auto Conference.  Paliwal made a number of statements about the Company's anticipated long-term growth and answered related questions from analysts as follows:

Dinesh Paliwal:

So quickly to wrap the discussion on last year's earnings, last week, we announced our full-year earnings.  What I can say?  It was a banner year for Harman, record high revenue, record high EBITDA and record high earnings per share.  We touched nearly $7 billion in our topline first time and most important for me is that futuristic indication of pipeline of orders.  So we reached $24.1 billion in auto backlog, which includes $5 billion new awards last year, which I will talk in a second.  So I'm very happy about that.

*      *      *

Looking at our backlog, this is a great success story. Over the period of six years, we have grown backlog with a CAGR of 10%, and if you see, this backlog is double-digit operating margin. Car audio business is crown jewel of the Company, which is about $6.6 billion, but $24 billion [in backlog] is record high in the industry, the second best is not even two-third of it; so very happy with this. This gives us the confidence to give you – to give us and give you the visibility in [2017] and of course, mid-term 2019 and 2021. We know exactly the timings of the major SOPs and what have you.

*      *      *

Just to close it out, I would not read every line, but we have a very compelling growth story, and it's a secular growth story.  With over $24 billion auto backlog with double-digit margin in it, enabling technologies to address the megatrends, we are in all growth markets.

*      *      *

Ryan Brinkman:

Firstly, on the North America SAAR cycle; that's one of the biggest inbound questions we get from investors, all this notion of peak SAAR, where do you think we are in the demand cycle in the US and how is Harman positioned for the next several years of – some people think potentially slower growth industry-wide?

Dinesh Paliwal:

Going forward, we have guided you based on what we see.  We see some moderation, and we guided 2% to 3% production for 2017 and about 3% in midyears 2018, 2019 time frame.  And that's pretty much what we think our customers are sharing and we also rely on our customers' long-lead items and what their visibility

- 22 -

is. . . . So between those three, we feel good about the guidance we've given and that reflects what I just said 2% to 3% for 2017 and 3% for the outyears.

\*      \*      \*

Dinesh Paliwal:

So Ryan, first of all, we are very happy that we had over $5 billion worth of new awards in fiscal 2016. Just [to] put things in perspective, that is 20% higher than our last year's automotive revenue; that's a great development. This is on top of a banner year of 2015, when we booked $6.1 billion new awards. So put that together, we have more than $11 billion of new awards in last 24 months. I don't know any company who has any success like that. *So that also tells you the momentum based on new technology, based on the acquisitions, the investment we have been making. I think automakers are taking notice of where we're going.* We're very happy about that.

\*      \*      \*

Unidentified Audience Member:

In the Connected Car division, a lot of the growth eventually in this business comes from takes rates. You guys assume, I think, a linear progression in your guidance of 3%. The talk obviously for long time is when that growth is exponential and your take rates approaching 75%, 90%, whatever it is, I know it is on your guidance, but how do you even think about that given your discussions with the OEMs or everything else. Where do we start hitting that inflection realistically because it always seems to be on the horizon and you never seem to get into the horizon?

Dinesh Paliwal:

*It is a great question and let me just say first of all, in our guidance, we have taken linear 3%, which frankly is conservative* because we do expect some non-linear development to happen; question is when. And also, we should understand what has been holding up take rates to go from linear to non-linear. Unless you have an enabling technology to keep your system software and hardware up to date in the car, not too many people are willing to spend $1,500 or $2,000 to buy a fully flag infotainment system.

. . . We think it may be one life cycle, maybe three to four years before we see non-linear, but we have guided our backlog is -- *and our guidance is based on 3%, a bit conservative*.

59.     The following month, on September 7, 2016, Paliwal appeared at the RBC Capital Markets Global Industrials Conference and again fielded questions about the Company's long-term projections:

Dinesh Paliwal:

So with that, we feel very good where we are today.  We have a $25 billion order book to set us up for the next five years, very strong visibility in our revenue in automotive and other areas.  I feel good about where our position is. We are number one in all markets we serve.

Joe Spak – RBC Capital Markets – Analyst:

Great, so I think you touched on a lot of the highlights and a lot of the drivers, positive secular drivers here that are going to help Harman.  And you recently put out your more midterm guidance, calling for high single-digit organic growth over the next couple of years, undoubtedly one of the best among our coverage.

The way you get there, I think, is a little bit unique. So I think you did about 16% constant currency last year. That dips down to about 7% at the midpoint. I think it dips down a little bit more the year after before it re-accelerates, so a little bit of choppiness.

Can you just talk about really some of the underlying dynamics there? And is that really just a function of the way business rolls on and off or is there something a little bit more unique there?

Dinesh Paliwal:

So, all in all, we are very happy because most of the peer group is really coming out with low to mid single-digit growth.  We are much ahead of them.  We are guiding 7% organic, and how it all makes up, automotive drives our topline.

\*          \*          \*

So I think 2017 is a pretty decent year. Then we have guided until 2021 – outlook, not guided. We are doing an outlook. So we see 2018 as a transition year as some of the larger programs are rolling off, particularly FCA. Where there are other big programs like General Motors, Subaru, and many others are just ramping up end of this fiscal 2017, but they will be – launching end of fiscal 2017, but they will be ramping up in 2018 and really get to scale in 2019 time frame.

\*          \*          \*

Joe Spak:

And then the other thing you brought up was take rates, which, as you mentioned, have been fairly consistently trending up, about 300 basis points – this is an industry number – a year.  We agree with you that it seems like at some point there is going to be a more massive inflection there.

And it also seems, and I would be curious to get your point of view, within your guidance range that seems to be – production you can't control.  I guess take

- 24 -

rates you can't really control as well, but it seems like take rates is a big leverage, where you come off of it, for you to maybe do a little bit better than you have guided. Is there any sensitivity you could give us to maybe what 100 basis points of take rate means for you?

Dinesh Paliwal:

Absolutely, and first of all, I reiterate and totally agree with you. *I think our guidance for 2017 or actually outlook for 2021 is by far very conservative*, because if you don't believe in autonomous or semi-autonomous experience, that is a different story, but I don't think anybody in this room thinks that we're going to go backward. I don't think so.

*        *        *

You ask me [about] sensitivity, so in our case, 1% increase in take rate amounts to about $50 million to $75 million in revenue gain. *So if there isn't any increase during the year or year out, we will see that as an upside in our case*.

60.    As Paliwal indicated above, Harman's confidence regarding its projections extending to 2021 was supported by the Company's outstanding backlog of customer orders.  According to Harman, "backlog" (or "awarded business")

represents the estimated future lifetime net sales for all of the Company's automotive customers.  The Company's awarded business does not represent firm customer orders.  The Company reports its awarded business primarily based on written award letters.  To validate these awards, the Company uses various assumptions including global vehicle production forecasts, customer take rates for the Company's products, revisions to product life cycle estimates and the impact of annual price reductions and exchange rates, among other factors. . . .  The assumptions the Company uses to validate these awards are updated and reported externally on an annual basis.

As noted, Paliwal stated in August 2016 that "[o]ur record automotive backlog of more than $24 billion provides Harman a strong foundation for long-term growth."  Paliwal explained that the backlog is what gives Harman "good visibility" and "confidence" into its projections extending out to 2021.  In the same regard, on November 9, 2016, Michael Mauser, Harman EVP and President, Lifestyle Audio Division, publicly stated:

We [have] an industry-leading backlog, back order in automotive, $24 billion. Nobody in that industry has that and you know that lasts into the next four or five years.  So there is a very good certainty how that business is going to evolve and I'm talking about profitable higher margin in all the business backlog.

In a June 14, 2016 presentation at the William Blair Growth Stock Conference, Paliwal described the

Company's backlog as follows:

> Most important thing on this slide, there are quite a few things, but order
> backlog.  I think that's the yardstick of future.  It's like always when you say share
> price is the indication of next few years of earnings.  I think order book is very
> important because when you get an order today you will not have it ready to launch
> for the next 2, 2 1/2 even 3 years sometimes.  And then you've got three, four years
> of production lifetime.  So you are talking six, seven years from the day you get
> order.

61.     On August 4, 2016, Paliwal and Rowland presented a slide regarding the Company's

growing backlog:



62.     Similarly, on August 10, 2016, Paliwal stated regarding the Company's then-recently

announced backlog of $24.1 billion:

> Car audio business is crown jewel of the Company, which is about $6.6 billion, but
> $24 billion [in backlog] is record high in the industry, the second best is not even
> two-third of it; so very happy with this. This gives us the confidence to give you – to
> give us and give you the visibility in [2017] and of course, mid-term 2019 and 2021.
> We know exactly the timings of the major SOPs and what have you.

**The Materially Misleading Proxy**

63. The Board issued the definitive Proxy on January 20, 2017. The Proxy contained a number of misleading statements and omissions regarding the Company's expected future cash flows.

64. *First*, the Proxy failed to disclose that its "Management Projections" – which supported the Board's recommendation regarding the intrinsic value of Harman – rested on an unreliable premise that the Company would immediately discontinue its longstanding and valuable bolt-on acquisition growth strategy (as described in detail above). The Proxy includes what it defines as Management Projections, which are partially contained in the table below:

**Proxy Management Projections**

|  | FY2017E | FY2018E | FY2019E | FY2020E | FY2021E |
|---|---|---|---|---|---|
| Revenue | $7,400 | $7,672 | $8,597 | $9,893 | $11,245 |
| EBITDA margin | 12.4% | 12.7% | 13.5% | 14% | 14.4% |
| EBITDA | $920 | $971 | $1,158 | $1,389 | $1,618 |

65. To provide a comparison, the following contains revenue and EBITDA numbers from the Public Organic Projections, as described above and publicly disclosed by Harman on August 4, 2016:

**Public Organic Projections**

|  | FY2017E | FY2018E | FY2019E | FY2020E | FY2021E |
|---|---|---|---|---|---|
| Revenue | $7,400 | $7,700 | $8,600 | [$9,900] | $11,000 |
| EBITDA margin | 12.4% | 12.7% | 13.5% |  |  |
| EBITDA | $917 | $978 | $1,161 |  |  |

66. Note that the Public Organic Projections are nearly identical to the Proxy Management Projections, with the only differences arising because of the rounded numbers in the Public Organic Projections. Comparing the two sets of nearly identical projections make it clear that the Proxy Management Projections also only include organic growth, *i.e.*, they too do not

- 27 -

incorporate any aspect of the Harman's well-established acquisition strategy.  Stockholders reading the Proxy would not have known this, however, because the Proxy concealed this important fact.

67.     As noted above, as of the time of the Acquisition, Harman's business strategy included a valuable mix of organic growth and bolt-on acquisitions.  Harman spent over $1.2 billion on acquisitions in 2015 and 2016 alone.  Multiple management presentations throughout 2016 articulated this strategy, as did Harman's annual report.   Paliwal confirmed between the announcement and close of the Acquisition that the Company's bolt-on acquisition strategy would "definitely" continue for the foreseeable future.  The projections contained in the Proxy, however, did not include any revenues from this valuable component of Harman's growth strategy.  Worse, the Board chose to conceal this fact when describing the Proxy Management Projections – the Proxy never states that those projections incorporate only organic growth, thus leaving out a material piece of the Company's operative business strategy.

68.     The following statements are rendered misleading by that crucial omission:

> *The Management Projections were prepared based on assumptions reflecting the best currently available estimates of and judgments by the Company's management at the time the Management Projections were prepared as to the expected future results of operations and financial condition of the Company.*

*      *      *

> *Based on the foregoing, this [discounted cash flow] analysis indicated an implied per share price range for the Company's common stock of $104.00 to $129.25 per share, rounded to the nearest $0.25 per share.  Each of the Financial Advisors compared the implied per share equity value range to the Company's closing price per share of $87.65 on November 11, 2016 and the merger consideration of $112.00 per share.*

*      *      *

> *In relying on financial analyses and forecasts provided to J.P. Morgan or derived therefrom, J.P. Morgan assumed that they were reasonably prepared based on assumptions reflecting best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate.*

- 28 -

\*     \*     \*

*With respect to the financial forecasts utilized in Lazard's analyses, Lazard assumed, with the consent of the Company, that they had been reasonably prepared on bases reflecting the best currently available estimates and judgments as to the future financial performance of the Company.*

69.     The Board thus concealed that these projections rested on an unreasonable foundation, *i.e.*, an assumption that Harman would immediately cease its longstanding business practice and ongoing plan of pursuing bolt-on acquisitions despite repeated statements to the contrary. The misleading nature of the omission was compounded by the Proxy's false claim (described below) that Harman did not publicly disclose long-term projections, which caused stockholders to overlook the previously disclosed Public Organic Projections and related descriptions.

70.     ***Second***, the Board misrepresented in the Proxy that the Proxy Management Projections contained greater downside risk than upside potential, which directly contradicted Paliwal's earlier statements that, *inter alia*, the same projections were based on "by far very conservative" assumptions and that he was "very confident" in hitting the numbers in the later years. Even without the inclusion of the Company's bolt-on acquisition strategy, the Financial Advisors calculated a discounted cash flow ("DCF") analysis under the Proxy Management Projections with a midpoint of approximately $116.25 per share, which was of course above the deal price of just $112.00 per share. A solitary midpoint DCF above the deal price could have left the Acquisition exposed without fairness opinions – thus causing Paliwal to lose his lucrative side deals with Samsung – so Paliwal engaged in less-than-creative financial engineering by manufacturing a new, lower set of projections to reduce the valuations. At Paliwal's direction, Harman management applied a massive 25% cut to the Proxy Management Projections to both revenues and EBITDA margins from 2018 through 2021. The Proxy refers to the 25% cut as the "Sensitized Projections." The Proxy is silent as to precisely when Paliwal created the Sensitized Projections, but given that the

- 29 -

financial advisors presented no developed financial analysis until their fairness presentations on November 13, 2016, it is reasonable to infer that Paliwal created the Sensitized Projections after Samsung indicated it wanted to employ him on October 20-22, 2016 – a time when Paliwal was highly conflicted, as described further below.

71.     Under the Sensitized Projections, the financial advisors ran an additional DCF analysis, this time returning a value range of just $89.50 to $111.00 per share, with an approximate midpoint of just $100.25 per share.  The Board specifically touted this DCF analysis on the Sensitized Projections as "support [for] its decision" to recommend the Acquisition to stockholders. The Proxy describes the so-called "Sensitized Management Projections" as follows:

> In order to assist the board with its assessment of potential downside risks that could arise from reasonable deviations in the assumptions underlying the Management Projections, the Financial Advisors, based on certain assumptions and direction provided by the Company's management, prepared for the board, for reference purposes only and taking into account the views of management and the board as to certain potential risks and uncertainties inherent in the Management Projections, including with respect to industry cyclicality, technological disruption, execution risks and risks associated with new industry participants, the Sensitized Projections, which were based on the Management Projections but assumed that the projected revenue growth reflected in the Management Projections during fiscal years 2018 through 2021 was 25% lower than the amount reflected in the Management Projections in each of those fiscal years and that the incremental EBITDA margin expansion reflected in the Management Projections during fiscal years 2018 through 2021 was also 25% less during each of those fiscal years. The Company's senior management and representatives of the Financial Advisors also discussed potential opportunities for and the likelihood of the Company exceeding the financial performance reflected in the Management Projections, and ***the Company's senior management determined, taking into account the perspectives of the Financial Advisors, that the Management Projections currently reflected more downside risk as described above than likely upside potential and that, accordingly, no further modifications to the Management Projections were necessary or appropriate***. The Sensitized Projections were provided to the board in connection with its evaluation of the proposed merger but were not provided to Samsung or its representatives.

72.     This bold-italicized statement is both objectively and subjectively false and conflicts with Paliwal's repeated statements to analysts that the Organic Growth/Management Projections were "***by far very conservative***" and that those same projections  reflected far more upside potential

than downside risk.  This statement is additionally rendered false in light of the fact that the Proxy

Management Projections did not incorporate management's growth strategy of bolt-on acquisitions

(which would have amounted to additional upside potential) and Harman's record-breaking,

industry-leading $24.1 billion backlog (which provided certainty and reduced the downside risk in

the Proxy Management Projections).  Harman stockholders were thus deprived of fair and accurate

information regarding management's projections, which would have been essential to adequately

inform Harman stockholders about the Company's forward-looking prospects.

73.     ***Third,*** despite the fact that Harman made its long-term organic projections public in

August 2016, the Proxy (dated January 20, 2017) misleadingly stated as follows:

> ***The Company does not as a matter of course make public long-term
> projections as to future performance . . ., among other reasons, the unpredictability
> of the underlying assumptions and estimates and the inherent unreliability of such
> projections, though the Company has in the past provided investors with public
> full-fiscal-year financial guidance*** covering items such a revenue, EBITDA and
> adjusted diluted earnings per share, among other items, which it may update from
> time to time during the relevant fiscal year.

> \*          \*          \*

> ***The Projections were prepared for internal use and to assist Samsung and our
> Financial Advisors with their respective due diligence investigations of the
> Company or to assist the board in its review and analysis of the proposed merger,
> as applicable.  The Projections were not prepared with a view toward public
> disclosure . . . .***

74.     The Public Organic Projections that Harman touted in August 2016 extended to 2021

and were of course "long-term projections as to future performance," well beyond the "full-fiscal-

year financial guidance" referenced in the above statement.  In addition,  the above statements

regarding "the inherent unreliability of such projections" are inconsistent with Paliwal's repeated

statements that Harman's backlog provided reliable visibility into the Company's future revenues.

These misrepresentations were material because, after being accepted as true by a reasonable

stockholder, it would have caused the stockholder to focus only on the projections contained in the

proxy while overlooking prior long-term disclosures and related statements regarding publicly disclosed projections. This deception thereby facilitated the above-described misrepresentations and omissions by creating the misleading impression that Harman previously disclosed no long-term projections.

75.     Had the Board honestly and correctly disclosed Harman's expectations regarding the Company's future business and cash flows, Harman stockholders would not have been swayed by the unduly pessimistic sales pitch contained in the Proxy and would have realized the Acquisition undervalued Harman's future earnings potential. Had Harman's future business plan been properly disclosed and accurately presented, Harman stockholders would not have voted in favor of the Acquisition. But Paliwal and the rest of the Board knew that. So they concealed the fact that the Proxy Management Projections contained in the proxy did not include a keystone component of the Company's operative reality and standalone business strategy and presented a misleading narrative regarding the disclosed projections.

76.     The misleading statements and omissions described above were material. The Proxy represented that the Proxy Management Projections which formed the basis for the financial advisors' intrinsic valuation of Harman constituted "support [for the Board's] decision" to recommend the Acquisition to stockholders. And as noted above, when stockholders are forced to decide whether to accept a sum certain value in a cash-out merger, there is no more material information than management's estimates of the standalone corporation's future cash flows. Here, however, the Proxy: (a) omitted and concealed that Harman's "Management Projections" – which the Board relied upon to support and recommend stockholders vote "FOR" the Acquisition – rested on an unreliable premise that the Company would immediately discontinue its longstanding and valuable bolt-on acquisition growth strategy; (b) falsely represented that the Proxy Management Projections contained more downside risk than upside potential, which directly contradicted

Paliwal's earlier statements to analysts; and (c) included false statements indicating that Harman did not previously "make public long-term projections as to future performance" (false); that the projections contained the Proxy "were prepared for internal use" (false); and that the projections contained in the Proxy "were not prepared with a view toward public disclosure" (false).

77.     While Paliwal drove the projection-related misstatements, responsibility lies with the entire Board.  In addition to Paliwal, each of the Outside Directors knew – or certainly should have known – that a crucial component of Harman's growth strategy included inorganic growth, yet the "Management Projections" assumed that the Company would immediately cease and discontinue all acquisitions. Each Individual Defendant knew that Harman continued to pursue its acquisition-based strategy, given that each is charged with knowledge of the statements in the Company's most recent annual report, that "[a]cquisitions are an important element of our corporate growth strategy and use of capital."  Each Outside Directors knew – or certainly should have known – of the repeated public statements that Paliwal was making in support of the additional upside potential contained in the Proxy Management Projections, which contradicted Paliwal's downside-only adjustment.  Each Outside Director purportedly attended the final Board meeting on November 13, 2016, wherein J.P. Morgan and Lazard presented a DCF valuation based on the Proxy Management Projections and the Sensitized Projections.  And ultimately, each Individual Defendant, including each Outside Director, is implicated in the following recommendations in the Proxy, which are purportedly supported by valuations based on the Proxy Management Projections and Sensitized Projections:

> The board unanimously approved the merger agreement and determined that the merger and the other transactions contemplated by the merger agreement are advisable and in the best interests of the Company and its stockholders.  The board unanimously recommends that the stockholders of the Company vote "FOR" the proposal to adopt the merger agreement.

In support of these recommendations, the Proxy states that "the board believes [the following items] support its decision," which include:  the Company's "projected financial performance" and the

"discounted cash flow analysis using the Sensitized Projections . . . [which resulted in an] implied per share price range for the Company's common stock of $89.50 to $111.00, rounded to the nearest $0.25 per share."

78.    **Fourth,** the Proxy contained a misleading partial disclosure when describing J.P. Morgan's conflicts of interest.  Over the past several years, J.P. Morgan has advised and provided services to Samsung and its many affiliates.  As disclosed in the Proxy, over the preceding two years, "J.P. Morgan and its affiliates have had commercial or investment banking relationships with the Samsung" including the following engagements:

> Such services during such period have included acting . . . as joint bookrunner on the initial public offering of Samsung SDS in October 2014, as joint global coordinator and joint bookrunner on the initial public offering of Cheil Industries in December 2014, as financial advisor to [Samsung on Samsung's] disposals of equity interests in Samsung Techwin and Samsung Chemicals in June 2015 and as joint bookrunner on the initial public offering of Samsung Biologics in October 2016.

79.    Note that all of these engagements would have been completed prior to final deal negotiations in early November 2016 and prior to J.P. Morgan's November 13, 2016 fairness opinion.  The Proxy further stated that J.P. Morgan has earned roughly $17 million from Samsung in the past two years alone.

80.    What the Proxy fails to disclose, however, is that J.P. Morgan Asset Management also concurrently served as investment manager for the $270 million U.S. office mezzanine debt fund of Samsung affiliate Samsung SRA Asset Management at the same time J.P. Morgan was advising Harman during the Acquisition process.  Established in 2012, Samsung SRA has been an active investor in real estate equity and debt in the US, Europe and Korea on behalf of both Korean and international investors, with a net "assets under management" of over $2 billion.  Samsung SRA referenced J.P. Morgan Asset Management's engagement as a "partnership" on October 19, 2016, thus indicating that the engagement continued at least through the date of the Acquisition.

- 34 -

81.     This omission renders the Proxy's list of prior engagements misleading because it would give a reasonable stockholder the impression that no J.P. Morgan "affiliate" was engaged in a concurrent representation of a Samsung "affiliate."  This undisclosed conflict was material because J.P. Morgan served as the Board's lead advisor on the Acquisition and provided a fairness opinion regarding the $112.00 Acquisition price, which the Board repeatedly touted as justification for approving the Merger Agreement.  While the Board additionally retained Lazard, J.P. Morgan led both the process and valuations.  J.P. Morgan alone conducted discussions with Company A in October 2016 – neither any Board member nor Lazard participated in these discussions, even though J.P. Morgan was incentivized to prefer Samsung in light of its concurrent conflicts of interest.  Moreover, Lazard conducted no independent and separate financial analysis of Harman when issuing its fairness opinion.  Lazard merely relied on a joint analysis developed in conjunction with J.P. Morgan.

82.     As noted, based on the misleading Proxy, on February 17, 2017, Harman stockholders voted in favor of the Acquisition.

**The Sale Process Was Flawed and the Acquisition Price Therefore Does Not Provide a Reliable Indication of Value**

83.     The materially misleading Proxy did not arise in a vacuum.  Paliwal and the Outside Directors were incentivized to misstate the record after Paliwal obtained side-deals from Samsung for tens of millions of dollars in personal incentives and after the full Board oversaw a flawed process that failed to solicit a higher bidder for the Company.  By not contacting additional competing bidders (beyond Company A, who had already offered a higher price but was rebuffed by Paliwal and J.P. Morgan), the Board prevented the reliable price discovery that might have otherwise been obtained in a broad and unconflicted sale process.  The following provides a chronology of the flawed Acquisition process and demonstrates that its production of a $112.00 per share offer does not provide a reliable indication of value.

84.     Samsung reached out to an undisclosed member of Harman's management team on August 22, 2016 regarding a strategic interest.  Paliwal – but not the full Harman Board – soon intervened.  On September 8, 2016, Paliwal and Samsung executives met in person in San Jose, California.  At that meeting, Paliwal provided an overview of Harman's business and invited Samsung to sign a confidentiality agreement.  According to Paliwal in a later television interview, "when the Samsung opportunity in the summer came up, and we started talking, we found so many similarities of complementary technology.  They are into high end display, they are into processor, they are into 5G connectivity, they are investing in our division intelligence and speech engine, totally complementary.  Put it all together."  Ten days later, on September 18, Harman and Samsung entered into a confidentiality agreement.

85.     Paliwal held additional meetings with Samsung executives on September 18 and 19, 2016.  At these meetings, Samsung expressed an interest in acquiring Harman.  Rather than immediately inform the Outside Directors, Paliwal unilaterally invited Samsung to submit a formal bid with a specific price included.  By inviting a specific bid from a potentially interested acquirer, Paliwal, without full Board authorization, thus put Harman in play.  Paliwal did not promptly inform the Outside Directors of his invitation.  Also without informing the Outside Directors, Paliwal held an additional in-person meeting with Samsung on September 20, 2016 and a follow-up telephone call on October 2, 2016, where he provided additional highly confidential information to Samsung regarding Harman's businesses.

86.     Just as Paliwal had requested, on October 4, 2016, Samsung delivered a written acquisition proposal to Harman for $106.00 per share.  The Outside Directors learned of the letter and met two days later, on October 6, 2016.  Shortly thereafter, Samsung increased its proposal to just $109.00 per share.  The Board met again on October 11, 2016 and authorized Paliwal alone to attempt to obtain a higher offer of "at least" $112.00 per share.  It did not take much of an attempt.

- 36 -

The same day, Samsung agreed to increase the offer to $112.00 per share in cash, predicated on an exclusivity agreement. Samsung formalized its proposal in a written letter the following day. The $112.00 per share offer represented a mere 2.75% increase over the prior outstanding offer. Paliwal chose against countering to obtain a higher price.

87.     On October 13, 2016, Harman's lead financial advisor J.P. Morgan met with representatives of an entity identified only as "Company A." The previous December, Company A had submitted a mixed consideration proposal (cash and stock) to Harman for $115.00 per share. As a result, Company A's advisors came prepared to the October 13th meeting and reviewed illustrative transactions, indicating that Company A could again submit a bid of cash and stock for Harman, including more than a majority of Company A's stock. The Proxy does not disclose the value of the illustrative transactions proposed by Company A. Following that discussion – without requesting any non-public due diligence in order to assess the value of Company A's illustrative transactions – J.P. Morgan and Paliwal evaluated a "pro forma accretion/dilution" analysis with Company A and determined, without contemporaneous input from the Outside Directors, that Company A was unlikely to make a proposal more attractive than $112.00 per share. J.P. Morgan and Paliwal reached this unsupported conclusion, despite the fact that Company A had already proposed $115.00 per share for Harman less than a year prior. At Paliwal's request, J.P. Morgan called Company A's representatives on October 14, 2016 and requested a proposal consisting of more cash and less stock. After being unjustifiably rebuffed by Paliwal and J.P. Morgan, Company A did not thereafter respond.

88.     Without contacting any entity other than Company A, on October 14, 2016, Paliwal caused Harman to enter into an exclusivity agreement with Samsung. The exclusivity agreement prohibited Harman from conducting a true sale process and soliciting competing acquisition proposals through November 14, 2016. Harman and Samsung would announce the Acquisition on

that date and extend the no-shop, exclusivity agreement indefinitely. At this point, the Board received no formal financial analysis from its advisors to indicate that $112.00 per share was within a range of fairness.

89.     Thus, despite knowing Paliwal's incentives, the Board allowed Paliwal to prematurely eliminate Company A without informing Company A that Harman was (i) in play, and (ii) would soon enter exclusive negotiations. Paliwal effectively denied Company A an opportunity to respond when he rushed Harman into exclusivity less than 24 hours after making late-night requests to alter the cash vs. stock component in Company A's prior $115.00 proposal.

90.     The exclusivity agreement did not prevent Harman from attempting to negotiate a higher price from Samsung, as it allowed Harman to "negotiate the terms of the proposed transaction" even after the exclusivity agreement expired. The Outside Directors left discussions to Paliwal and, enticed by lucrative personal side-payments from Samsung, Paliwal chose not to seek a higher price. The Outside Directors allowed Paliwal to freeze negotiations at a price reached during an unsupervised one-on-one conversation with Paliwal's future employer and then sell the company without a counteroffer.

91.     Over three days in New York, from October 20-22, 2016, the management teams of Harman and Samsung held a series of unsupervised diligence meetings to cement the deal. At those in-person diligence meetings – attended by no Outside Director – Samsung expressed its preference for hiring Paliwal and other top executives, including Rowland. In fact, Samsung indicated that it was not willing to go through with the acquisition if Paliwal did not sign a suitable employment agreement. Harman thus had Samsung at a key leverage point. But rather than attempt to use this leverage to extract payment for Harman stockholders, Paliwal used Harman's leverage to extract payment for himself. Paliwal responded favorably, indicating that he could discuss his personal arrangements after the basics of the merger agreement were agreed-upon between the parties.

Again, nothing prevented Paliwal from attempting to negotiate a higher price from Samsung at this point.

92.    The Board met on November 3, 2016.  J.P. Morgan and Lazard reviewed only "preliminary" financial analyses of Harman.  The Board still had yet to receive any developed financial analysis with regard to the Company's standalone value, but still refused to attempt to negotiate a price above $112.00 per share.

93.    Harman continued to perform very well during this time.  Also on November 3, 2016, Harman reported outstanding first quarter fiscal year 2017 results:  in just one quarter, net sales increased 8% over the prior year to $1.8 billion; GAAP EBITDA increased 7%; Operational EBITDA increased 15%; and operational EPS increased an astounding 27%.  Paliwal publicly stated that:  "'Harman delivered a solid first quarter, with strong revenue growth and outstanding EBITDA and EPS performance. We secured $2 billion in new automotive awards in the quarter, demonstrating increasing demand from automakers and their drivers for a rich in-car experience, including embedded infotainment, cloud connectivity and sound management solutions. . . . [Harman is] *on track to meet our fiscal 2017 guidance*.'"  Also on November 3, 2016, Harman again confirmed that its acquisition strategy was continuing by presenting  "Capital Allocation Considerations" as above, which indicated that the Company's second priority, just behind driving organic growth, was that it would continue "strategic, bolt-on acquisitions that accelerate growth," as follows:



94.     On November 9, 2016, Michael Mauser, Harman EVP and President, Lifestyle Audio Division discussed the results with analysts, described the results as "very, very strong growth in revenue across the division, close to 20%, 19% growth and an EBITDA growth . . . of 50%, 5-0 for the first quarter.  So we are on a very good path starting in the new fiscal year."

95.     Starting November 8, 2016 – before the Board received any developed financial analysis regarding the $112.00 per share price and before any Board member voted in favor of the Merger agreement – Paliwal began negotiating his personal compensation directly with Samsung. The Outside Directors broadly permitted Paliwal to do so, yet did not oversee or supervise any of the discussions.  Harman had not signed the Merger Agreement with Samsung, yet Paliwal and the Board again chose against using Harman's leverage to negotiate a price higher than $112.00 per share.

96.     On November 11, 2016, in the midst of Paliwal's personal negotiations, J.P. Morgan and Lazard again showed an updated, but again merely "preliminary" financial analysis to the Board. At this same meeting, according the Proxy, the Board "expressed full support" for the Acquisition and authorized management to enter into the Merger Agreement, finalize their own compensation

agreements, and announce the Acquisition on November 14, 2016.  The Board still had yet to receive anything beyond mere "preliminary" financial analysis from its paid advisors.  Paliwal finalized his side-deal with Samsung in the next two days.

97.    The price term remained fixed while Paliwal and Samsung negotiated a termination fee, non-solicitation restrictions, and dividend payments. The price term remained fixed while Paliwal and Samsung negotiated certain undefined other "key terms" in the month leading up to the announcement. Indeed, the price term stood fixed at $112.00 while Paliwal and Samsung negotiated Paliwal's $21,961,769 retention award. Each term represents a point in the process where Paliwal could have negotiated price, but chose not to.

98.    On November 13, 2016, the Board held a meeting to formally approve the Merger Agreement and the Acquisition.  For the first time since retaining its advisors, the Board received a non-preliminary financial analysis.  J.P. Morgan and Lazard presented a DCF valuation on the Proxy Management Projections and the 25% downside adjustment created at Paliwal's direction.  Based in part on that information, the Board formally approved the Merger Agreement and Acquisition at $112.00 per share.

99.    Rather than electing for a "go shop" period to elicit a higher bid for Harman stockholders, the Board agreed to preclusive deal protection devices that intentionally made it nearly impossible for other buyers to make a successful competing bid for the Company.  These provisions, which prevented the emergence of competing bidders, include: (i) 5.02 of the Merger Agreement included a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Samsung, expect in extremely limited circumstances; (ii) a provision that demanded that the Company terminate any and all prior or on-going discussions with other potential acquirers, and require that any other potential acquirer with whom the Company engaged in prior discussions return or destroy any non-public

- 41 -

Company information provided to the potential acquirer; (iii) a matching rights provision that allowed Samsung to match any competing proposal; (iv) a provision that required Harman to pay Samsung a $240 million termination fee if the Company decided to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer. The Merger Agreement further provided that the termination fee had to be paid by the Company contemporaneously with or before the termination was effectuated. The collective effect of these provisions chilled any possibility of a topping bid.

100.   In sum, as alleged in detail herein, the Acquisition price was inadequate and did not represent the Company's actual intrinsic value. The Acquisition price of $112.00 per share was far lower than the intrinsic value of Harman under a discounted cash flow calculation based on projections that properly reflected the Company's operative business reality, strategy, and prospects. Even under the organic projections that did not incorporate that material aspect of the Company's growth strategy, the Financial Advisors calculated a midpoint intrinsic valuation of Harman at approximately $116.25 per share. Given that Harman expected its acquisition strategy to be value-accretive, a proper valuation including the full components of Harman's operative reality results in a value at well above $116.25 per share, which renders $112.00 per share significantly inadequate.

101.   J.P. Morgan received approximately $31 million in fees and Lazard received approximately $25 million in fees for their work in connection with the Acquisition. Each advisor received $3 million for delivering a fairness opinion, $2 million upon announcement of the Acquisition, and the remainder of the fees upon close of the Acquisition. Put differently, the Financial Advisors received a combined $6 million for the fairness opinions, $4 million upon the announcement, and $46 million upon closing of the Acquisition. All of J.P. Morgan and Lazard's fees were dependent upon their declaring the deal fair.

**Paliwal Used the Acquisition to Extract Record-Breaking Side-Payments from Samsung**

102.    Paliwal used the Acquisition to extract an enormous financial windfall and guaranteed post-close employment.  Before any Harman director voted in favor of the Acquisition and before receiving a final financial analysis in support of the Acquisition price, Harman sold his employment to Samsung for a $21,961,769 cash "retention award" and an additional guarantee of "no less than $21,000,000" in long-term unit incentive compensation over the next three years.  Through the Acquisition, Paliwal was also able to accelerate $28,913,614 in restricted Harman stock and bonuses.  Achieving such unprecedented payments required Paliwal to run a flawed process, devoid of substantive negotiation and competing bids, which the Outside Directors overlooked.

103.    The Acquisition generally motivated Paliwal to quickly sell Harman to any capable party because doing so accelerated $28,913,614 in bonuses without his needing to hit the targets or fulfill the commitments on which Harman had based the awards.  Specifically, Paliwal bagged $19,855,582 in accelerated Performance-Based Restricted Stock Units, even though Paliwal never completed the targets Harman set to achieve a "focus on key drivers of long-term stockholder value."  Similarly, while Harman had negotiated "Time-vested restricted share units" intending to "enhance [CEO] retention," Paliwal accelerated $7,788,032 in time-based restricted shares without having to continue to serve as Harman's CEO.  Finally, Paliwal received his prorated Annual Bonus, an estimated $1,270,000, in cash, without having met the yearly targets. In sum, brokering a quick sale became a shortcut to $28,913,614 Paliwal would have otherwise had to earn.

104.    The Acquisition specifically motivated Paliwal to sell Harman to Samsung, and only Samsung, because Paliwal would not only receive the aforementioned windfall but would also earn more while continuing as CEO in a private subsidiary. Paliwal carried over the same salary and benefits from his Harman contract, which totaled $16,632,865 in 2016. In addition, Paliwal's Samsung agreement replicated the severance package Harman and Paliwal had executed, which

- 43 -

equals three times Paliwal's highest base pay plus his highest incentive pay. At salary and bonus levels guaranteed in Paliwal's Samsung agreement, Paliwal's severance would pay at least $24,798,594 (or three times Paliwal's $ 1,266,198 base salary plus Paliwal's $7,000,000 in guaranteed in target annual bonus) if Samsung terminated Paliwal for cause or Paliwal left for good reason.

105.   Paliwal also used the Acquisition to negotiate additional benefits beyond what Paliwal was earning as Harman's CEO including an additional $21,961,769 in retention awards, a $21,000,000 long term incentive guaranteed over the course of three years, and up to $2 million in annual travel expense. Since defendants elected to not disclose the conditions of Paliwal's $21,961,769 retention payment, Plaintiff cannot be sure Samsung even requires Paliwal to remain employed at Samsung for Paliwal's payment to vest. Samsung also guaranteed that Paliwal's long term incentive would be "no less than $21,000,000 (at Target)." Not only did Paliwal cash in his Harman incentive awards, Samsung also replaced them through 2019 and improved upon them by putting a floor on incentive pay where Harman once installed a ceiling. Samsung's guarantee also creates corresponding increases in Paliwal's retirement based on Paliwal's "average compensation during the three consecutive calendar years in which his compensation was highest" as well as Paliwal's severance payment noted above. Finally, Paliwal's $2 million discretionary annual travel allowance vastly exceeds the $28,355 of automobile and $15,526 spousal travel/gift expenses Paliwal incurred on Harman's behalf in 2016.

106.   Moreover, Samsung offered to liberate Paliwal from the regulatory and fiduciary constraints confining a public company CEO. Because Paliwal retains authority in his severance agreement to selectively contest which responsibilities he surrenders, Paliwal chooses which duties to keep and which he allows Samsung to absorb. In effect, Samsung now pays Paliwal more for doing less.

- 44 -

107.    The chart below compares key terms in Paliwal's Samsung and Harman contracts:

| | **Current Samsung Agreement** | **Harman's 2016 Agreement** |
|---|---|---|
| Retention Bonus | $21,961,769 over 3 years | $0 |
| Annual Base Salary | $1,266,198 | $1,258,946 in 2016 |
| Threshold, Target, Maximum Annual Bonus | 100% base salary; 200% base salary; 300% base salary. | 100% base salary; 200% base salary; 300% base salary. |
| Long-Term Unit Incentive Program | "No less than" $21 million at target over three years. | $7 million at target in 2016. |
| Supplemental Executive Retirement Plan | 50% of his highest average of 3 consecutive years compensation. | 50% of his highest average of 3 consecutive years compensation. |
| Severance Agreement | (1) pro rata Performance Bonus, (2) unpaid Annual Bonus, and (3) Payment equal to three times Base Salary plus Target Bonus. | (1) pro rata Performance Bonus, (2) unpaid Annual Bonus, and (3) Payment equal to three times Base Salary plus Target Bonus. |
| Other Compensation | Up to $2,000,000 annual travel expense. | Paid $93,302 in 2016 for 401(k) contribution, life insurance, automobile, and spousal travel expense. |

108.    While unfortunate, it is not surprising that Paliwal would steer a process that resulted in a highly misleading description of the Company's standalone future cash flows in a Proxy that was integral in his personal receipt of over $50 million that he would not have otherwise received if Harman had continued as a standalone entity.

### CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all persons who owned shares of Harman common stock at the time of the Acquisition, excluding defendants and their affiliates (the "Class").   This action is properly maintainable as a class action for the reasons set forth below.

110.    The Class is so numerous that joinder of all members is impracticable.   According to the Proxy, there are 69,883,605 shares of Harman common stock issued and outstanding, likely held by thousands of persons.

111.    There are questions of law and fact that are common to the Class, including:

(a)     whether Harman and the Individual Defendants violated §14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

(b)     whether the Individual Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

(c)     whether Plaintiff and the other members of the Class were, or stand to be, injured as a result of defendants' misconduct.

112.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff is not subject to any atypical claims or defenses.

113.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

114.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would (i) establish incompatible standards of conduct for defendants, or (ii) as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, substantially impairing or impeding their ability to protect their interests.  Moreover, defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

### Violations of §14(a) of the Exchange Act and Rule 14a-9
### Promulgated Thereunder Against Harman and the Individual Defendants

115.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

- 46 -

116.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

117.     During the relevant period, Harman and the Individual Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

118.     By virtue of their positions within the Company, Harman and the Board were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Harman and the Board. The Proxy misrepresented and/or omitted material facts, as detailed above. Harman and the Board were at least negligent in filing the Proxy with these materially false and misleading statements.

119.     As stated herein, the Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder; the Proxy was an essential link in the consummation of the Acquisition. The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

120.     As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the class were precluded both from exercising their right to seek appraisal and were induced to vote their shares and accept inadequate

- 47 -

consideration of $112.00 per share in connection with the Acquisition. The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived Plaintiff and the Class of her right to a fully informed shareholder vote in connection therewith and the full and fair value for her Harman shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning Harman's value, which was far greater than the $112.00 per share that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, Plaintiff and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price Harman shareholders received and Harman's true value at the time of the Acquisition) in an amount to be determined at trial.

121.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

122.    By reason of the foregoing, Harman and the Board have violated §14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

### COUNT II

### Violation of §20(a) of the Exchange Act Against the Individual Defendants

123.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

124.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules

promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

125.    By reason of the allegations herein, the Individual Defendants violated §14(a) of the Exchange Act by issuing and publishing the Proxy, which contained untrue statements of material fact concerning the Acquisition, and omitted material facts concerning the Acquisition necessary in order to make the statements in the Proxy not misleading.

126.    The Individual Defendants were controlling persons of Harman within the meaning of §20(a) of the Exchange Act.

127.    The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Harman.

128.    The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, had the power or ability to control the issuance, publication and contents of the Proxy.  The Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Acquisition.

129.    The Individual Defendants, by virtue of their positions as officers and/or directors of Harman, had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

130.    By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act, and Plaintiff is entitled to relief.

- 49 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure;

B.      Declaring that the Proxy distributed by defendants to shareholders was materially

false and misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.      Awarding Plaintiff and the members of the Class compensatory and/or rescissory

damages against the defendants;

D.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment

interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.


DATED:  July 12, 2017                    MOTLEY RICE LLC
                                         WILLIAM H. NARWOLD


                                         s/ William H. Narwold
                                         WILLIAM H. NARWOLD

                                         20 Church Street, 17th Floor
                                         Hartford, CT 06103
                                         Telephone:  860/882-1676
                                         860/882-1682 (fax)
                                         bnarwold@motleyrice.com

                                         Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID T. WISSBROECKER
DAVID A. KNOTTS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone:  212/802-1486
212/602-1592

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 12, 2017.

s/ William H. Narwold
WILLIAM H. NARWOLD

MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860/882-1676
860/882-1682 (fax)

E-mail:  bnarwold@motleyrice.com

# Mailing Information for a Case 3:17-cv-00246-RNC Baum v. Harman International Industries, Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)