UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
PATRICIA B. BAUM, Individually    :
and on Behalf of All Others       :
Similarly Situated,               :
                                  :
     Plaintiff,                   :
                                  :
v.                                :   Case No. 3:17-cv-00246 (RNC)
                                  :
HARMAN INTERNATIONAL              :
     INDUSTRIES, INC.,            :
DINESH C. PALIWAL,                :
ADRIANE M. BROWN,                 :
JOHN W. DIERCKSEN,                :
ANN M. KOROLOGOS,                 :
ROBERT NAIL,                      :
ABRAHAM N. REICHENTAL,            :
KENNETH M. REISS,                 :
HELLENE S. RUNTAGH,               :
FRANK S. SKLARSKY, and            :
GARY G. STEEL,                    :
                                  :
     Defendants.                  :
                                  :
```

RULING AND ORDER

This is a proposed class action under the federal
securities laws brought by and on behalf of shareholders of
Harman International Industries, Inc. ("Harman"). The amended
complaint alleges that Harman and members of its board used a
false and misleading proxy statement to solicit support for
Harman's acquisition by Samsung Electronics Co., Ltd.
("Samsung"). Plaintiff seeks compensatory damages for
defendants' alleged violations of Sections 14(a) and 20(a) of
the Securities Exchange Act and Securities and Exchange

1

Commission ("SEC") Rule 14a-9.  Defendants move for dismissal on the ground that plaintiff has failed to state a claim.

Plaintiff alleges that defendants sought to downplay Harman's value in order to make the Samsung acquisition seem fair to shareholders.  She claims that the proxy statement ("the proxy") was false and misleading in four specific ways.  First, she asserts that the proxy omitted the material fact that Harman's financial projections did not account for future acquisitions, even though Harman's growth strategy was built on acquisitions.  Second, plaintiff argues that the proxy falsely stated that Harman management determined that its financial projections included more downside risk than likely upside potential, thereby justifying the development of a less optimistic set of financial forecasts.  These forecasts, in turn, helped to justify a lower sale price to Samsung.  Third, she claims that the proxy inaccurately stated that Harman does not as a matter of course release financial projections and that the projections contained in the proxy were not prepared for public disclosure.  Fourth, plaintiff argues that the proxy was false and misleading by omitting a material fact relevant to a potential conflict of interest on the part of a financial advisor who recommended that shareholders approve the acquisition.

For reasons discussed below, plaintiff's first and third arguments are unavailing. Plaintiff does, however, sufficiently allege that the proxy was misleading as to the reason that Harman revised its financial projections and as to a potential conflict of interest on the part of a financial advisor. Additionally, plaintiff has adequately pled loss causation by asserting that Harman shareholders did not receive adequate compensation in the acquisition. Accordingly, the motion to dismiss is granted in part and denied in part.

I. Background

The following facts are drawn from the amended complaint and accepted as true for purposes of the pending motion. Plaintiff was at all relevant times the owner of Harman common stock. Harman was a Delaware corporation that maintained its headquarters in Stamford, Connecticut. The individual defendants were Harman board members during the Samsung acquisition in November 2016. Dinesh C. Paliwal was also Harman's Chairman, CEO and President from 2008 until the Samsung acquisition.

A. Harman's Pre-Acquisition Business

Harman designs and engineers connected products and solutions for automakers, consumers and enterprises, including connected car systems, audio and visual products, enterprise automation solutions, and connected services. Before it was

3

purchased by Samsung, Harman powered its growth largely by acquiring other companies.  In the period from February 2015 to March 2016, Harman completed six acquisitions totaling $1.2 billion in consideration.  In an annual report issued August 11, 2016, Harman affirmed the importance of acquisitions in its corporate growth strategy.  On January 4, 2017 -- several months after Harman was acquired by Samsung -- Harman CEO and board member Paliwal told <u>Bloomberg</u> that Harman would "definitely make some unique technology acquisitions."

On August 4, 2016, Paliwal and Harman's chief financial officer conducted a conference call, during which they presented a slideshow called "Fourth Quarter & Full-Year Fiscal 2016 Highlights."  One of the slides shown stated that "strategic bolt-on acquisitions that accelerate growth" remained a key aspect of Harman's corporate strategy.  The slideshow also depicted projections for Harman's growth during fiscal years 2017, 2019, and 2021.  Paliwal expressed optimism about Harman's future financial performance due to its $24.1 billion backlog, and confidence that Harman would see accelerated revenue expansion.  On the same day as the fourth-quarter call, Harman issued a press release providing financial projections for fiscal years 2017-2019.  These projections accounted only for "organic" growth, meaning that they did not incorporate potential acquisitions.

B. <u>The Samsung Acquisition</u>

Paliwal held a number of meetings with Samsung executives in September 2016, and Samsung expressed interest in acquiring Harman. Without immediately informing the other board members, Paliwal unilaterally invited Samsung to submit a formal bid with a specific price. On October 4, Samsung delivered a written acquisition proposal to Harman for $106 per share. The other board members learned of the letter and met on October 6. Shortly thereafter, Samsung increased its proposal to $109 per share. The board met again on October 11, and authorized Paliwal to obtain an offer of at least $112. The same day, Samsung agreed to increase the offer to $112 per share in cash, predicated on an exclusivity agreement.

On October 13, 2016, Harman's lead financial advisor, J.P. Morgan, met with representatives of an entity identified as "Company A." The representatives indicated that Company A could submit a bid to purchase Harman for cash and stock (otherwise known as a mixed consideration proposal). Company A had submitted a mixed consideration proposal the previous December to purchase Harman for $115 per share. J.P. Morgan and Paliwal determined, without contemporaneous input from the other board members, that Company A was unlikely to make a proposal that was more attractive than $112 per share. At Paliwal's request, J.P. Morgan called Company A's representatives on October 14 and

requested a proposal that consisted of more cash and less stock. Company A did not respond.

On October 14, 2016 Paliwal caused Harman to enter into an exclusivity agreement with Samsung. The agreement provided that Samsung's acquisition of Harman would be announced on November 14 and that Harman would not solicit competing proposals before that date. The agreement did not prohibit Harman from attempting to negotiate a higher price with Samsung. From October 20-22, the management teams of Harman and Samsung held a series of meetings to finalize the deal, which were not attended by any board members other than Paliwal. Samsung indicated that it would only consummate the acquisition if Paliwal signed a suitable employment agreement. Paliwal responded that he could discuss such a deal after the basics of the merger agreement were settled.

The board met again on November 3, 2016. J.P. Morgan and Harman's other financial advisor, Lazard, reviewed preliminary financial analyses of the company. Harman continued to do well during this time period, and Paliwal affirmed that the company was on track to meet its 2017 fiscal year guidance. He also stated that Harman would continue to make strategic, bolt-on acquisitions.

Paliwal began negotiating his personal compensation with Samsung on November 8, 2016. On November 11, J.P. Morgan and

Lazard showed the board an updated, but still preliminary,
financial analysis. The board authorized management to enter
into the merger agreement and finalize individual compensation
packages, and to announce the acquisition on November 14, 2016.
Over the next two days Paliwal finalized a compensation
agreement with Samsung that included a retention award of
approximately $22 million, a guarantee of no less than $21
million in long-term compensation over the next three years, and
acceleration of approximately $29 million in restricted Harman
stock and bonuses. These payments were contingent on
consummation of the acquisition.

On November 13, 2016, the board held a meeting to formally
approve Samsung's acquisition of Harman. J.P. Morgan and Lazard
presented a discounted cash flow (DCF) analysis of financial
projections that management had developed through fiscal year
2021 ("the Management Projections"). J.P. Morgan and Lazard
also presented a DCF analysis of a separate set of projections
that were based on the Management Projections, but downwardly
moderated predicted growth by 25% ("the Sensitized
Projections"). Based on this information, the board formally
approved the acquisition at $112 per share.

C. <u>The Proxy Statement</u>

On January 20, 2017 the board issued a proxy statement to
solicit votes on the merger. The proxy contained both the

Management Projections and the Sensitized Projections. According to the proxy, "the Management Projections were prepared based on assumptions reflecting the best currently available estimates of and judgments by [Harman's] management at the time the Management Projections were prepared as to the expected future results of operations and financial condition of the Company." Although not labeled as such, the Management Projections reflected only organic growth, meaning that they did not account for future acquisitions. In fact, the Management Projections were very similar to the guidance that Harman had released in August 2016. The proxy further stated that "senior management determined, taking into account the perspectives of the Financial Advisors, that the Management Projections currently reflected more downside risk . . . than likely upside potential and that, accordingly, no further modifications to the Management Projections were necessary or appropriate."

The "Sensitized Projections" were based on the Management Projections but assumed 25% less growth in revenue and earnings before interest payments, taxes, depreciation, and amortization ("EBITDA"). According to the proxy, Harman's financial advisors developed the Sensitized Projections "taking into account the views of management and the board as to certain potential risks and uncertainties inherent in the Management Projections." The

Sensitized Projections were provided to the board in connection with its evaluation of the proposed merger, but not to Samsung.

The proxy additionally stated that, "Harman does not as a matter of course make public long-term projections as to future performance," and that the projections contained in the proxy "were prepared for internal use and to assist Samsung and our Financial Advisors with their respective due diligence investigations of the Company or to assist the board in its review and analysis of the proposed merger, as applicable. The Projections were not prepared with a view toward public disclosure. . . ."

Appended to the proxy were fairness opinions prepared by Harman's financial advisors J.P. Morgan and Lazard, each recommending that Samsung's offer to purchase Harman for $112 per share was fair. As discussed, the financial advisors had conducted two DCF analyses: one based on the Management Projections and the other based on the Sensitized Projections. The former produced a midpoint price of approximately $116.25 per share; the latter yielded a midpoint of approximately $100.25 per share.

The proxy also disclosed that J.P. Morgan had provided certain services to both Harman and Samsung in the preceding two years.

Such services during such period have included acting
as joint lead arranger and joint bookrunner on the
Company's syndicated facility in March 2015, as M&A
financial advisor to the Company on the Company's
acquisition of Symphony Teleca in April 2015, as joint
bookrunner on offerings of debt securities by the
Company in May 2015, as joint bookrunner on the
initial public offering of Samsung SDS in October
2014, as joint global coordinator and joint bookrunner
on the initial public offering of Cheil Industries in
December 2014, as financial advisor to Parent on
Parent's disposals of equity interests in Samsung
Techwin and Samsung Chemicals in June 2015 and as
joint bookrunner on the initial public offering of
Samsung Biologics in October 2016.

The proxy did not mention that J.P. Morgan Asset Management

served as an investment manager for a Samsung affiliate during

the same time period that J.P. Morgan acted as a financial

advisor on the Samsung-Harman deal.

On February 17, 2017, a majority of stockholders voted to

approve Samsung's acquisition of Harman.  Approximately 50

million out of 70 million shares, or 67%, were voted in favor of

the deal.

II.  Legal Standard

In ruling on the motion to dismiss, the Court may consider

"the complaint and the documents incorporated by reference into

the complaint (primarily the proxy statement in question)."

Montanio v. Keurig Green Mountain, Inc., 237 F. Supp. 3d 163,

166 (D. Vt. 2017) (citing Subaru Distribs. Corp. v. Subaru of

Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005)).  To withstand

dismissal, a complaint generally "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court must accept all factual allegations as true and view them in the light most favorable to the plaintiff. Id.

The Private Securities Litigation Reform Act ("PSLRA") imposes additional pleading requirements on a plaintiff who alleges that the defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1). In such a case, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id.

> In any private action under the Securities Exchange Act

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Id. § 78u-4(b)(2)(A).  Additionally, where a Section 14(a) claim

is premised on allegations of fraud, the plaintiff "must state

with particularity the circumstances constituting fraud," as

required by Rule 9(b) of the Federal Rules of Civil Procedure.

See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc., 268 F.

Supp. 3d 526, 558 (S.D.N.Y. 2017) (citing Rombach v. Chang, 355

F.3d 164, 171 (2d Cir. 2004); In re JP Morgan Chase Sec. Litig.,

363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005)).

III.  Discussion

Section 14(a) of the Securities Exchange Act prohibits the

solicitation of proxy votes "in contravention of such rules and

regulations as the [Securities and Exchange] Commission may

prescribe."  15 U.S.C. § 78n(a).  Rule 14a-9 provides,

> No solicitation subject to this regulation shall be
> made by means of any proxy statement, form of proxy,
> notice of meeting or other communication, written or
> oral, containing any statement which, at the time and
> in light of the circumstances under which it is made,
> is false or misleading with respect to any material
> fact, or which omits to state any material fact
> necessary in order to make the statements therein not
> false or misleading or necessary to correct any
> statement in any earlier communication with respect to
> the solicitation of a proxy for the same meeting or
> subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

To state a claim that a defendant has violated these

provisions (collectively, "Section 14(a)"), "a plaintiff must

allege that: '(1) a proxy statement contained a material

12

misrepresentation or omission, which (2) caused plaintiff['s]
injury, and (3) that the proxy solicitation itself, rather than
the particular defect in the solicitation materials, was an
essential link in the accomplishment of the transaction.'"
Montanio, 237 F. Supp. 3d at 170 (quoting Bond Opportunity Fund
v. Unilab Corp., 87 F. App'x 772, 773 (2d Cir. 2004)).  "Under
Rule 14a-9, [a] plaintiff[] need not demonstrate that the
omissions and misrepresentations resulted from knowing conduct
undertaken by the director defendants with an intent to
deceive."  Wilson v. Great Am. Indus. Inc., 855 F.2d 987, 995
(2d Cir. 1988).  Unless a claim rests on an allegation of
knowing falsity, negligence in drafting a proxy statement is
sufficient to impose liability.  Id.

A person who directly or indirectly controls any person
liable under the Securities Exchange Act may also be held liable
under Section 20(a).  15 U.S.C. § 78t(a).

A. Management Projections' Omission of Acquisitions

Plaintiff first alleges that the proxy was false and
misleading in that the Management Projections assumed that
Harman would not continue to acquire other companies.  She
asserts that acquisitions were an intrinsic aspect of Harman's
business model.  Plaintiff argues that the proxy omitted a
material fact by failing to specify that the Management
Projections did not incorporate growth from future acquisitions.

However, plaintiff has not sufficiently alleged that this omission rendered the proxy misleading.

Further, to the extent plaintiff claims the Management Projections themselves were false and misleading, her claim is defeated by the PSLRA's safe harbor for forward-looking statements.

i.  Omission of Material Fact

Plaintiff asserts that "if a [proxy] statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," the issuer may be liable for the omission.  See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, -- U.S. --, 135 S. Ct. 1318, 1329 (2015).[1]  The argument fails because the proxy did not suggest in any way that the

---

[1] Although Omnicare concerned Section 11 of the Securities Exchange Act, Section 14(a) "bars conduct similar to that described in § 11."  135 S. Ct. at 1326 n.2.  Moreover, Rule 14a-9's omissions clause is nearly identical to Section 11's.  Compare 17 C.F.R. § 240.14a-9(a) (prohibiting filing a proxy statement that "omits to state any material fact necessary in order to make the statements therein not false or misleading") with 15 U.S.C. § 77k(a) (imposing liability for registration statement that "omitted to state a material fact required to be stated therein to make the statements therein not misleading").  See also Trahan v. Interactive Intel. Grp., Inc., 308 F. Supp. 3d 977, 987 (S.D. Ind. 2018) (applying Omnicare to a Section 14(a) claim).

Management Projections were based on an assumption of future acquisitions. In fact, the proxy specified that the projections presented therein, including the Management Projections, "do not take into account any circumstances or events occurring after the date they were prepared." ECF No. 29-2 at *63. Such events would include any acquisition that had yet to be consummated.

"[P]roxy solicitations need only provide the full objective facts upon which investors can make their own judgments as to value, and need not, and most often should not, embellish the facts with speculative financial predictions." Shaev v. Hampel, No. 99 Civ. 10578 (RMB), 2002 WL 31413805, at *8 (S.D.N.Y. Oct. 25, 2002) (quoting Kahn v. Wien, 842 F. Supp. 667, 676 (S.D.N.Y. 1994)). "It is well established that 'Section 14 carries with it no formal requirement that predictions be made as to future behavior, and indeed, they are discouraged.'" Id. (quoting Krauth v. Exec. Telecard, Ltd., 890 F. Supp. 269, 288-89 (S.D.N.Y. 1995)). Cf. Vladimir v. Bioenvision, Inc., 606 F. Supp. 2d 473, 484-85 (S.D.N.Y. 2009) ("General statements about a company's financial projections or activities that do not address the prospects for a merger do not give rise to a duty to disclose [even] a potential merger").

"A plaintiff asserting a claim for a material omission under Rule 14a-9 'must show that there was a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Koppel v. 4987 Corp., 167 F.3d 125, 131-32 (2d Cir. 1999) (quoting United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198 (2d Cir. 1993)). Plaintiff has alleged that Harman historically built its business through acquisitions and that the company affirmed that acquisitions were central to its strategy. But she has not alleged that Harman had plans for any specific acquisitions, and a reasonable investor would not have assumed that the Management Projections accounted for purely hypothetical future deals. Disclosure of the fact that the Management Projections did not include hypothetical future acquisitions would not have significantly altered the total mix of information available to Harman shareholders. See id.

NECA-IBEW Pension Trust Fund v. Precision Castparts Corp. is therefore unhelpful to plaintiff. See No. 3:16-cv-01756-YY, 2017 U.S. Dist. LEXIS 165139 (D. Or. Oct. 3, 2017), adopted by 2018 U.S. Dist. LEXIS 11463 (D. Or. Jan. 24, 2018). In Precision Castparts, the plaintiffs similarly alleged that Precision Castparts Corporation ("PCC") filed a false and misleading proxy statement that failed to incorporate future acquisitions into its financial projections. Id. at *18. PCC, like Harman, had pursued growth through an acquisition-based strategy. Id. at *3-4. Unlike Harman, however, PCC had

16

generated a set of financial projections that contemplated two scenarios: one that assumed continued acquisitions, and one that did not. Id. at *7. Berkshire Hathaway proposed acquiring PCC on July 9, 2015, several months after the projections were developed. Id. at *9. On July 11, PCC developed a set of revised financial projections that did not contemplate any future acquisitions. Id. at *9. Nonetheless, PCC acquired two more companies during July 2015. Id. The revised projections then provided the basis for a fairness opinion recommending that the acquisition be completed, which in turn informed the board's decision to approve the acquisition. Id. at *10-11. PCC filed a proxy statement soliciting shareholders' votes, which referred to the revised projections as the "most up-to-date and accurate forecasts." Id. at *18. The proxy further stated, "the Company Forecasts did not assume any acquisitions other than those that were previously announced or completed because of the inherent uncertainty of consummating acquisitions." Id. After filing the proxy statement, PCC made a number of additional acquisitions. Id. at *21. The court held that the proxy statement's mischaracterization of the forecasts was false and misleading in violation of Section 14(a). Id. at *20-22.

Precision Castparts is distinguishable from the case at bar in two key respects. First, plaintiff here has not alleged that defendants prepared an alternative set of financial

projections that accounted for future acquisitions, and then
directed a financial advisor to ignore those projections in
developing a fairness opinion.  Second and more importantly, the
Precision Castparts plaintiffs did not allege merely that PCC
was pursuing an acquisition strategy; they alleged that PCC
completed two acquisitions in the same month that the company
eliminated acquisitions from its financial forecasts and had
other acquisitions in the pipeline.  Id. at *26-27.  The
statements in PCC's proxy that (1) the revised projections were
the most up-to-date projections available, and (2) PCC did not
assume future acquisitions because such acquisitions were
inherently uncertain could thus be "demonstrably proven false at
the time they were made."  Id. at *35.  Here, by contrast,
plaintiff has not alleged that defendants knew of specific
acquisitions, let alone that they had developed a more accurate
set of financial projections based on their expected deals.
Precision Castparts does not stand for the principle that any
company that has expressed a commitment to an acquisition
strategy is misleading in failing to specify whether financial
projections account for future acquisitions.[2]

_____

[2] Plaintiff also cites a number of fiduciary duty cases, decided
under state law, in which courts valued companies based on
projections that assumed continued future acquisitions.  These
cases have no bearing on defendants' disclosure duties under
federal securities law.

Plaintiff's reliance on Azar v. Blount Intern., Inc. is similarly misplaced. See No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017). In Blount, as in Precision Castparts, the plaintiffs asserted that the defendants had developed two sets of financial projections, one more optimistic than the other. Id. at *5-7. The Blount plaintiffs also alleged with particularity that that the sunnier projections were more accurate, and were omitted from a proxy statement soliciting votes for an acquisition. Id. at *12-14. The plaintiffs further claimed that the defendants had relied on the more optimistic projections for their own purposes, while presenting bleaker predictions to shareholders in order to justify the proposed acquisition. Id. at *24-25. Here, as discussed, plaintiff has not alleged that defendants developed a hidden set of projections that accounts for future acquisitions. Her allegation that defendants omitted any mention of acquisitions from the proxy statement is not equivalent to a claim of concealed financial projections. Cf. Campbell v. Transgenomic, Inc., 916 F.3d 1121, 1125-26 (8th Cir. 2019) (concluding that summary judgement for the defendant was inappropriate where proxy omitted projected net income/loss of company with which merger was proposed, and which defendant's board had reviewed before approving the merger).

Laborers' Local #231 Pension Fund v. Cowan, while more similar to this case, is also distinguishable. See No. 17-478, 2018 WL 3243975 (D. Del. July 2, 2018). In Cowan, the plaintiffs alleged that the defendant, as the chairman of Lionbridge Technologies, Inc. ("Lionbridge"), had omitted a material fact from a proxy statement in violation of Section 14(a). Id. at *1, *11. The proxy statement expressed support for Lionbridge's acquisition by HIG Capital, LLC, based, among other things, on a fairness opinion provided by Lionbridge's financial advisor. Id. at *2-3. The fairness opinion was premised on financial projections provided by Lionbridge that neglected to incorporate growth from future acquisitions. Id. at *2. The court permitted plaintiffs to proceed with their claim that the proxy was misleading by citing the fairness opinion as a "positive reason" to support the merger, but omitting the fact that the fairness opinion relied on financial projections that did not account for future acquisitions. Id. at *11.

Cowan bears resemblance to this case in that Lionbridge had publicly highlighted its acquisition growth strategy before the merger. Id. at *1. However, the proxy at issue in Cowan stated that Lionbridge's economic forecasts did not account for any "transaction or event . . . that may occur and that was not anticipated when the forecasts were prepared." Id. at *2

(emphasis added).  This suggests that the projections <u>did</u>
account for transactions that <u>were anticipated</u> at the time.
Harman's proxy, by contrast, stated simply that the projections
"do not take into account any circumstances or events occurring
after the date they were prepared."  ECF No. 29-2 at *63.[3]  More
importantly, the plaintiffs in <u>Cowan</u> did not assert only that
Lionbridge had publicly touted its acquisition-powered growth
strategy; they alleged that Lionbridge completed an acquisition
three days after the merger closed.  <u>Id.</u> at *4.  Plaintiff here,
again, has not alleged facts that would show that Harman
similarly had a known acquisition in the pipeline.
Additionally, prior to the merger, Lionbridge had completed a
major reorganization to facilitate its acquisition growth
strategy, and its board cited "the ability to access capital to
fund acquisitions" as a reason to merge with HIG.  <u>Id.</u> at *2.
The potential for acquisitions following the merger were far
less hypothetical than in the case at bar.

---

[3] Plaintiff's argument that this is "boilerplate language"
because it frequently appears in proxy statements is misplaced.
As discussed below, a defendant cannot claim the PSLRA's safe
harbor for forward-looking statements by using "boilerplate
cautionary language."  <u>Slayton v. Am. Exp. Co.</u>, 604 F.3d 758,
772 (2d Cir. 2010).  This rule, however, does not apply to
plaintiff's claim that defendants omitted a material fact, which
she recognizes is governed by <u>Omnicare</u> rather than the body of
law regarding forward-looking statements.

Koppel is also unhelpful to plaintiff. See 167 F.3d 125. In Koppel, the defendants solicited shareholder support for a deal to sell a building. Id. at 129. The deal continued a lease and distributed millions of dollars in sale proceeds to the lessee, even though the lessee had defaulted on its obligations under the lease. Id. The solicitation recommended approving the deal based on a report that had been prepared under the false assumption that the lessee was in full compliance with the lease terms. Id. The Second Circuit held that the Koppel plaintiffs stated a valid claim under Rule 14a-9 because the solicitation did not disclose that the report was premised on a false assumption. Id. at 133. The plaintiffs sufficiently alleged that the lessee had in fact defaulted on its obligations. Id. Here, by contrast, plaintiff has not alleged that Harman was planning any specific acquisitions at the time the proxy statement was filed. She has thus not pled facts that would prove the Management Projections were based on a false assumption. Cf. In re Trump Hotels S'holder Derivative Litig., Nos. 96 Civ. 7820 DAB, 96 Civ. 8527 DAB, 2000 WL 1371317, at *14 (S.D.N.Y. Sept. 21, 2000) (denying motion to dismiss where defendants knew or should have known the fact that a planned expansion would not take place, when fairness opinion incorrectly assumed that expansion would occur).

Defendants had no obligation to specify that the Management Projections did not factor in potential acquisitions. Plaintiff has not alleged with particularity facts that would show that this omission rendered the proxy misleading. <u>See</u> 15 U.S.C. § 78u-4(b)(1). She has thus not adequately pled that the omission was material.[4]

ii. <u>Safe Harbor</u>

Defendants argue that the Management Projections fall within the PSLRA safe harbor. The safe harbor protects any forward-looking statement that is either (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (2) immaterial; or (3) the plaintiff

---

[4] Defendants argue that a reasonable investor would have been aware that the Management Projections did not incorporate potential acquisitions because those projections were similar to the August 2016 guidance. The August 2016 forecasts captured only "organic" growth, meaning that they did not incorporate potential acquisitions. However, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." <u>comScore, Inc.</u>, 268 F. Supp. 3d at 562 (quoting <u>Kronfeld v. Trans World Airlines, Inc.</u>, 832 F.2d 726, 736 (2d Cir. 1987)). It would be unreasonable to expect the average shareholder to realize that the Management Projections did not account for acquisitions simply by comparing them to the August 2016 organic projections, if the proxy statement had in fact implied otherwise.

23

fails to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1). The safe harbor is written in the disjunctive; a statement is protected if it satisfies any one of these three requirements. Slayton, 604 F.3d at 766.

Plaintiff is correct that "the safe harbor provision does not protect the statements in the Proxy underlying the Board's assessment about the Management Projections. Such unprotected statements of present or historical fact include the Board's description of how the Management Projections were developed." See City of Hialeah Emps.' Retirement Sys. v. FEI Co., 289 F. Supp. 3d 1162, 1173 (D. Or. 2018). "The safe harbor also does not protect material omissions." In re Salix Pharms., Ltd., 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202, at *29 (S.D.N.Y. Apr. 22, 2016). For this reason, the safe harbor would not protect defendants from liability for the proxy's failure to disclose the fact that the Management Projections did not account for acquisitions, if that fact were material. As discussed above, it is not. However, to the extent that plaintiff argues the Management Projections themselves were false and misleading for failing to account for future acquisitions, the safe harbor does preclude this claim.

In plaintiff's view, the safe harbor provision is designed to protect companies from "fraud by hindsight" lawsuits when

optimistic projections for growth are not borne out. However, courts have consistently held that the safe harbor may apply to Section 14(a) when a plaintiff alleges that a proxy statement contained false statements or material omissions. See, e.g., Hialeah, 289 F. Supp. 3d at 1173; Trahan, 308 F. Supp. 3d at 994; Shaev, 2002 WL 31413805, at *7. See also 15 U.S.C. § 78u-5(c)(1) (providing for application of safe harbor provision in any private action arising under the Act "based on an untrue statement of a material fact or omission of a material fact," with exceptions not relevant here); Paradise Wire & Cable Defined Ben. Pension Plan v. Weil, No. CCB-17-132, 2018 WL 1535496, at *5 (D. Md. Mar. 28, 2018) ("[F]orecasts of future performance not worded as guarantees are generally not actionable under federal securities law.") (internal quotation marks omitted).

Defendants argue that the Management Projections were identified as forward-looking statements and accompanied by meaningful cautionary language. The Management Projections were "plainly forward-looking -- [they] project[] results in the future." Slayton, 604 F.3d at 769. See also 15 U.S.C. § 78u-5(i)(1)(A) (defining "forward-looking statement" to include "a statement containing a projection of revenues"). The proxy also explained that statements using words like "estimate"

– such as the Management Projections -- qualify as "forward-looking statements."  ECF No. 29-2 at *29, *62.

"The defendants, however, carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor."  Slayton, 604 F.3d at 773.  The PSLRA defines "meaningful cautionary statements" as those that "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  Defendants "must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  Slayton, 604 F.3d at 772.  Plaintiff argues that the cautionary language in the proxy falls short of this standard.  But the proxy contained a lengthy "cautionary statement concerning forward-looking statements," ECF No. 29-2 at *29, as well as cautionary language specific to the Management Projections, id. at *62.  These warnings identified factors that could cause results to be different from those predicted, including industry performance; regulatory, market and financial conditions; and "risks related to the distraction of management's attention from the Company's ongoing business operations due to the pendency of the merger."  Id. at *29, *62.

Plaintiff compares the cautionary language here to the cautionary language at issue in In re Harman International Industries, Inc. Securities Litigation, 791 F.3d 90 (D.C. Cir.

2015).  In that case, the plaintiffs alleged that statements about Harman's personal navigational device ("PND") products made on three conference calls were misleading.  Id. at 95.  The Court of Appeals for the District of Columbia dismissed as "boilerplate" the moderator's verbal warning that, "'certain statements by the Company during this call are forward-looking statements' that 'include the Company's beliefs and expectations as to future events and trends affecting the Company's business and are subject to risks and uncertainties," and an annual report's general statement that the company could experience difficulties if it failed to meet certain benchmarks or was outstripped by competitors.  Id. at 97, 103-104.  Here, by contrast, the proxy contained detailed cautionary language in two locations that identified specific factors that could affect financial outcomes.  More importantly, in the 2015 Harman case, "the purportedly cautionary statements were not meaningful because they were misleading in light of historical fact," namely that much of Harman's PND product inventory was already obsolete.  Id. at 104.  In this case, as discussed, plaintiff has not alleged with particularity any historical facts that would show that Harman had plans or expectations that should have altered the Management Projections.  See 15 U.S.C. § 78u-4(b)(1).

Plaintiff further asserts that cautionary language cannot shield the Management Projections, because no cautionary language can protect a statement that is materially false or misleading. See Slayton, 604 F.3d at 770. This argument is unavailing for the same reason: plaintiff has not sufficiently alleged that the Management Projections were materially false or misleading. Finally, plaintiff asserts that to bring a statement within the safe harbor, cautionary language must address the specific risk that defendants allegedly failed to disclose. See Salix, 2016 U.S. LEXIS 54202, at *34. However, plaintiff has not established that predicting Harman's future without anticipating hypothetical acquisitions presented any risk.

Even if the Management Projections were not protected by meaningful cautionary language, "[t]he safe harbor provision also requires dismissal if the plaintiffs do not 'prove that the forward-looking statement was made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading.'" Id. (quoting 15 U.S.C. § 78u-5(c)(1)(B)) (emphasis in original) (internal alterations omitted). As discussed, plaintiff has alleged that Harman previously invested heavily in acquisitions, and that its leadership stated on a number of occasions that this strategy would continue. She has not pointed to any specific

acquisitions that Harman had in the pipeline.  The facts alleged

do not give rise to a "strong inference" that defendants had

actual knowledge that the Management Projections were inaccurate

for failing to account for future acquisions, as required by

the PSLRA.  See 15 U.S.C. § 78u-4(b)(2)(A).

> [I]n determining whether the pleaded facts give rise
> to a 'strong' inference of scienter, we must take into
> account plausible opposing inferences . . . . A
> complaint will survive only if a reasonable person
> would deem the inference of scienter cogent and at
> least as compelling as any opposing inference one
> could draw from the facts alleged.

Slayton, 604 F.3d at 774 (quoting Tellabs, Inc. v. Makor Issues

& Rights, Ltd., 551 U.S. 308, 323, 324 (2007)).  The facts

alleged most reasonably support the inference that the

Management Projections did not account for future acquisitions

because no such acquisitions were planned.  This is more

compelling than the inference that defendants knew the

Management Projections were inaccurate for their failure to

incorporate hypothetical deals.

Plaintiff's reliance on Precision Castparts is again

misplaced for the same reason.  There, the plaintiffs argued

that PCC's characterization of the revised projections, rather

than the projections themselves, were false and misleading.

2017 U.S. Dist. LEXIS 165139, at *32.  The court concluded that

the challenged statements were not protected by the safe harbor

simply because "if the statements can be demonstrably proven

false at the time they were made, as they were in this case, they are not forward-looking statements." Id. at *35. The court did not, however, conclude that plaintiffs sufficiently alleged that defendants had actual knowledge that the revised projections themselves were false. Cf. id. at *23 (defendants' stated belief in acquisition strategy contradicted their statement of present fact that future acquisitions were inherently uncertain).

For these reasons, plaintiff cannot show that defendants violated Section 14(a) by failing to incorporate future acquisitions into the Management Projections.[5]

B. Opinion Statement Regarding Management Projections

Plaintiff next argues that the proxy was false and misleading in stating that, taking into account the financial advisors' perspectives, Harman's senior management determined that the Management Projections contained greater downside risk

---

[5] Under the judicially created "bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." Shaev, 2002 WL 31413805, at *6. Defendants argue that because of the cautionary language used in the proxy, any omission was immaterial as a matter of law. I do not agree that an omission regarding development of the Management Projections, which informed the fairness opinions and the board's approval of the merger, would be immaterial as a matter of law. See Wilson, 855 F.2d at 922 ("Material facts include . . . those facts which affect the probable future of the company.") (internal citation omitted). However, plaintiff has not shown that any omission was material for reasons discussed above.

than upside potential. "A statement of a corporate board's reasoning, belief, or opinion can be . . . actionable as a material misrepresentation under Section 14(a)." Montanio, 237 F. Supp. 3d at 170 (citing Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1092 (1991)). Plaintiff asserts that this statement was material because it misled shareholders into discounting the Management Projections. This assessment of the Management Projections also justified creation of the Sensitized Projections, which informed the fairness opinions and the proxy's recommendation that shareholders approve Samsung's acquisition of Harman.

Defendants do not appear to dispute the statement's materiality. Rather, they take the position that the statement is protected by the safe harbor as an assumption underlying or relating to the Management Projections. See 15 U.S.C. § 78u-5(i)(1)(D). However, the statement plainly reflects Harman's assessment of the Management Projections, rather than an assumption on which the Management Projections were based. The statement also explains the decision to generate the Sensitized Projections, which plaintiff asserts were critical to the acquisition's consummation. I agree with plaintiff that it is a statement of reason or belief and as such may provide a basis for liability. Va. Bankshares, 501 U.S. at 1092. See also Hialeah, 289 F. Supp. 3d at 1175 ("The Board's assessment

that the Higher Projections were likely less realistic than the Lower Projections was a statement of opinion or belief.")[6]; Bumgarner v. Williams Cos., No. 16-CV-26-GKF-FHM, 2016 U.S. Dist. LEXIS 72540, at *8 (N.D. Okl. June 3, 3016) ("Defendants' explanation for reducing the projected synergies is a statement of existing fact and may be verified based on information now available.").

In order to be actionable under Section 14(a), "[t]he statements must be subjectively false -- they misstate the actual opinions, beliefs, or motivations of the speaker -- and they must be objectively false -- 'false or misleading with respect to the underlying subject matter [the statements] address.'" Montanio, 237 F. Supp. 3d at 170 (quoting Fait v. Regions Fin. Corp., 655 F.3d 105, 111 (2d Cir. 2011)). "In other words, the complaint must allege 'that the [d]efendants did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect.'" Id. at 171 (quoting Fisher v. Kanas, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006))

------

[6] In Hialeah, the court analyzed defendants' endorsement of a particular set of projections as both a forward-looking statement and as a statement of opinion or belief. 289 F. Supp. 3d at 1173, 1175. Here, the statement at issue is more clearly a statement of opinion, as it does not merely express confidence or a lack thereof in a particular set of financial predictions; rather, it offers a specific analysis of the risk reflected and justifies the development and use of a new set of projections.

(internal alterations omitted).  Plaintiff sufficiently alleges
both subjective and objective falsity.

Subjective falsity turns on "whether [p]laintiff properly
alleged that [d]efendants knew their statements about the
[Management] Projections were false."  In re Hot Topic Sec.
Litig., CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513, at
*18 (D. Or. May 2, 2014).  Plaintiff here asserts that Paliwal
called the August 2016 financial projections "by far very
conservative."  Those projections contained very similar
predictions for revenue and EBITDA as the Management
Projections.  Indeed, the August 2016 forecasts represented the
Management Projections rounded to the nearest hundred million
and included the same fiscal years with the exception of 2020.
ECF No. 16 at *28.

Defendants argue that plaintiff cannot rely on Paliwal's
earlier statements because the August 2016 guidance because it
contained distinct analysis from the Management Projections.
The August 2016 projections included only revenue and EBITDA,
whereas the Management Projections encompassed other metrics,
such as depreciation and amortization, capital expenditures, and
unlevered cash flow.  Additionally, the August figures did not
include revenue or EBITDA figures for 2020.  This argument is
unconvincing.  Paliwal expressed confidence in Harman's revenue
growth overall; his comments were unrelated to the additional

metrics that were included in the Management Projections and were not specific to 2020.  See e.g., ECF No. 16 at *20 ("Longer term, we are confident that we will see accelerated revenue expansion from our automotive backlog. . . .").

Moreover, plaintiff alleges that the defendants harbored an economic incentive to make the acquisition look more attractive. In particular, Paliwal stood to gain millions of dollars if the acquisition was completed.  See Slayton, 604 F.3d at 776 ("[M]otive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'") (quoting Tellabs, Inc., 551 U.S. at 325).  At this stage, plaintiff has sufficiently alleged that defendants downplayed the accuracy of the Management Projections, not because of their honestly held beliefs, but rather to convince shareholders that the merger was a fair deal.

Hot Topic is instructive with respect to objective falsity. 2014 U.S. Dist. LEXIS 180513.  In that case, Hot Topic had developed a set of long-range financial projections ("LRP projections") in early 2012.  Id. at *4.  In early 2013, a buyer made an offer to acquire the company.  Id.  Hot Topic rejected the initial offer, and then developed a set of revised projections that significantly downgraded the company's expected growth.  Id.  Hot Topic subsequently accepted a slightly higher offer from the buyer, instructed its financial advisor to base a

fairness opinion on the revised projections, and filed a proxy statement soliciting votes for the acquisition. Id. at *6-7. The proxy described the revised projections as more accurate than the LRP projections. Id. at *7. The court concluded the plaintiffs sufficiently alleged this statement was objectively false because "a projection that is seriously undermined by undisclosed facts or unreasonable assumptions or that does not follow generally accepted accounting principles is likely to be false." Id. at *15.

The court relied on a number of factors that have close analogues in the case at bar. First, the revised projections downwardly moderated growth from Torrid -- one of Hot Topic's subsidiaries -- despite the company's past praise for Torrid's growth. Id. Similarly, here, the challenged statement contradicts Paliwal's past expressions of optimism regarding Harman's growth. Second, the revised projections assumed a slow buildout of new stores that conflicted with Hot Topic's stated goals for expansion. Id. In this case, plaintiff claims that the Management Projections did not account for future acquisitions, which resulted in a relatively modest forecast. As discussed above, plaintiff cannot show that the Management Projection's omission of growth from acquisitions rendered them inaccurate. However, because the Management Projections did not reflect Harman's stated goal of making new acquisitions, at a

minimum, it is plausible that they were not overly optimistic as the proxy suggested. Third, Hot Topic's revisions to gross revenue were belied by the company's strong improvements in that area in the two preceding years. Id. at *16-17. Harman similarly delivered record revenue in 2016 and had a $24.1 billion backlog. ECF No. 16 at *15. See also Blount, 2017 U.S. Dist. LEXIS 39493, at *13 ("These positive financial indicators provide sufficient, specific reasons to support the allegation that the more optimistic September Projections were more accurate than the more pessimistic November and December Projections."). Fourth and finally, Hot Topic provided only the LRP projections to the buyer, indicating that those projections sufficiently reflected the company's prospects. 2014 U.S. Dist. LEXIS 180513 at *17. Harman likewise only provided the Management Projections to Samsung; the Sensitized Projections were employed solely for the fairness opinion, the board's evaluation of the merger, and the proxy. ECF No. 29-2 at *64.

Defendants liken the case at bar to Hialeah. See 289 F. Supp. 3d 1162. In Hialeah, the defendant company, FEI, had developed two sets of financial forecasts in the course of its 2015 annual financial review and planning process: the Higher Projections and the Lower Projections. Id. at 1167. The Higher Projections were compiled by aggregating department-specific projections provided by managers of business units across FEI.

Id.  The Lower Projections modified the Higher Projections by
"applying adjustments developed by FEI senior management to
reflect FEI group-level dynamics."  Id.   In May 2016, in the
midst of negotiating an acquisition, the FEI board began calling
the Higher Projections unrealistic.  Id. at 1168-69.  The board
provided the Lower Projections to its financial advisor, who
issued an opinion determining that the proposed acquisition was
fair.  Id. at 1169.  The board filed a proxy statement
recommending that shareholders vote to approve the acquisition
and providing both sets of projections.  Id.  The proxy
explained that the Lower Projections were more realistic because
the Higher Projections reflected an upside case across all
business units, which was inconsistent with FEI's past
experience.  Id.  FEI shareholders then brought suit alleging,
among other things, that this statement was false and
misleading.  Id. at 1170.

     The Hialeah court concluded that "the facts stated by
[p]laintiff in this case are not as compelling as those stated
in Hot Topic."  Id. at 1176.  The court distinguished Hot Topic
on two grounds.  First, in Hot Topic the defendants had
developed the more pessimistic set of financial projections on
the eve of the acquisition.  Id.  Second, in Hot Topic the new
projections conflicted with the defendants' public statements
regarding expected growth.  Id.  So too here.  Additionally, in

<u>Hialeah</u>, the FEI board provided a reasonable basis for relying

on the Lower Projections: that it could not realistically expect

each individual business unit to meet its financial goals in any

given year. <u>Id.</u> Here, the proxy simply stated that Harman

management determined, considering the financial advisors'

perspectives, "based on various economic and technological

trends and developments in the industries in which the Company

competes, . . . there existed downside risk that was not

reflected in the Management Projections." ECF No. 29-2 at *62.

This vague explanation for relying on a relatively pessimistic

forecast is far less convincing than one provided by FEI in

<u>Hialeah</u>.[7]

Defendants' reliance on <u>Montanio</u> is similarly unavailing.

<u>See</u> 237 F. Supp. 3d 163. In <u>Montanio</u>, the plaintiffs alleged

that Keurig filed a proxy statement that was false and

misleading, among other things, by assigning a 50% probability

_____

[7] Defendants argue that Paliwal's statements about the August
2016 guidance are further distinguishable because the proxy
specified that, in accordance with the views of its financial
advisors, management determined the Management Projections
reflected downside risk. It is of course plausible that
management could change its view of its own forecasts based on
input from its financial advisors. However, the proxy also
stated that "the Financial Advisors, based on certain
assumptions and directions provided by the Company's management,
prepared for the board certain adjusted projections," i.e. the
Sensitized Projections. ECF No. 29-2 at *62. The financial
advisors' role in determining that the Sensitized Projections
should be developed is thus somewhat unclear from the proxy.

weighting to the success of a new appliance called Keurig Kold. Id. at 168-69.  The court rejected the argument that this statement could be proven objectively false by prior expressions of optimism regarding Keurig Kold's future.  Id. at 173.  But because those statements were made before Keurig Kold was placed on the market, they were purely speculative.  Id.  The court explained that "in Hot Topic, the Revised Projections contained reduced estimates of growth which were contrary to recent stated success," whereas the earlier statements regarding Keurig Kold "were never actually used as a benchmark for the company's success."  Id.  The case at bar is more similar to Hot Topic than it is to Hialeah or Montanio.  Harman achieved record revenue growth in 2016, and used the Management Projections, rather than the Sensitized Projections, as a benchmark prior to filing the proxy.

Given plaintiff's allegations, the inference that defendants wanted to justify creating the Sensitized Projections, thereby making the Samsung acquisition seem fair, is at least as compelling as the explanation provided by the proxy.  Slayton, 604 F.3d at 774.  Taken together, the facts alleged support a strong inference that defendants did not truly believe that the Management Projections contained more downside risk than upside potential.  See 15 U.S.C. § 78u-4(b)(2)(A).

This statement may provide a basis for liability under Section 14(a).

C. Statements that Management Projections Were Not Previously Disclosed

Plaintiff next asserts that the proxy misleadingly indicated that the Management Projections had not been previously released.  She points out that in August 2016 Harman publicly disclosed its organic projections for fiscal years 2017-2019 and 2021, which as discussed were similar to the Management Projections.  Plaintiff alleges that the following statements were therefore false:  (1) "The Company does not as a matter of course make public long-term projections as to future performance . . . ."; (2) "The Projections were prepared for internal use . . . . The Projections were not prepared with a view toward public disclosure."  According to plaintiff, these statements discouraged shareholders from finding the August 2016 organic projections, thereby compounding the proxy's other allegedly misleading statements.  Plaintiff appears to suggest that if a reasonable shareholder had consulted the organic projections, she would have realized that the Management Projections were materially the same, and therefore, (1) did not incorporate growth based on future acquisitions; and (2) did not include more downside risk than likely upside potential.

This claim fails because plaintiff has not pled any facts that would show that the statements related to public disclosure are false and misleading.  15 U.S.C. § 78u-4(b)(1).  That Harman released one set of forecasts in August 2016 does not contradict the statement that the company "does not, as a matter of course, make public long-term projections as to future performance." Plaintiff points to no other occasion on which Harman disclosed such projections.  Although she argues that "as a matter of course" describes an event that is "to be expected as a natural or logical consequence," Harman's one-time release of financial projections does not meet this standard.

Nor has plaintiff sufficiently alleged that the "Projections" were not developed for internal use.  The proxy defines "Projections" to include the Management Projections, the Sensitized Projections, and additional extrapolations associated with each.  Plaintiff has not alleged that this full panoply of forecasts was publicly disclosed at any point.  Plaintiff argues that even if only the Management Projections were previously publicized, the challenged statement would only be half true. However, the complaint does not even allege this much.  The Management Projections included analysis not encompassed by the August 2016 forecast, including, among other things, revenue and EBITDA for fiscal year 2020, depreciation and amortization, and unlevered free cash flow.  ECF No. 29-2 at *63.  Plaintiff has

41

not adequately alleged that the described statements are false
or misleading.

D. J.P. Morgan's Potential Conflict of Interest

Fourth and finally, plaintiff alleges that the proxy
omitted a material fact in describing J.P. Morgan's relationship
with Samsung.  The proxy disclosed that in the two years
previous years, J.P. Morgan and its affiliates had been
compensated for providing certain services to both Samsung and
Harman.

> Such services during such period have included acting
> as joint lead arranger and joint bookrunner on the
> Company's syndicated facility in March 2015, as M&A
> financial advisor to the Company on the Company's
> acquisition of Symphony Teleca in April 2015, as joint
> bookrunner on offerings of debt securities by the
> Company in May 2015, as joint bookrunner on the
> initial public offering of Samsung SDS in October
> 2014, as joint global coordinator and joint bookrunner
> on the initial public offering of Cheil Industries in
> December 2014, as financial advisor to Parent on
> Parent's disposals of equity interests in Samsung
> Techwin and Samsung Chemicals in June 2015 and as
> joint bookrunner on the initial public offering of
> Samsung Biologics in October 2016.

ECF No. 29-2 at *54.  Plaintiff alleges that the proxy omitted a
material fact by neglecting to disclose that J.P. Morgan Asset
Management served as an investment manager for a Samsung
affiliate during the same time period that J.P. Morgan acted as
a financial advisor on the Samsung-Harman deal.  I agree.

The complaint explains that a potential conflict of
interest by J.P. Morgan would be material because J.P. Morgan

conducted the unsuccessful acquisition negotiations with
Company A and prepared a fairness opinion recommending that the
acquisition by Samsung be approved.  "[T]he failure to disclose
even potential conflicts of interest may be actionable under
federal securities law."  IBEW Local 98 Pension Fund v. Cent.
Vt. Pub. Serv. Corp., No. 11-cv-222, 2012 U.S. Dist. LEXIS
36784, at *40 (D. Vt. Mar. 19, 2012) (quoting Kahn, 842 F. Supp.
at 677).  "The relevant inquiry is not whether an actual
conflict of interest existed, but rather whether full disclosure
of potential conflicts of interest has been made."  Wilson, 855
F.2d at 994.

     Defendants argue that the proxy did not fail to disclose a
potential conflict because it stated that J.P. Morgan had
provided services to Harman and Samsung.  Defendants further
assert that by using the word "included" before listing the
services that J.P. Morgan had furnished, the proxy made clear
that the list was not exhaustive.  However, by only listing
engagements that ended before J.P. Morgan issued its fairness
opinion in November 2016, the proxy could have led shareholders
to incorrectly believe that J.P. Morgan had no ongoing business
relationship with Samsung apart from the acquisition.  See ECF
No. 29-2 at *176.  Even assuming that defendants were not
obligated to enumerate all potential conflicts of interest on

the part of their financial advisors, the proxy could be read to suggest, falsely, that no potential conflict currently existed.

The omitted fact was material because "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc. 426 U.S. 438, 449 (1976). Harman shareholders should have been given the opportunity to assess for themselves whether J.P. Morgan's ongoing relationship with Samsung was material. See Wilson, 855 F.2d at 994. To the extent materiality cannot be determined at this stage, it presents a mixed question of fact and law that must be resolved by a jury. See id.; comScore, 268 F. Supp. 3d at 562.

Because the facts alleged support a strong inference that defendants acted negligently in failing to disclose J.P. Morgan's ongoing relationship with Samsung, they are sufficient to state a claim under Section 14(a). See Wilson, 855 F.2d at 987 ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence standard.").[8]

---

[8] Because this claim does not sound in fraud, plaintiff need not satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. comScore, 268 F. Supp. 3d at 557–58.

E. <u>Loss Causation</u>

As discussed, in order to prevail under Section 14(a), plaintiff must allege that the purported violation caused her injury. <u>Montanio</u>, 237 F. Supp. 3d at 170. <u>See also</u> 15 U.S.C. § 78u-4(b)(4) ("[P]laintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."). Defendants argue that plaintiff's claims must be dismissed for the independent reason that she has failed to plead loss causation. I disagree.

Two components of causation are required in a federal securities action: transaction causation and loss causation. <u>Koppel</u>, 167 F.3d at 137. To satisfy transaction causation, a plaintiff must show a material violation of the proxy rules, and that the proxy solicitation was an "essential link" in establishing the unfavorable transaction. <u>See id.</u>; <u>Montanio</u>, 237 F. Supp. 3d at 170. Defendants do not dispute that shareholder approval was required for the acquisition. As such, transaction causation is plainly met. Multiple courts have also found that where, as here, a plaintiff asserts that shareholders were misled into approving an acquisition that undervalued the company, loss causation is adequately alleged. <u>See, e.g.</u>, <u>Precision Castparts</u>, 2017 U.S. Dist. LEXIS 165139, at *9;

Blount, 2017 U.S. Dist. LEXIS 39493, at *32; Hot Topic, 2014
U.S. Dist. LEXIS 180513, at *10.

Loss causation "has often been described as proximate
cause, meaning that the damages suffered by plaintiff must be a
foreseeable consequence of any misrepresentation or material
omission." Castellano v. Young & Rubicam, Inc., 257 F.3d 171,
186 (2d Cir. 2001). In other words, a plaintiff, having
established "reliance" via transaction causation, must also
establish that reasonably foreseeable damages flowed from that
reliance. Id. Here, that means that plaintiff must simply
plausibly allege that the shareholders' approval of the
acquisition damaged her. She has plainly done so. Plaintiff
notes that the Management Projections produced a price of
approximately $116.25 per share, which is greater than the $112
per share that shareholders ultimately received. The lower
price paid to shareholders, plaintiff alleges, is a result of
material omissions or false statements that justified the
production of a weaker set of projections, which, in turn, were
relied upon by a potentially conflicted adviser in producing a
fairness statement that endorsed the $112 price. This is not an
attenuated causal chain that presents a difficult question of
proximate cause. Plaintiff has alleged loss causation.

Defendants cite Minzer v. Keegan to argue that plaintiff
has failed to plead causation because she has not shown that,

but for the alleged violations, a reasonable shareholder would have voted against the acquisition.  See 218 F.3d 144, 149 (2d Cir. 2000).  Minzer, however, provides the definition of materiality, not the standard for loss causation, which is set forth above.  See id. ("[I]n the proxy context this definition of materiality assumes that the omitted information would have influenced a reasonable shareholder against the proposed transaction for which proxies are sought.").

Defendants also rely on Little Gem Life Scis. LLC v. Orphan Med., Inc., in which a complaint was dismissed for failing to plead loss causation where the plaintiff asserted only that, but for the alleged omissions, the shareholders would not have approved the unfavorable transaction.  See No. 06-1377 ADM/ABJ, 2007 WL 541677, at *7 (D. Minn. Feb. 16, 2007).  They ignore the body of more recent case law holding that allegations such as plaintiff's are sufficient to plead loss causation.  As one district court explained in a published decision,

> [Plaintiff] does not set forth his proposed damages model —- he states that the class "suffered damages and actual economic losses . . . in an amount to be determined at trial. . . ."  He sets forth, however a causal chain from the misrepresentations to the transaction, to the alleged damages.  It is not immediately apparent what more a defendant could desire at the pleading stage.

Lane v. Page, 727 F. Supp. 2d 1214, 1231 (D.N.M. 2010).  See also Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d

87, 97-98 (2d Cir. 2001) ("[P]laintiffs may allege . . . loss causation by averring . . . that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction."). Plaintiff has sufficiently pled loss causation.[9]

F. <u>Control Person Liability</u>

Section 20(a) provides liability for any person who directly or indirectly controls any person liable under the Securities Exchange Act. 15 U.S.C. § 78t(a). Plaintiff alleges that the individual defendants were controlling persons of Harman by virtue of their position as directors of the board.

Defendants argue only that Section 20(a) liability cannot lie because plaintiff has failed to state a claim under Section 14(a). Because plaintiff has adequately pled a violation of the securities laws to the extent discussed above, defendants' motion to dismiss the Section 20(a) claim is denied. <u>See</u> <u>Perez</u>

_____

[9] Defendants also suggest that plaintiff should have sought a preliminary injunction prior to the shareholder vote, rather than seeking damages after the fact. They do not, however, dispute that plaintiff has a right to pursue damages at this stage. Additionally, defendants argue that many of plaintiff's allegations smack of corporate mismanagement, which is not actionable under federal securities law. This does not, however, bar plaintiff from relief on the claims that, for reason discussed above, are actionable under Section 14(a).

<u>v. Higher One Holdings, Inc.</u>, No. 3:14-cv-755 (AWT), 2017 U.S.

Dist. LEXIS 156175, at *25-26 (D. Conn. Sept. 25, 2017).

IV.    <u>Conclusion</u>

The motion is granted in part and denied in part.

Plaintiff's claims based on defendants' opinion statement

regarding the Management Projections and J.P. Morgan's potential

conflict of interest may proceed under Sections 14(a) and 20(a)

of the Securities Exchange Act.

So ordered this 3rd day of October 2019.

                              /s/ RNC
                    _____
                         Robert N. Chatigny
                    United States District Judge