UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICIA B. BAUM, Individually    :
and on behalf of all others       :
similarly situated,               :
                                  :
          Plaintiff,              :
                                  :
v.                                :    CASE NO. 3:17-cv-246(RNC)
                                  :
HARMAN INTERNATIONAL              :
INDUSTRIES, INC., et al.,         :
                                  :
          Defendants.             :


MEMORANDUM OF DECISION

    This is an action under the federal securities laws brought

by a former shareholder of Harman International Industries, Inc.

("Harman") individually and on behalf of a proposed class.  The

complaint alleges that Harman's senior management used a false

and misleading proxy statement to solicit support for Harman's

acquisition by Samsung Electronics Co., Ltd. ("Samsung").

Plaintiff seeks compensatory damages for defendants' alleged

violations of Sections 14(a) and 20(a) of the Securities

Exchange Act of 1934 and of Securities and Exchange Commission

Rule 14a-9.

    In 2019, a motion to dismiss the complaint under Rule

12(b)(6) was granted in part and denied in part.  See Baum v.

Harman Int'l Indus., Inc., 408 F. Supp. 3d 70 (D. Conn. 2019).

Prior to that ruling, discovery had been stayed pursuant to the

1

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.
§ 78u-4(b)(3)(B), which imposes an automatic stay of discovery
during the pendency of a motion to dismiss.  Before the stay was
lifted, defendants renewed their request for dismissal of the
remaining claims through the procedural vehicle of a Rule 12(c)
motion for judgment on the pleadings, which has served to extend
the stay.  This memorandum addresses the issues presented in
that motion.

The issues have been extensively briefed.  Most
significantly for present purposes, the parties have briefed the
Second Circuit's summary order in Gray v. Wesco Aircraft
Holdings, Inc., affirming the dismissal of a minority
shareholder's complaint for failure to adequately plead that the
allegedly misleading proxy caused the plaintiff to incur a "non-
speculative economic loss."  847 F. App'x 35, 37 (2d Cir. 2021).
The District Court's opinion in Wesco, see 454 F. Supp. 3d 366
(S.D.N.Y. 2020), has also been the subject of extensive
briefing.

After careful consideration of the parties' submissions, I
am not persuaded that plaintiff's claim should be dismissed.
For reasons discussed more fully below, I continue to believe
that the allegations of the complaint, accepted as true and
viewed most favorably to plaintiff, provide a sufficient basis
for a plausible claim that the proxy was materially misleading.

Plaintiff's complaint is similar in nature to the complaint in
Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991),
where facts developed in discovery led to a plaintiff's verdict.
The judgment was reversed by the Supreme Court on the issue of
causation because the merger did not require the approval of the
minority shareholders and, accordingly, any false statements in
the proxy were not an "essential link in effectuating the
transaction" under the causation test of Mills v. Electric Auto-
Lite Co., 396 U.S. 375, 385 (1970).  See Virginia Bankshares,
501 U.S. at 1102.  Importantly for the present case, the Supreme
Court's opinion provides no reason to doubt that the judgment
awarding damages to the plaintiff would have been sustained if
the merger required the minority's approval.

Defendants contend that Wesco dooms plaintiff's claim
because her theory of economic loss rests on allegations
concerning the inherent value of her Harman shares at the time
of the merger.  Plaintiff responds that the Second Circuit
affirmed the dismissal in Wesco, not because the damages theory
pleaded here is untenable, but because the plaintiff's
allegations in that case were insufficient to plead a non-
speculative claim.  I agree.  Accordingly, the complaint will
not be dismissed.[1]

---

[1] Defendants argue that Harman's poor performance since the
merger undercuts plaintiff's claim, and they submit evidence in

I.   Legal Standard

In support of the present motion, defendants repeat arguments that were made in support of the 12(b)(6) motion and add new arguments.  Insofar as the motion relies on arguments previously considered and rejected, it constitutes, in substance, a motion for reconsideration and will be treated as such.[2]  To the extent it relies on new arguments, it must satisfy the usual standard for a motion for judgment on the pleadings.[3]

support.  Plaintiff responds that defendants' reliance on Harman's post-merger performance implicates disputed issues of fact requiring consideration of matters outside the pleadings that are not subject to judicial notice.  I agree and therefore conclude that the issue of Harman's post-merger performance cannot be considered at this time.

[2] "A motion for reconsideration is 'an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources,' and may be granted only where a court has overlooked 'controlling decisions or factual matters that were put before it on the underlying motion' and which, if examined, might reasonably have led to a different result." Drapkin v. Mafco Consol. Grp., Inc., 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (citations omitted) (quoting In re Initial Public Offering Sec. Litig., 399 F.Supp.2d 298, 300 (S.D.N.Y. 2005) and Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000)).  Motions for reconsideration enable a court to consider an intervening change of controlling law, new evidence, or a need to correct a clear error or prevent a manifest injustice. Bergerson v. N.Y. State Office of Mental Health, 652 F.3d 277, 288-89 (2d Cir. 2011).

[3] Judgment on the pleadings may be granted when "material facts are undisputed and . . . judgment on the merits is possible merely by considering the content of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); see Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., 47 F.3d 14, 16 (2d Cir. 1995).  To survive such a motion, a complaint generally "must contain sufficient factual matter, accepted as true, to 'state a claim

This two-pronged approach comports with that of other district courts in similar circumstances.  See Estep v. City of Somerset, No. 10-286-ART, 2011 WL 845847, at *2 (E.D. Ky. Mar. 8, 2011); see also Aviles v. S&P Global, Inc., No. 17-CV-2987 (JPO), 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020).

## II.  Discussion

A.  Proxy Statement Regarding Management Projections

    1.  The Complaint Sufficiently Alleges a Claim Based on Subjective Falsity

Plaintiff's Section 14(a) claim is based on a statement in the proxy concerning certain projections of Harman's future performance.  The proxy stated: "senior management determined . . . that the Management Projections . . . reflected more downside risk . . . than likely upside potential."   To adequately plead a claim based on this statement, plaintiff must allege facts permitting an inference that the statement was both subjectively and objectively false.  Baum, 408 F. Supp. 3d at 86-87 (quoting Montanio v. Keurig Green Mountain, Inc., 237 F. Supp. 3d 163, 170 (D. Vt. 2017)).  "In other words, the complaint must allege 'that the [d]efendants did not actually

_____

to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  All factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the non-moving party.  Id.

hold the belief or opinion stated, and that the opinion stated was in fact incorrect.'" Id. at 87 (quoting Montanio, 237 F. Supp. 3d at 171).  I concluded at the motion to dismiss stage that the complaint sufficiently alleges both.  Id.

Defendants challenge my holding as to subjective falsity.[4] I again conclude that plaintiff has sufficiently alleged subjective falsity based, in part, on statements made by Harman's Chairman, CEO, and President, Dinesh C. Paliwal, before the proxy was issued, which conflict with the statement in the proxy quoted above.  Prior to the issuance of the prosxy, Paliwal commented on Harman's August 2016 Guidance, which defendants now concede was "virtually identical" to the Management Projections.  In his comments, Paliwal stated that the projections contained in the 2016 Guidance "were 'by far very conservative' and . . . reflected far more upside potential

---

[4] Defendants argue that Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 575 U.S. 175 (2015) requires courts to use a more rigorous standard than the one used in the prior ruling.  ECF No. 89-2 at 24.  Omnicare did not change, and in fact reiterated, the longstanding proposition, set forth in Virginia Bankshares, that the expression of an opinion not honestly held "gives rise to liability under § 14(a) when it is also 'false or misleading about its subject matter.'" Omnicare, 575 U.S. at 189 n.7 (quoting Virginia Bankshares, 501 U.S. at 1096).  The standard used in the 12(b)(6) ruling tracks Omnicare's restatement of the Virginia Bankshares standard for allegations of subjective falsity.

than downside risk."  In addition, he stated that he was "very confident" in Harman's ability to "hit[] the numbers" contained in the 2016 Guidance.  ECF. No. 16 at ¶¶ 10, 59, 70, 72.[5]

Defendants argue that Paliwal's prior statements are not inconsistent with the statement in the proxy.  They assert that what Paliwal described as "by far very conservative" was not the Management Projections generally (or their August 2016

---

[5] Paliwal used the phrase "by far very conservative" in a September 2016 presentation at the RBC Capital Markets Global Industries Conference.  See ECF No. 89-9 (transcript of presentation).  After some opening discussion, the presenter and Paliwal engage in the following exchange:

> JOE SPAK: Right.  And then the other thing you brought up was take rates, which, as you mentioned, have been fairly consistently trending up, about 300 basis points -- this is an industry number -- a year. We agree with you that it seems like at some point there is going to be a more massive inflection there.
>
> And it also seems, and I would be curious to get your point of view, within your guidance range that seems to be -- production you can't control.  I guess take rates you can't really control as well, but it seems like take rates is a big leverage, where you come off of it, for you to maybe do a little bit better than you have guided.  Is there any sensitivity you could give us to maybe what 100 basis points of take rate means for you?
>
> DINESH PALIWAL: Absolutely, and first of all, I reiterate and totally agree with you.  I think our guidance for 2017 or actually outlook for 2021 is by far very conservative, because if you don't believe in autonomous or semi-autonomous experience, that is a different story, but I don't think anybody in this room thinks that we're going to go backward.  I don't think so.

Id. at 5 (emphasis added).

analogues) but rather a single assumption used in developing the projections, specifically, an assumption that industry take rates would grow by 3% a year.  ECF No. 89-2 at 18-19.  Relying on this premise, defendants urge that describing a single assumption as "conservative" is not inconsistent with management's subsequent determination that the overall guidance had more downside risk than upside potential.  Id. at 19, 22.

Defendants' interpretation of Paliwal's statements is unavailing at this juncture.  Despite defendants' assertions to the contrary,[6] the complaint explicitly alleges that the "by far very conservative" language applied to the projections as a whole.  See ECF No. 16 at ¶ 72 ("This . . . statement [in the proxy] is both objectively and subjectively false and conflicts with Paliwal's repeated statements to analysts that the Organic Growth/Management Projections were '*by far very conservative*' and that those same projections reflected far more upside potential than downside risk.").  In assessing the plausibility of this allegation, any ambiguities in Paliwal's statements must be construed in favor of the plaintiff.  Shore v. Charlotte-Mecklenburg Hosp. Auth., 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019) ("A court may consider facts and documents subject to

---

[6] See ECF No. 103 at 3 ("To be clear: Nowhere in her pleading does plaintiff allege that Paliwal described Harman's overall guidance as 'conservative.'").

judicial notice, provided that the court construe such facts in
the light most favorable to the non-moving party."); accord USHA
Holdings, LLC v. Franchise India Holdings Ltd., 11 F. Supp. 3d
244, 270 (E.D.N.Y. 2014) ("At this stage of the litigation,
'documents are construed in the light most favorable to
plaintiff and all doubts are resolved in its favor' . . . ." )
(quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d
Cir. 2014))).  If the statement so construed can reasonably be
read to refer to the Management Projections as a whole, that is
sufficient.

I continue to think such an interpretation is reasonable.
Paliwal's statement that "our guidance for 2017 or actually
outlook for 2021 is by far very conservative" does not
necessarily refer exclusively to take rates, given the broader
context of the discussion, which involved a question about
Harman's midterm guidance.  Indeed, at the time of the 12(b)(6)
motion, defendants described the subject of Paliwal's
characterization more broadly; they noted that "backlog and take
rates . . . were the topics under discussion when Paliwal made
his prior statements.  Compl. ¶ 60 (quoting cautionary language
on backlog and take rates from August 2016 press release.)."
ECF No. 29-1 at 24 (emphasis added).  Furthermore, Paliwal's
statement that he was "very confident" about "hitting the

numbers" (in the projections), can reasonably be interpreted as a reference to more than just take rates.[7]

---

[7] Defendants' reliance on Martin v. Quartermain, 732 F. App'x 37 (2d Cir. 2018) (summary order) is misplaced.  There, as here, the defendant company issued positive projections and later walked them back.  The Second Circuit affirmed the district court's grant of the defendants' motion to dismiss, opining that none of the statements constituted "a material misrepresentation or omission."  Id. at 40.  The case is distinguishable because the plaintiffs in Martin "primarily focused" on the omission theory of liability.  Id. at 41.  Omission-based claims require a different analysis than claims based on subjective falsity.  In addition, the Second Circuit relied on the fact that "all the relevant allegations in the complaint suggest that . . . [the defendant] believed that" the optimistic estimates would prove accurate.  Id. at 40-41.  Among other things, a theory of subjective falsity would have required accepting that the defendant "invested tens of millions of dollars into drilling and associated studies in a venture that it secretly believed would not be profitable."  In re Pretium Res. Inc. Sec. Litig., 256 F. Supp. 3d 459, 478 (S.D.N.Y. 2017), aff'd Martin, 732 F. App'x 37.  Plaintiff's claims in this case are not similarly implausible.

Other cases on which defendant relies are inapposite.  Tongue v. Sanofi was a case about material omissions, not subjective falsity.  816 F.3d 199, 212 (2d Cir. 2016) ("Plaintiffs' case essentially boils down to an allegation that the statements were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections.").  As was Oklahoma Firefighters Pension & Retirement System v. Xerox Corp., 300 F. Supp. 3d 551, 576 (S.D.N.Y. 2018) ("[Plaintiff] does not argue that these statements fall within the first category of opinions Omnicare recognizes as actionable: [Plaintiff] does not allege that Xerox's officers held beliefs other than those they professed, or that the facts embedded in these opinions were untrue."), aff'd Ark. Pub. Emps. Ret. Sys. v. Xerox Corp., 771 F. App'x 51 (2d Cir. 2019).

2.    The Complaint Sufficiently Pleads Fraud

Plaintiff's fraud theory is that Harman's senior management did not actually determine or believe that the Management Projections reflected more downside risk than likely upside potential.  I concluded at the 12(b)(6) stage that this theory is sufficiently supported by the allegations of the complaint. Baum, 408 F. Supp. 3d at 89.  In doing so, I relied on plaintiff's allegations that defendants had a financial incentive to make the acquisition look more attractive.  Id. at 87 (citing Slayton v. Am. Exp. Co., 604 F.3d 758, 776 (2d Cir. 2010) ("[M]otive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 325 (2007)))).

Defendants continue to argue that because Paliwal owned Harman stock, he had no motive to sell the company's shares at a price favorable to Samsung.  However, the complaint alleges that the financial difference between Paliwal's final compensation agreement with Samsung and his compensation with an independent Harman was more than $50 million.  Accordingly, plaintiff adequately alleges that Paliwal "benefitted in a concrete and personal way from the purported fraud."  See Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

In addition to plausibly alleging a financial motive for the alleged fraud, plaintiff plausibly alleges that, in furtherance of the fraud, Harman's senior management arranged for the creation of "Sensitized Projections," which were based on the Management Projections but assumed, without good cause, 25% less growth in revenue and earnings.  The complaint alleges that the Sensitized Projections were developed by Harman's financial advisors based on input from senior management, provided to the Board in connection with its evaluation of the proposed merger, then touted in the proxy as a "Reason[] for the Merger."

Defendants cite Wesco but that case differs from this one in two key respects.  Unlike plaintiff here, the plaintiff in Wesco failed to plausibly allege motive on the part of the CEO to complete a transaction at the expense of shareholders.  454 F. Supp. 3d at 396.  And, although Wesco's management updated its Initial Projections with a more pessimistic set of projections (as here), those changes were preceded by a series of negative developments that rendered the Initial Projections obsolete.  Id. at 397.  As a result, "[t]he sets of statements and reports [we]re not contradictory but can be easily reconciled."  Id. at 398.[8]

---

[8] These same distinctions exist with regard to defendants' other cases.  In In re Analogic Corp. Shareholder Litigation,

3.   The Statement in the Proxy Is Not Protected by the
     PSLRA's Safe Harbor

Defendants continue to rely on the PSLRA's safe harbor for
forward-looking statements as a bar against liability.  In their
view, the statement at issue - that the Management Projections
"reflected more downside risk . . . than likely upside
potential" – is a perfect example of a forward-looking statement
under the statute.  I considered and rejected this argument at
the 12(b)(6) stage.  Baum, 408 F. Supp. 3d at 86.  Accordingly,
I review that decision for clear error.  See Bergerson, 652 F.3d
at 288-89.

The PSLRA provides in relevant part that "a person . . .
shall not be liable with respect to any forward-looking
statement . . . if and to the extent that" the statement is

---

the plaintiff failed to plead "any facts that would demonstrate
that the [pessimistic] projections were not actually the most
reliable."  No. 18-cv-11301-ADB, 2019 WL 4804800, at *10 (D.
Mass. Sept. 30, 2019).  The Analogic defendants offered explicit
statements "describing the Company's previous failures in
meeting projections," including repeated disappointments
relative to each of the four previous operating plans.  Id. at
*11.  Furthermore, the defendants' interests apparently aligned
with that of the shareholders.  Id. at *13.  Similarly, in Golub
v. Gigamon Inc., a more pessimistic set of projections was
created only after "what [the company] acknowledged was a
surprisingly poor Q3 2017."  372 F. Supp. 3d 1033, 1051 (N.D.
Cal. 2019).  In this case, defendants point to no intervening
changes in the company's economic situation that prompted the
Sensitized Projections.

"identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1).  Under the Act's definition, a "forward-looking statement" includes "any statement of the assumptions underlying or relating to" an otherwise defined forward-looking statement such as a "statement of future economic performance," or a "statement containing a projection of . . . earnings."  Id. § 78u-5(i)(1).  Defendants have the burden of proving that a statement falls within the safe harbor.  Golesorkhi v. Green Mountain Coffee Roasters, Inc., 973 F. Supp. 2d 541, 554 (D. Vt. 2013).

Defendants argue that the statement in the proxy concerning the Management Projections is protected because it constitutes (a) a statement of "future economic performance," (b) "a statement containing a projection of . . . earnings," or (c) a "statement of the assumptions . . . relating to" either a statement of future economic performance or a statement containing a projection of earnings.  I continue to think that the statement is not protected by the safe harbor.

The statement at issue – in full, "the Company's senior management determined . . . that the Management Projections currently reflected more downside risk . . . than likely upside

14

potential" – does not fall within the bounds of the safe harbor.
Defendants focus on the latter half of the statement and argue
that it is a statement of "the assumptions underlying or
relating to" the Management Projections, which were themselves
unquestionably forward-looking.  But focusing on the dependent
clause mistakes the nature of the statement and the claim.  The
statement makes one clear assertion of historical fact: that
"the Company's senior management determined" something.
Management literally <u>made a determination</u>.  As plaintiff's
counsel pointed out during oral argument, this can easily be
proven – or not – at trial.  <u>See</u> <u>Omnicare</u>, 575 U.S. at 183 ("A
fact is 'a thing done or existing' or '[a]n actual happening.'"
(alteration in original) (quoting Webster's New International
Dictionary 782 (1927))).

The statement also implies that Harman's senior management,
at the time of the statement, actually held a certain belief
about the Management Projections: that they "currently"
contained more downside risk than likely upside potential.  This
statement, professing management's opinion at the time the
statement was made,

> does not depend on the occurrence of future events.  An
> opinion is false for the purposes of securities fraud if
> the speaker disbelieves the opinion ("subjective
> falsity") and if it is objectively unreasonable at the
> time spoken ("objective falsity").  Statements of
> present opinion do not implicate the policy rationales
> underlying the safe harbor because future events cannot

render them false – they are true or false at the moment
spoken.

Wendy Gerwick Couture, <u>Mixed Statements: The Safe Harbor's Rocky
Shore</u>, 39 Sec. Reg. L.J. 257, 265 (2011).

Defendants rely on cases that express concern about
excluding from the safe harbor statements of present belief in
the accuracy of projections.  <u>See</u> <u>Wesco</u>, 454 F.Supp.3d at 389
("Expressing confidence or lack thereof in a given projection is
not different from making a projection." (quoting <u>Golub</u>, 372 F.
Supp. 3d at 1048)).  That concern merits careful consideration
under the PSLRA.  But it need not be dispositive when a forward-
looking statement in a proxy encompasses a false statement of
historical fact in furtherance of an alleged fraud.  <u>See</u> <u>NECA-
IBEW Health & Welfare Fund v. Pitney Bowes Inc.</u>, No. 3:09-cv-
01740 (VLB), 2013 WL 1188050, at *17 (D. Conn. Mar. 23,
2013)(collecting cases).

B.   <u>The Complaint Adequately Pleads Loss Causation</u>

As stated at the outset, I agree with plaintiff that
defendants' reliance on the Second Circuit's summary order in
<u>Wesco</u> is misplaced.  In <u>Wesco,</u> the plaintiff alleged

> that the Proxy misleadingly portrayed Wesco's future
> financial performance and valuation in a depressed
> light in order to induce shareholders to approve the
> inadequate merger consideration ($11.05 per Wesco
> share) offered by [the buyer].  According to [the
> plaintiff], Wesco shareholders suffered an economic
> loss based on the difference between the merger
> consideration and the intrinsic fair value of the
> shares.

Wesco, 847 F. App'x at 36.  The District Court held that the plaintiff failed to adequately plead loss causation; the Second Circuit affirmed.  Id. at 37.

As the Second Circuit explained, although research analysts had estimated that bidders might offer Wesco substantially more than the merger consideration, the analysts' estimates were insufficient to establish loss causation in light of "contradict[ory]" allegations that several potential buyers, with access to confidential information, "in fact offered" bids well below the amount of the estimates.  Id.  The Second Circuit was also unpersuaded that Wesco's Initial Projections of future financial performance, prepared by the company when it started to explore a merger, reflected a higher "implied value of Wesco's shares."  Id.  The court noted that the complaint failed "to allege that the Initial Projections were sufficiently likely, or that shareholders faced a genuine choice 'between the Merger and the achievement of the Initial [] Projections.'"  Id. (alteration in original).  The court concluded that the Initial Projections were not "sufficiently likely" only after considering the surrounding circumstances in their totality. See id. at 38 (noting that Wesco had a long history of financial underperformance and that 13 out of 14 potential acquirers lost interest in Wesco).

17

The allegations here are materially different.  Plaintiff alleges that Harman received an offer to pay a higher price than Samsung paid; Harman's exclusivity arrangement with Samsung prevented solicitation of other bids; and Harman did not underperform prior to the merger agreement with Samsung.  Only one of the allegations in Wesco has an analogue here – Wesco's stock traded below the deal price before the merger's announcement.  But merger announcements typically are followed by a rise in price, as plaintiff points out.

Defendants contend that after Wesco, a minority shareholder cannot recover damages based on the "inherent" value of her shares at the time of the merger because such a claim is "too speculative."  However, in cases brought by minority shareholders who have been cashed-out as a result of a merger, courts have applied a measure of damages that compares the value of what the plaintiff received and the fair value of the shares.[9]

---

[9]  The Supreme Court has stated that the correct measure of "actual damages" for violations of the Exchange Act is "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct."  Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972) (referring to 15 U.S.C. § 78bb(a)(1), which limits recovery for Exchange Act violations to "actual damages").  The Court's statement could be interpreted to mean that a minority shareholder who has been cashed-out must prove that the acquiring company (or another bidder) was prepared to pay a higher price for the shares.  But the Court's statement has not been read that narrowly.  Instead, minority shareholders have been able to recover the difference between the merger price and the "fair value" of the shares

18

In Virginia Bankshares, for example, the minority shareholder relied on this measure of damages in seeking compensation measured by the difference between the merger price and the fair value of his shares at the time of the transaction, which the trier of fact found to be $18 per share.[10]   501 U.S. at 1089. The Supreme Court's opinion reversing the judgment expresses no disagreement with permitting the trier of fact to use this measure of damages in a proper case.

Nor does the Second Circuit's summary order in Wesco state or imply that the measure of damages used in Virginia Bankshares is an improper method of determining actual damages in this context.  Rather, as the summary order explains, the complaint's allegation that the shares were intrinsically worth more than the merger price was "too speculative to plead economic loss." 847 F. App'x at 37.  Viewed in light of the allegations of the complaint, the court's holding is unremarkable.  In fraud actions, like any other, "[r]ecovery of damages will not be allowed when the evidence leaves the existence of damages uncertain or speculative."  22 Am. Jur. 2d § 339.  The holding

---

without having to prove what a third party would have paid to acquire the company.  This measure of damages corresponds to the out-of-pocket theory of damages that applies when a seller sues a buyer for fraudulent inducement.

[10] The jury's award appears to have been based on the book value of the bank's real estate assets at the time of the merger.

in Wesco that the plaintiff's allegation of intrinsic value was too speculative is plainly based on the particular facts alleged there, as is typically the case when the court chooses to dispose of an appeal by summary order.

Defendants seem to suggest that any claim for damages based on projections should be rejected because projections by their nature involve speculation.  However, projections are used in appraisal litigation under state statutes requiring "fair value" to be determined in light of "all relevant factors," Del. Code Ann. tit. 8, § 262, using "concepts and methods then customary in the relevant securities and financial markets."  N.Y. Bus. Corp. Law § 623.  See Ronald J. Colombo, § 7:4, Law of Corporate Officers & Directors: Rights, Duties, & Liabilities (2021-2022). Commentators have strongly criticized the inefficiency of statutory appraisal litigation, which has given rise to "appraisal arbitrage" – "a trading and litigation strategy that is predicated on deal dissenters receiving appraisal remedies in excess of the deal prices from which they dissent."  William J. Carney & Keith Sharfman, The Death of Appraisal Arbitrage: Ending Windfalls for Deal Dissenters, 43 Del. J. Corp. L. 61 (2018).  But Wesco does not preclude reliance on projections to raise a triable issue of "fair value" in litigation under section 14(a).

The language of the summary order is instructive.  The
Second Circuit rejected the plaintiff's <u>claim</u> as "too
speculative" because it was predicated on projections that were
not "<u>sufficiently</u> likely."  This language implies that a claim
should not be rejected as "too speculative" when it takes
account of projections that <u>are</u> "sufficiently likely."
Defendants have not shown that the Management Projections fail
this test.  In the absence of such a showing, plaintiff's
allegations provide a sufficient basis for pleading a non-
speculative claim.

In addition to their arguments based on <u>Wesco</u>, defendants
argue that "plaintiff must 'specifically assert[] a causal
connection between the concealed information' and her inability
to receive more than $112 per share."  ECF No. 89-2 at 37
(emphasis omitted) (quoting <u>Emergent Cap. Inv. Mgmt., LLC v.
Stonepath Grp., Inc.</u>, 343 F.3d 189, 198 (2d Cir. 2003)).
Defendants' argument is unavailing because plaintiff's primary
claim does not rely on any "concealed information."  Rather, the
complaint alleges that Harman's senior management fraudulently
induced the Board and shareholders to believe that the
Management Projections were overly optimistic when, in reality,
Harman's senior management believed them to be either correct or
conservative.  As a result, shareholders were misled into
ratifying a sale at a price that undervalued the company's

shares.  The "risk that caused the loss," as alleged, is the "risk" that the Management Projections were basically correct or actually pessimistic.  That "risk" fell "within the zone of risk" created by defendants' alleged misrepresentation that they believed the Management Projections were overly optimistic.

Emergent Capital discusses Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001), in a way that lends support to plaintiff's damages theory.  In Suez Equity, the plaintiffs not only alleged "a disparity between the price they had paid for the company's securities and the securities' 'true' value at the time of the purchase," importantly, they also "asserted a causal connection between the concealed information — i.e., the executive's history — and the ultimate failure of the venture."  Emergent, 343 F.3d at 198.  Put differently, the plaintiffs successfully pleaded that (1) the defendants concealed a lack of managerial ability, which led the plaintiffs to purchase the security, and (2) the same lack of managerial ability harmed the plaintiffs by causing loss.  Here, plaintiff similarly alleges that Harman's senior management (1) misrepresented the Management Projections as having more downside risk than upside potential, and (2) the misrepresentation was damaging to her because it resulted in approval of the merger at a price below the fair value of her shares.

C.   <u>Claims Against Independent Directors</u>

Defendants seek dismissal of the claims against the individual directors, arguing that the complaint "is totally devoid of <u>any</u> facts about these nine men and women – let alone particularized facts suggesting that they committed fraud."[11] ECF No. 89-2 at 39.  Plaintiff responds that because she has pleaded a knowing misrepresentation by Paliwal, she need only plead negligence as to the directors, and that their signatures on the proxy demonstrate negligence under <u>Wilson v. Great American Industries, Inc.</u>, 855 F.2d 987 (2d Cir. 1988).

Plaintiff is correct.  Her § 14(a) claim is predicated on Paliwal's allegedly fraudulent conduct, and because she satisfies the heightened pleading burden as to him, her claims against the outside directors require her to plead only negligence.  "[N]egligence is not a state of mind," <u>Beck v. Dobrowski</u>, 559 F.3d 680, 682 (7th Cir. 2009), so plaintiff need not "state with particularity facts giving rise to a strong inference that the [director] defendant[s] acted with the required state of mind," <u>see</u> 15 U.S.C. § 78u-4(b)(2)(A); <u>accord Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.</u>, 268 F. Supp.

---

[11] Because I conclude the § 14(a) claim survives, the § 20(a) control-person liability claim against the director defendants also remains viable.  <u>See</u> <u>Baum</u>, 408 F. Supp. 3d at 93.  The remainder of this section addresses defendants' arguments about the § 14(a) claims against the outside directors.

3d 526, 559 (S.D.N.Y. 2017) (rejecting argument that claims of
negligence are subject to the PSLRA's elevated pleading
standard).  The complaint states the "circumstances constituting
fraud" with particularity, so plaintiff's allegations that the
directors prepared and disseminated a proxy containing a
misleading statement are sufficient.  See Wilson, 855 F.2d at
995; Dekalb Cnty. Pension Fund v. Transocean Ltd., 817 F.3d 393,
408 n.90, 409 (2d Cir. 2016).

D.    The Complaint Sufficiently Pleads that the Proxy Omitted a
      Material Fact Concerning J.P. Morgan's Relationship with
      Samsung

     Defendants also move for judgment on the pleadings as to
plaintiff's other surviving claim: that the proxy was false and
misleading by omitting a material fact relevant to a potential
conflict of interest on the part of J.P. Morgan, which
recommended that shareholders approve the acquisition.  In my
prior opinion, I stated: "Plaintiff alleges that the proxy
omitted a material fact by neglecting to disclose that J.P.
Morgan Asset Management served as an investment manager for a
Samsung affiliate during the same time period that J.P. Morgan
acted as a financial advisor on the Samsung-Harman deal.  I
agree."  Baum, 408 F. Supp. 3d at 91.  This conclusion was not
clear error under the standard for reconsideration.

     Defendants argue that the proxy was not misleading because
(1) it facially purports to disclose only conflicts between J.P.

24

Morgan and its affiliates and "Samsung," and does not extend its disclosure to "Samsung affiliates"; (2) the Samsung affiliate at issue here is a subsidiary of a "completely separate entity," Samsung Life Insurance Co., Ltd.; (3) plaintiff has failed to demonstrate why a reasonable stockholder would care about this potential conflict, in part because Lazard also provided fairness opinions; and (4) plaintiff fails to adequately plead negligence.  I take these arguments in turn.

As to the first and second arguments, defendants are correct that the plain text of the proxy purports to disclose only relationships between J.P. Morgan and its affiliates, on the one hand, and "Samsung," as defined by the proxy to mean "Samsung Electronics, Co., Ltd," on the other.  No mention of Samsung affiliates is made.  However, the proxy subsequently discloses relationships between J.P. Morgan or its affiliates and Samsung entities separate from Samsung Electronics Co., Ltd., thereby suggesting that the proxy will be honest and complete about J.P. Morgan's relationships with its affiliates. The alleged omission to disclose the concurrent relationship with a subsidiary of Samsung Life Insurance Co. might well prove insufficient to support recovery.  Viewed in a plaintiff-friendly manner, however, it is marginally sufficient to support a claim.

Defendants' third argument – that Lazard issued a separate
fairness opinion – does not merit reconsideration because the
complaint alleges that J.P. Morgan played a special role above
and beyond the role played by Lazard, all while operating under
an undisclosed potential conflict of interest.

Defendants' fourth argument, that plaintiff fails to
sufficiently plead negligence because the proxy merely repeated
the list of conflicts provided by J.P. Morgan, is also
unavailing at this point.  The Second Circuit's decision in
Wilson holds that preparation of a proxy containing a material
omission is negligent.  855 F.2d at 995; see Dekalb, 817 F.3d at
409 (reiterating same).  It is not clear that more is required
to adequately allege a negligence claim in this case.  See
comScore, 268 F. Supp. 3d at 560, 562 (recounting the Wilson
standard and describing it as a "low bar").  Defendants' broader
arguments about materiality are mixed questions of law and fact
not appropriate for resolution on the pleadings.  See Baum, 408
F. Supp. 3d at 91.

## III.  Conclusion

For the foregoing reasons, the motion for judgment on the
pleadings has been denied.

Dated: December 14, 2021.

26

_____
　　　　　Robert N. Chatigny
United States District Judge